**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS – CONNECTICUT and MAKE THE ROAD NEW YORK, | |
| *Plaintiffs*, | Civil Action No. 3:17-cv-1061 |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF THE FREEDOM OF INFORMATION ACT, 5 U.S.C. § 552** *et. seq.* |
| U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, and U.S. DEPARTMENT OF STATE, | |
| *Defendants*. | |

This action seeks to enhance public understanding of an urgent concern: discrimination in immigration enforcement against Muslims, Latinos, and other members of disfavored groups by the U.S. Department of State ("DOS") and the U.S. Department of Homeland Security ("DHS"). The contemporary importance of this issue is no accident. Throughout the 2016 presidential campaign, then-candidate Donald J. Trump asserted he would ban all Muslims, including refugees fleeing war-torn regions of the world, from entering the United States. Candidate Trump also perpetuated harmful and racially charged stereotypes about Mexican and other Latino immigrants, to whom he referred as murderers, rapists, and "bad hombres." He subsequently called for "extreme vetting" of immigrants. In his first week in office, President Trump continued his anti-immigrant and anti-refugee rhetoric and moved promptly to issue a thinly veiled "Muslim Ban" executive order that indefinitely blocked Syrian refugees from entering the United States, suspended all refugee admissions for 120 days, and prohibited individuals from seven predominantly Muslim countries from entering the United States for 90

days. Numerous lawsuits challenging the order's constitutionality were swiftly brought, and courts around the country preliminarily enjoined that ban. Undaunted, the Administration replaced it with a second executive order, which multiple courts again enjoined. During this time, protests erupted at airports across the country, and media coverage focused on allegations and instances of discrimination in immigration enforcement. The same day he signed the second Muslim Ban executive order, the President issued a memorandum directing the Secretaries of State and Homeland Security to develop procedures for "enhanced vetting" for applications for visas and immigration benefits. Since then, however, the Trump Administration has disclosed little information concerning its policies and practices regarding targeted immigration enforcement.

These events and concerns directly implicate the work of the Plaintiff nonprofit organizations, the Council on American-Islamic Relations – Connecticut ("CAIR-CT") and Make the Road New York ("MRNY") (together, "Plaintiffs"). Plaintiff CAIR-CT endeavors to enhance the public's understanding of Islam, while Plaintiff MRNY strives to empower immigrant and working-class communities. As a critical component of its work, each Plaintiff disseminates information through publications, educational sessions, and electronic communications.

In furtherance of their missions, on April 12, 2017 Plaintiffs submitted three specific and narrow requests pursuant to the Freedom of Information Act, 5 U.S.C. § 552 *et seq.*, as amended ("FOIA"), to U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Department of State ("DOS") (collectively, "Defendants"). The requests seek disclosure of agency policies, communications, and statistics related to visa processing and visa issuances for individuals applying abroad; to adjudication of entry document

applications; and to screening and searching of individuals arriving at U.S. ports of entry. The requests are not limited to policies, communications, and statistics produced pursuant to, or as a result of, the President's travel ban orders, but encompass immigration enforcement policies broadly. Plaintiffs are concerned that in recent months, either as a result of the travel ban orders or otherwise, Defendants have been targeting individuals based on their actual or perceived religion, ethnicity, race, national origin, and/or other group identity for special treatment with respect to entry document applications, visa processing, and screening of individuals arriving at U.S. ports of entry. Plaintiffs also sought expedited processing and waiver of fees on multiple grounds.

Despite the intense and justified public scrutiny surrounding these issues, the Defendants failed to timely respond to Plaintiffs' requests. Instead, over 60 days after Plaintiffs submitted their FOIA requests, Defendants have failed to disclose a single record. Plaintiffs accordingly bring this action pursuant to FOIA for declaratory and injunctive relief, seeking to compel the disclosure and release of urgently needed records that Defendants have improperly withheld from public scrutiny.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to the FOIA, 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. § 1331.

2.      Venue properly lies in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(e) and 1402(a)(2), as Plaintiff CAIR-CT's principal place of business is in the District of Connecticut.

## PARTIES

Plaintiff CAIR-CT

3.      CAIR-CT is a non-profit 501(c)(3) organization dedicated to presenting an

Islamic perspective on issues of importance to the American public.

4.      CAIR-CT's mission is to enhance the public's understanding of Islam, encourage

dialogue, protect civil liberties, empower American Muslims, and build coalitions that promote

justice and mutual understanding. CAIR-CT works to promote civil rights by mediating on

behalf of Muslims who have experienced discrimination, helps elected officials to understand

policy issues related to Islam and Muslims, and monitors legislation and government activities.

As the Connecticut chapter of a national organization, CAIR-CT specifically works on behalf of

Connecticut's more than 150,000 Muslim residents, many of whom would be affected by the

requested policies and practices.

5.      As part of its policy advocacy and monitoring of news media and public policy,

CAIR-CT publishes news and alerts regarding issues affecting the Muslim community, including

"Action Alerts" and press releases regarding legal issues affecting Muslims. CAIR-CT also

conducts trainings and educational workshops addressing interactions with law enforcement and

other government officials, including conducting regular trainings at local mosques and Islamic

centers throughout Connecticut that aim to educate people on issues affecting the Muslim

community. CAIR-CT also works with local and national media to ensure that an accurate image

of Islam and Muslims is presented to the American public.

6.      CAIR-CT's office and principal place of business is in Hartford, Connecticut.

Plaintiff MRNY

7.      MRNY is a non-profit, membership-based 501(c)(3) organization dedicated to

empowering immigrant, Latino, and working-class communities in New York City. MRNY has

more than 19,000 dues-paying members residing in New York City and Long Island, many of whom would be affected by the requested policies and practices.

8.      MRNY's mission includes educating the public about civil rights issues affecting working-class and immigrant communities through electronic newsletters, reports, fact sheets, trainings, curricula, classes, and other educational and informational material. MRNY also disseminates information and analyses on pending and proposed legislation and mobilizes community members to advocate to their legislators.

9.      MRNY also engages in organizing and public-policy advocacy efforts, including research on issues affecting the community it serves as well as substantial outreach to policymakers and the media. MRNY regularly conducts research and publishes reports, fact sheets, and other informational material on issues important to the immigrant, Latino, and working class communities it serves. Additionally, MRNY frequently releases media statements, and disseminates information about local, state, and national issues to its thousands of members and to the public at large.

10.     MRNY's office and principal place of business is in Brooklyn, New York.

Defendants

11.      USCIS is an agency within DHS, which oversees lawful immigration to the United States with the stated mission of securing America's promise as a nation of immigrants. This includes the processing of visa petitions and applications for various immigration benefits. USCIS is an agency within the meaning of 5 U.S.C. § 552(f), and is in possession of, and exerts control over, records responsive to Plaintiffs' FOIA request to it.

12.     CBP is an agency within DHS with the primary mission of detecting and preventing the unlawful entry of persons and goods into the United States. CBP officials conduct

inspections at ports of entry of immigrants seeking to enter the United States. CBP is an agency within the meaning of 5 U.S.C. § 552(f), and is in possession of, and exerts control over, records responsive to Plaintiffs' FOIA request to it.

13.     DOS is a cabinet department of the United States federal government with the mission of shaping and sustaining a peaceful, prosperous, just, and democratic world and fostering conditions for stability and progress. DOS conducts consular interviews of visa applicants and decides whether to approve or deny visa applications. DOS is an agency within the meaning of 5 U.S.C. § 552(f), and is in possession of, and exerts control over, records responsive to Plaintiffs' FOIA request to it.

## STATEMENT OF FACTS

Discriminatory Policies and Practices in Border Screening, Visa Petitions and Visa Applications Under President Trump

14.     Throughout the 2016 presidential campaign, then-candidate Donald J. Trump repeatedly "called for a total and complete shutdown of Muslims entering the United States." Press Release, Donald J. Trump for President, Inc., Donald J. Trump Statement on Preventing Muslim Immigration (Dec. 7, 2015). Candidate Trump also advanced racially charged stereotypes about individuals of Mexican heritage. *See, e.g.*, Donald J. Trump, Presidential Campaign Announcement (June 16, 2015) ("When Mexico sends its people, they're not sending their best. . . . They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people.").

15.     On January 27, 2017, President Donald J. Trump issued an executive order ("EO1") that indefinitely blocked Syrian refugees from entering the United States, barred all refugee admissions for 120 days, and prohibited individuals from seven predominantly Muslim

countries—Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen—from entering the United

States for 90 days. Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Feb. 1, 2017).

16.     The order spread chaos at international airports across the country. Large groups

of people gathered at several airports to protest EO1. Because the president gave little to no

guidance as to the implementation of the order, CBP officers at the border were in the dark as to

how to proceed with their duties and, when confronted with individuals from the seven listed

countries attempting to enter the United States on validly issued visas, were left to guess as to

who was admissible and who was not. *See* Jonathan Allen & Brendan O'Brien, *How Trump's*

*Abrupt Immigration Ban Sowed Confusion at Airports, Agencies*, Reuters (Jan. 29, 2017),

http://www.reuters.com/article/us-usa-trump-immigration-confusion-idUSKBN15D07S. By the

following day, January 28, 2017, CBP officials across the country had detained hundreds of

people arriving at airports throughout the United States. Laura Jarrett, *More Than 700*

*Foreigners Held Over First Weekend of Travel Ban*, CNN (Feb. 24, 2017),

http://www.cnn.com/2017/02/23/politics/700-detained-travel-ban-weekend/.

17.     On the evening of January 28, 2017, following the filing of a nationwide class

action, the U.S. District Court for the Eastern District of New York issued a nationwide order

prohibiting the government from removing from the United States pursuant to EO1 any detained

travelers, including refugees and nationals of the seven enumerated countries, who had been

legally authorized to enter the United States. Decision and Order, *Darweesh v. Trump*, No. 17

Civ. 480 (AMD) (E.D.N.Y. Jan. 28, 2017).

18.     On February 3, 2017, the U.S. District Court for the Western District of

Washington issued a nationwide order suspending enforcement of several provisions of EO1.

Temporary Restraining Order, *Washington v. Trump*, No. C17-0141JLR (W.D. Wash. Feb. 3,

2017). Days later, the Ninth Circuit Court of Appeals—construing the temporary restraining order as a preliminary injunction—denied the government's motion to stay the injunction pending appeal. *Washington v. Trump*, 847 F.3d 1151, 1155 (9th Cir. 2017), *reconsideration en banc denied*, 853 F.3d 933 (9th Cir. 2017).

19.     In response, President Trump issued a new executive order ("EO2") on March 6, 2017, which revoked EO1; banned travel from six of the same seven predominantly Muslim countries (removing Iraq) for a period of at least 90 days; and suspended the refugee program for a period of at least 120 days. Exec. Order No. 13,780, 82 Fed. Reg. 13209 (Mar. 6, 2017). The order was scheduled to go into effect on March 16, 2017 and was meant to ban travel while the administration implemented an "extreme vetting" program. *See* S.A. Miller & Dave Boyer, *Trump Signs New Extreme Vetting Order*, Wash. Times (Mar. 6, 2017), http://www.washingtontimes.com/news/2017/mar/6/trump-sign-new-extreme-vetting-order/.

20.     In addition to the two travel ban orders, President Trump also issued a memorandum instructing the Department of Homeland Security and the State Department, in consultation with the Attorney General, to "implement protocols and procedures" to "enhance the screening and vetting of applications for visas and all other immigration benefits." Memorandum from the President to the Sec'y of State, the Att'y Gen., and the Sec'y of Homeland Sec. (Mar. 6, 2017), https://www.whitehouse.gov/the-press-office/2017/03/06/memorandum-secretarystate-attorney-general-secretary-homeland-security. Defendant DOS has instituted new security measures pursuant to that memorandum. *See, e.g.*, Notice of Information Collection Under OMB Emergency Review: Supplemental Questions for Visa Applicants, 82 Fed. Reg. 20,956 (May 4, 2017).

21.     Prior to EO2 taking effect, federal district courts in Hawaii and Maryland granted a preliminary injunction against enforcement of the sections affecting travel and refugees, finding that the order was likely motivated by discriminatory animus against Muslims. *Hawai'i v. Trump*, ___F. Supp. 3d ___, 2017 WL 1011673 (D. Haw. Mar. 15, 2017); *Int'l Refugee Assistance Project v. Trump*, __F. Supp. 3d ___, 2017 WL 1018235 (D. Md. Mar. 16, 2017).

22.     The Fourth Circuit, sitting en banc, has largely affirmed the preliminary injunction granted by the District of Maryland, holding, *inter alia*, that the plaintiffs were likely to succeed on the merits of their Establishment Clause claim because "the reasonable observer would likely conclude that EO-2's primary purpose is to exclude persons from the United States on the basis of their religious beliefs." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 2017 WL 2273306, at *24 (4th Cir. May 25, 2017) (en banc).

23.     Similarly, on June 12, 2017, the Ninth Circuit largely affirmed the preliminary injunction granted by the District Court of Hawaii, holding, *inter alia*, that the plaintiffs were likely to succeed on the merits of their statutory claims that EO2 did not make "sufficient finding that the entry of these classes of people would be 'detrimental to the interests of the United States'" and that it runs afoul of other provisions of the INA that prohibit nationality-based discrimination and require the President to follow a specific process when setting the annual cap on the admission of refugees." *Hawai'i v. Trump.*,___ F.3d ___, 2017 WL 2529640, at *1 (9th Cir. June 12, 2017).

24.     On June 1, the government sought certiorari, *see* Pet. for a Writ of Certiorari, *Trump v. Int'l Refugee Assistance Project*, No. 16-1436 (June 1, 2017), as well as a stay pending the disposition of the petition for a writ of certiorari, *see* Application for Stay, *Trump v. Int'l*

*Refugee Assistance Project*, No. 16A1190 (June 1, 2017); *see also* Application for Stay, *Trump v. Hawai'i*, No. 16A1191 (June 1, 2017).

25.     On June 26, 2017, the Supreme Court granted certiorari and granted the Government's applications to stay the Fourth and Ninth Circuits' injunctions, to the extent they prevented enforcement of §2(c) with respect to foreign nationals who lack any "bona fide relationship with a person or entity in the United States." *Trump v. Int'l Refugee Assistance Project*, ___ U.S. ___ (June 26, 2017) (per curiam).

26.     Despite the lower court decisions blocking implementation of the executive orders, news organizations have reported that Muslim travelers and travelers from Muslim-majority countries, both U.S. citizens and non-citizens, have been detained and interrogated about their religious beliefs at U.S. airports. *See, e.g.*, Alex Kane, *Even Muslim-American Citizens Have Been Caught in the Net of Trump's Travel Ban*, Nation (Mar. 23, 2017), https://www.thenation.com/article/even-muslim-american-citizens-have-been-caught-in-the-net-of-trumps-travel-ban/. Civil liberties advocacy organizations report that CBP has subjected Muslim travelers and travelers from Muslim-majority countries at ports of entry to additional questioning and demanded that they unlock phones and other electronic devices for search. *See, e.g.*, Emanuella Grinberg & Jay Croft, *American NASA Scientist Says His Work Phone Was Seized at Airport*, CNN (Feb. 15, 2017), http://cnn.it/2klWgMd. Other news outlets cite evidence that the executive orders, though suspended, have emboldened federal officers to act more aggressively towards individuals seeking visas or admission to the United States. *See* Nicholas Kulish, Caitlin Dickerson & Ron Nixon, *Immigration Agents Discover New Freedom to Deport Under Trump*, N.Y. Times (Feb. 25, 2017), http://nyti.ms/2mie63i.

27.     Although much discrimination at airports has targeted Muslims and those perceived to be Muslim, individuals of other backgrounds have also reported additional scrutiny, possibly due to other forms of profiling. *See, e.g.*, Ivan Espinoza-Madrigal, *Airports: The Next Racial Profiling Frontier*, Huffington Post (Mar. 04, 2017), http://www.huffingtonpost.com/entry/airports-the-next-racial-profiling-frontier_us_58d045abe4b07112b64730d2 (describing experience of suspected racial profiling by CBP at Boston Logan Airport); Spencer Ackerman, *TSA Screening Program Risks Racial Profiling Amid Shaky Science – Study*, Guardian (Feb. 8, 2017), https://www.theguardian.com/us-news/2017/feb/08/tsa-screening-racial-religious-profiling-aclu-study (describing internal Transportation Security Administration documents "indicat[ing] a substantial focus on Arabs, Muslims, and Latinos, despite repeated TSA assurances that [DHS] does not profile travelers based on ethnicity, race, or religion").

Plaintiffs' FOIA Request to CBP

28.     On April 12, 2017, Plaintiffs submitted a request to CBP ("CBP Request") via foiaonline.regulations.gov under tracking number CBP-2017-048412. Plaintiffs also submitted the request to U.S. Department of Homeland Security, Privacy Office, Senior Director of FOIA Operations via FedEx overnight shipping. The CBP Request is attached hereto as Exhibit A.

29.     The CBP Request sought policies, training materials, and communications related to the search, screening, and processing of individuals by CBP at ports of entry and preclearance locations, as well as records related to the custody conditions during such search, screening, and processing. The CBP Request also sought numerical data and statistics showing the number of people who had been subject to heightened screening procedures, visa revocations, waivers of enforcement, and complaints of treatment. The CBP Request also sought a fee waiver and expedited processing. *See* Ex. A.

30.     CBP acknowledged receipt of the request on April 18, 2017. Exhibit B, CBP

Confirmation Email.

31.     In its acknowledgment of receipt, however, CBP did not provide a determination

as to whether, or when, CBP would comply with the request. Nor did it make a decision

regarding Plaintiffs' requests for a fee waiver and expedited processing. *See id.*

32.     As of the filing date of this Complaint, more than 40 days (excepting Saturdays,

Sundays, and federal holidays) have elapsed since CBP received the CBP Request.

33.     As of the filing date of this Complaint, CBP has not notified Plaintiffs of a

determination as to whether it will comply with the CBP Request.

34.     Because CBP failed to comply with the time limit provision of FOIA, Plaintiffs

are deemed to have exhausted their administrative remedies with respect to the CBP Request.

*See* 5 U.S.C. § 552(a)(6)(C)(i).

Plaintiffs' FOIA Request to USCIS

35.     On April 12, 2017, Plaintiffs submitted a request to USCIS ("USCIS Request")

addressed to the USCIS National Records Center, FOIA/PA Office and the U.S. Department of

Homeland Security, Privacy Office, Senior Director of FOIA Operations via certified, trackable

United States mail.  The USCIS Request is attached hereto as Exhibit C, USCIS Request.

36.     The USCIS Request sought policies, training materials, and communications

related to the criteria and/or grounds to be considered during visa application adjudications, visa

revocations, and consideration of refugee applications, including case-by-case waivers pursuant

to recent Executive Orders. The USCIS Request also sought numerical data and statistics

showing the number of individuals who have been subject to additional scrutiny, visa

revocations, waivers of enforcement, or unfavorable treatment. The USCIS Request also sought expedited processing and a fee a waiver. *See* Ex. C.

37.     USCIS acknowledged receipt of the USCIS Request on April 20, 2017 and granted Plaintiffs' request for fee waiver and request for expedited processing. Exhibit D, USCIS Confirmation Email.

38.     USCIS's confirmation email did not provide a determination as to whether, or when, USCIS would comply with the USCIS Request. *See id.*

39.     Also on April 20, 2017, Dawn D. Horn, a Government Information Specialist at USCIS, emailed to summarize the agency's understanding of Plaintiffs' FOIA request and request clarification of the terms "case-by-case waivers" and "travel document applications" as used in the USCIS Request. Exhibit E, First USCIS Follow-Up Email.

40.     On April 27, 2017, Plaintiffs responded to USCIS's email, clarifying that the USCIS Request sought "all records concerning adjudication or consideration of visa petitions, revocations, refugee/asylum applications, waiver applications, and travel document applications during the specified time period." Exhibit F, Plaintiffs' First Email Response to USCIS. Plaintiffs' email emphasized that "[t]he same applies to our request for email, text, and electronic communications, which reaches communications concerning all such categories of agency action or policy, not just refugee/asylum applications or the Executive Orders." *Id.* Additionally, Plaintiffs confirmed that the request was limited to records created on or after November 8, 2016, except with regard to Item 4 of the USCIS Request. *Id.* Finally, Plaintiffs provided the requested definitions for "case-by-case waivers" and "travel document applicants," and disputed the agency's contention that Item 5 of the USCIS Request would need to be submitted as a separate request. *Id.*

41.     More than a month later, on May 31, 2017, Anna Gillispie, a Government Information Specialist at USCIS, sent a series of additional follow-up questions about the scope of the USCIS Request. Exhibit G, Second USCIS Follow-Up Conversation at 6-7. Specifically, the email requested definitions for the terms "communications," "informal understanding," "sent," and "received," and clarification on the scope of the emails and records referenced in the USCIS Request. *Id.*

42.     On June 7, 2017, Plaintiffs responded to USCIS's follow-up email, clarifying the scope of the USCIS Request and providing relevant definitions. *Id.* at 5.

43.     On the same day, Ms. Gillispie responded to Plaintiffs with two follow-up questions concerning the definitions of "procedures and practices" and "policies." *Id.* at 3.

44.     The same day, Plaintiffs responded to these questions and requested a timeframe for the production of documents responsive to their request. *Id.* at 2.

45.     On June 20, 2017, Plaintiffs again requested a timeframe for the production of documents response to their request. *Id.* at 1.

46.     As of the filing date of this Complaint, USCIS has yet to respond to Plaintiffs' request for an expected timeframe for the production of documents.

47.     As of the filing date of this Complaint, more than 40 days (excepting Saturdays, Sundays, and legal public holidays) have elapsed since USCIS received the USCIS Request.

48.     As of the filing date of this Complaint, USCIS has not notified Plaintiffs of a determination as to whether it will comply with the USCIS Request.

49.     Because Defendants USCIS failed to comply with the time limit provision of FOIA, Plaintiffs are deemed to have exhausted their administrative remedies with respect to the USCIS Request. *See* 5 U.S.C. § 552(a)(6)(C)(i).

Plaintiffs' FOIA Request to DOS

50.     On April 12, 2017, Plaintiffs submitted a request to DOS ("DOS Request"), addressed to the Office of Information Programs and Services at DOS, via FedEx overnight shipping. The DOS Request is attached hereto as Exhibit H.

51.     The DOS Request sought policies, training materials, and communications related to the criteria and/or grounds to be considered during visa application adjudications, visa revocations, and consideration of refugee applications, including case-by-case waivers pursuant to recent Executive Orders. The DOS Request also sought numerical data and statistics showing the number of individuals who have been subject to additional scrutiny, visa revocations, waivers of enforcement, or unfavorable treatment. The DOS Request also sought a fee waiver and expedited processing. *See* Ex. H.

52.     DOS acknowledged receipt of the Request on April 17, 2017 and granted Plaintiffs' request for expedited processing and a fee waiver. Exhibit I, DOS Confirmation.

53.     As of the filing date of this Complaint, more than 40 days (excepting Saturdays, Sundays, and legal public holidays) have elapsed since DOS received the DOS Request.

54.     As of the filing date of this Complaint, DOS has not notified Plaintiffs of a determination as to whether it will comply with the DOS Request.

55.     Because DOS failed to comply with the time limit provision of FOIA, Plaintiffs are deemed to have exhausted their administrative remedies with respect to the DOS Request. *See* 5 U.S.C. § 552(a)(6)(C)(i).

## **CLAIM FOR RELIEF**

56.     Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth

herein.

57.     Plaintiffs have a legal right under FOIA to obtain the specific agency records sought in the Requests, and Defendants' failure to promptly make the requested records available to Plaintiffs has no legal basis.

58.     Each Defendant's failure to determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after receipt whether to comply with the Request directed to it violates FOIA, 5 USC § 552(a)(6)(A)(i), and applicable regulations promulgated thereunder.

59.     Defendants' failure to conduct a reasonable search for the records responsive to the Requests and to promptly make them available violates FOIA, 5 U.S.C. § 552(a)(3), and applicable regulations promulgated thereunder.

60.     The failure of Defendants DOS and USCIS to process as soon as practicable the Requests, which were granted expedited processing, violates FOIA, 5 U.S.C. § 552(a)(6)(E)(iii) and applicable regulations promulgated thereunder.

61.     On information and belief, Defendants currently have possession, custody or control of the requested records.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.   Declare that Defendants violated FOIA by unlawfully withholding the requested records;

2.   Order Defendants to conduct a reasonable search for the requested records and to disclose them to Plaintiffs in their entireties and on an expedited basis;

3.   Award Plaintiffs' costs and reasonable attorneys' fees in this action as provided by 5 U.S.C. § 552(a)(4)(E); and

4.   Grant other such relief as the Court may deem just and proper.

Respectfully submitted,                          Dated: June 27, 2017

  /s/ Muneer I. Ahmad_____ _____

Muneer I. Ahmad (ct28109), Supervising Attorney        Justin B. Cox†
Michael J. Wishnie, (ct27221), Supervising Attorney     National Immigration Law Center
Ruben Loyo, Supervising Attorney*                        1989 College Ave. NE
Adam Bradlow, Law Student Intern                         Atlanta, GA 30317
David Chen, Law Student Intern                           Tel: (678) 404-9119
Joseph Laris Cohen, Law Graduate Intern                  Fax: (213) 639-3911
Susanna D. Evarts, Law Student Intern                    cox@nilc.org
Amit Jain, Law Student Intern
Clare Kane, Law Student Intern                           Karen C. Tumlin†
Aaron Korthuis, Law Graduate Intern                      Nicholas Espíritu†
Zachary Manfredi, Law Graduate Intern                    Melissa S. Keaney†
Joseph Meyers, Law Student Intern                        Esther Sung†
Victoria Roeck, Law Student Intern                       National Immigration Law Center
                                                         3435 Wilshire Boulevard, Suite 1600
Jerome N. Frank Legal Services Organization              Los Angeles, CA 90010
Yale Law School**                                        Tel: (213) 639-3900
P.O. Box 902020                                          Fax: (213) 639-3911
New Haven, CT 06520                                      tumlin@nilc.org
(203) 432-4800                                           espiritu@nilc.org
muneer.ahmad@ylsclinics.org                              keaney@nilc.org
                                                         sung@nilc.org

*Counsel for Plaintiffs*                                 Rebecca Heller†
                                                         Stephen Poellot†
                                                         International Refugee Assistance Project
                                                         Urban Justice Center
                                                         40 Rector St., 9th Floor
                                                         New York, NY 10006
                                                         Phone: (646) 704-3922
                                                         bheller@refugeerights.org
                                                         spoellot@refugeerights.org

---

* Application for admission to the U.S. District Court for the District of Connecticut
forthcoming.
** This complaint does not purport to state the views of Yale Law School, if any.
† *Pro Hac Vice* applications forthcoming.

17