## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS – CONNECTICUT and MAKE THE ROAD NEW YORK,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, and U.S. DEPARTMENT OF STATE,<br><br>*Defendants.* | Civil Action No. 3:17-cv-1061-RMS |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

LEGAL STANDARD......................................................................................................... 4

ARGUMENT ..................................................................................................................... 5

    I.    Plaintiffs Waived Challenges to All Documents with the Exception of the EO
    Report.......................................................................................................... 5

    II.    DHS Properly Withheld the EO Report Pursuant to the Presidential
    Communications Privilege ........................................................................ 6

    III.    Exemptions 1 and 3 were Properly Applied ........................................... 15

    IV.    Exemption 5, Deliberative Process Privilege, was Properly Applied.................. 19

    V.    Exemption 7(e) was Properly Applied................................................... 22

    VI.    Even if Plaintiffs Had Preserved their Challenges to Three Additional State
    Department Documents, Such Challenges Fail .................................... 26

        A.    State Properly Asserted Exemption 7(e) over Two Documents .............. 26

        B.    State Properly Asserted Exemption 5 over One Document...................... 28

CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Dep't of Def.*,
    435 F. Supp. 3d 539 (S.D.N.Y. 2020) ................................................................. 8

*ACLU v. Dep't of Just.*,
    681 F.3d 61 (2d Cir. 2012) ................................................................. 5, 16, 19

*ACLU v. Dep't of Just.*,
    No. 15 CIV. 1954 (CM), 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016) ................. 11

*ACLU v. Nat'l Sec. Agency*,
    No. 13-CIV-09198-KMW-JCF, 2017 WL 1155910 (S.D.N.Y. Mar. 27, 2017), *aff'd*,
    925 F.3d 576 (2d Cir. 2019) ................................................................. 11

*ACLU v. Nat'l Sec. Agency*,
    925 F.3d 576 (2d Cir. 2019) ................................................................. 11, 28, 29

*Adamowicz v. IRS*,
    402 F. App'x 648 (2d Cir. 2010) ................................................................. 22

*Ahmed v. U.S. Citizenship & Immigr. Servs.*,
    No. 11-cv-6230, 2013 WL 27697 (E.D.N.Y. Jan. 2, 2013) ............................... 23

*Allard K. Lowenstein Int'l Hum. Rts. Project v. DHS*,
    626 F.3d 678 (2d Cir. 2010) ................................................................. 24

*Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*,
    325 F. Supp. 3d 162 (D.D.C. 2018) ................................................................. 5

*Austin Sanctuary Network v. U.S. Immigr. & Customs Enf't*,
    No. 20-CV-01686 (LJL), 2022 WL 4356732 (S.D.N.Y. Sept. 19, 2022) ............. 29

*Behar v. U.S. DHS*,
    39 F.4th 81 (2d Cir. 2022) ................................................................. 9

*Bishop v. U.S. Dep't of Homeland Sec.*,
    45 F. Supp. 3d 380 (S.D.N.Y. 2014) ................................................................. 23, 28

*Blackwell v. FBI*,
    646 F.3d 37 (D.C. Cir. 2011) ................................................................. 24

*Brayton v. Off. of the U.S. Trade Representative*,
    641 F.3d 521 (D.C. Cir. 2011) ................................................................. 4

*Brennan Ctr. for Just. at N.Y.  Univ. Sch. of L. v. Dep't of State*,
 No. 17 CIV. 7520 (PGG), 2019 WL 10984173 (S.D.N.Y. Mar. 29, 2019) ............................ 11

*BuzzFeed, Inc. v. Dep't of Just.*,
 344 F. Supp. 3d 396 (D.D.C. 2018) ........................................................................ 14

*Carney v. U.S. Dep't of Just.*,
 19 F.3d 807 (2d Cir. 1994) .................................................................................... 4

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*,
 161 F. Supp. 3d 120 (D.D.C. 2016) ....................................................................... 30

*Ctr. for Investigative Reporting v. U.S. CBP*,
 436 F. Supp. 3d 90 (D.D.C. 2019) ......................................................................... 6

*Elec. Frontier Found. v. CIA*,
 No. C 09-3351 SBA, 2013 WL 5443048 (N.D. Cal. Sept. 30, 2013) ..................................... 11

*EPA v. Mink*,
 410 U.S. 73 (1973) .............................................................................................. 20

*Fams. for Freedom v. CBP.*,
 837 F. Supp. 2d 287 (S.D.N.Y. 2011) ....................................................................... 29

*Fed. Trade Comm'n v. Grolier Inc.*,
 462 U.S. 19 (1983) .............................................................................................. 7

*Freedom of Press Found. v. Dep't of Just.*,
 493 F. Supp. 3d 251 (S.D.N.Y. 2020) ....................................................................... 24

*Grand Cent. P'ship, Inc. v. Cuomo*,
 166 F.3d 473 (2d Cir. 1999) ......................................................................... 5, 20, 21

*Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*,
 929 F.2d 81 (2d Cir. 1991) .................................................................................... 21

*In re Sealed Case*,
 121 F.3d 729 (D.C. Cir. 1997) ...................................................................... *passim*

*Intell. Prop. Watch v. U.S. Trade Representative*,
 134 F. Supp. 3d 726 (S.D.N.Y. 2015) ....................................................................... 18

*Iraqi Refugee Assistance Project v. U.S. Dep't of Homeland Sec.*,
 No. 12-CV-3461 (PKC), 2017 WL 1155898 (S.D.N.Y. Mar. 27, 2017) ................................ 25

*Johnson v. CIA*,
    No. 17-CIV-1928 (CM), 2018 WL 833940 (S.D.N.Y. Jan. 30, 2018) ...................................... 4

*Jud. Watch, Inc. v. Dep't of Just.*,
    365 F.3d 1108 (D.C. Cir. 2004) ........................................................................ 10

*Jud. Watch, Inc. v. United States Dep't of Def.*,
    913 F.3d 1106 (D.C. Cir. 2019) ........................................................................ 26

*Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*,
    560 F. Supp. 3d 810 (S.D.N.Y. 2021) ........................................................ 11, 13, 14

*Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.*,
    30 F.4th 318 (2d Cir. 2022) ............................................................................ 23

*Larson v. U.S. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ........................................................................ 16

*Loving v. Dep't of Def.*,
    550 F.3d 32 (D.C. Cir. 2008) ............................................................................ 7

*Morley v. CIA*,
    508 F.3d 1108 (D.C. Cir. 2007) ........................................................................ 16

*N.Y. Times Co. v. Dep't of Just.*,
    390 F. Supp. 3d 499 (S.D.N.Y. 2019) ............................................................... 14

*N.Y. Times Co. v. U.S. Dep't of Just.*,
    550 F. Supp. 3d 26 (S.D.N.Y. 2021) ................................................................. 18

*N.Y. Times Co. v. FBI*,
    297 F. Supp. 3d 435 (S.D.N.Y. 2017) ................................................................. 4

*N.Y. Times Co. v. U.S. Dep't of Just.*,
    No. 14CIV03776ATSN, 2016 WL 5946711 (S.D.N.Y. Aug. 18, 2016) .................... 17

*N.Y. Times v. CIA*,
    965 F.3d 109 (2d Cir. 2020) ............................................................................ 14

*Nat'l Day Laborer Org. Network v. ICE*,
    No. 16 CIV. 387 (PAE), 2020 WL 7321396 (S.D.N.Y. Dec. 11, 2020) .................... 30

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*,
    811 F. Supp. 2d 713 (S.D.N.Y. 2011) ................................................................. 5

*Nat. Res. Def. Council v. EPA*,
   19 F.4th 177 (2d Cir. 2021) ................................................. 20

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977) .......................................................... 7

*Open Soc'y Just. Initiative v. Dep't of Def.*,
   No. 20-CV-5096 (JMF), 2021 WL 4942846 (S.D.N.Y. Oct. 22, 2021) .................. 18

*Osen LLC v. U.S. Cent. Command*,
   969 F.3d 102 (2d Cir. 2020) ........................................... 14, 16

*Pickering v. U.S. Dep't of Just.*,
   No. 19-CV-001F, 2021 WL 5810396 (W.D.N.Y. Dec. 7, 2021) ........................ 24

*Protect Democracy Project, Inc. v. Nat'l Sec. Agency*,
   10 F.4th 879 (D.C. Cir. 2021) ............................................. 15

*Roman v. Nat'l Sec. Agency*,
   No. 07-CV-4502(JFB)(WDW), 2009 WL 303686 (E.D.N.Y. Feb. 9, 2009) ......... 19

*Schwartz v. Dep't of Def.*,
   No. 15CV7077ARRRLM, 2017 WL 78482 (E.D.N.Y. Jan. 6, 2017) ................. 16, 18

*Sec. & Exchange Comm'n v. Collins & Aikman Corp.*,
   256 F.R.D. 403 (S.D.N.Y. 2009) ........................................... 21

*Seife v. U.S. Dep't of State*,
   298 F. Supp. 3d 592 (S.D.N.Y. 2018) ...................................... 20

*Soghoian v. U.S. Dep't of Justice*,
   885 F. Supp. 2d 62 ...................................................... 28

*Stinson v. City of New York*,
   304 F.R.D. 432 (S.D.N.Y. 2015) ........................................... 21

*United States v. Nixon*,
   418 U.S. 683 (1974) ..................................................... 7, 20

*United States v. Weber Aircraft Corp.*,
   465 U.S. 792 (1984) ...................................................... 7

*Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*,
   No. 18-2622 (ABJ), 2021 WL 4502106 (D.D.C. Sept. 30, 2021) .............. 10

*Weinberger v. Cath. Action of Haw.*,
    454 U.S. 139 (1981) ................................................................................ 15

*Wilner v. Nat'l Sec. Agency*,
    592 F.3d 60 (2d Cir. 2009) ............................................................ 5, 18, 19

**STATUTES**

5 U.S.C. § 552 ..................................................................................... *passim*

50 U.S.C. § 402 ............................................................................................ 19

50 U.S.C. § 3024 .......................................................................................... 18

50 U.S.C. § 3605 .......................................................................................... 19

**RULES**

Fed. R. Civ. P. 56 .......................................................................................... 4

**REGULATIONS**

Exec. Order 13,526,
    75 Fed. Reg. 707 (Dec. 29, 2009) ....................................................... 15, 16

Executive Orders 13,769,
    82 Fed. Reg. 8,977 (Jan. 27, 2017) .......................................................... 2

Exec. Order 13,780,
    82 Fed. Reg. 13,209 (Mar. 6, 2017) ................................................. *passim*

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 114-391 (2016) ..................................................................... 9

## INTRODUCTION

In this long-running action under the Freedom of Information Act ("FOIA"), Plaintiffs submitted requests for the disclosure of numerous records from three agency Defendants, relating to immigration policy and national security.  To fulfill Plaintiffs' requests, as narrowed by agreement of the parties, each Defendant conducted extensive searches, processed tens of thousands of pages of documents, and completed numerous rolling productions, pursuant to the processing rate requirements ordered by this Court.  At the conclusion of this process, Plaintiffs decided to challenge the withholdings asserted in a single document, a report required by Section 5(b) of Executive Order 13,780, which related to improving immigration vetting and screening procedures.  Plaintiff's challenge should be rejected.  The Report (apart from public documents in the Appendix, which have been disclosed) is properly withheld in full pursuant to the Presidential Communications Privilege.  As a closely held confidential communication from agency heads to the President, to assist policymaking in the sensitive areas of immigration policy and national security, the Report is precisely the type of document that the Presidential Communications Privilege is designed to protect.  Portions of the Report were also withheld pursuant to Exemptions 1, 3, 5, and 7(e), and those withholdings are properly justified as well.

Plaintiffs represented to Defendants and this Court that they would contest only the withholdings in the Executive Order Report ("EO Report"), and they therefore waived any other challenges they could have brought.  Yet Plaintiffs now try and challenge withholdings in three other documents from the Department of State.  Even if Plaintiffs had preserved these challenges, they are meritless, as the agency appropriately withheld information in these documents pursuant to Exemptions 5 and 7(e).  As a result, the Court should enter Judgment for Defendants and close this case.

## BACKGROUND

On April 12, 2017, Plaintiffs sent FOIA requests to Defendants U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), and the Department of State ("State"). These requests sought information on numerous topics, including Executive Orders 13,769 and 13,780, the screening of individuals at U.S. ports of entry, and documents related to certain policies and procedures related to immigration processing. Exhibits to Compl., at 2-5, 20-25, 52-57, ECF No. 4. Plaintiffs brought suit on June 27, 2017, seeking to compel production of the requested documents. ECF No. 1. Due to disagreements concerning the scope of Plaintiffs' requests to CBP and State, and over the processing rate for potentially responsive documents, the parties sought and the District Court granted the transfer of this case in its entirety to a Magistrate Judge for final resolution. ECF Nos. 61-63. Thereafter, with the aid of this Court, the parties eventually resolved disagreements as to the scope of Plaintiffs' requests and the appropriate rate of production; Defendants then provided Plaintiffs with numerous rolling productions, until the processing and production of all responsive documents was complete. *See, e.g.,* ECF Nos. 88, 89.

There remains one document over which litigation remains necessary: a final copy of the 60-day progress report required by Section 5(b) of Executive Order 13,780. As described in the Executive Order, this report concerns the implementation of a "program . . . to identify individuals who seek to enter the United States on a fraudulent basis" or otherwise threaten national security, through the development of a "uniform baseline for screening and vetting standards and procedures." *See* Exec. Order 13,780 § 5(a)-(b), 82 Fed. Reg. 13,209, 13,215 (Mar. 6, 2017).

As noted above, the Department of Homeland Security ("DHS") withheld the Report in full pursuant to the Presidential Communications Privilege, and withheld portions of the Report pursuant to certain other FOIA Exemptions. On December 12, 2022, Plaintiffs' counsel represented to Defendants' counsel in a phone conference that Plaintiffs wished to proceed to summary judgment briefing, but Plaintiffs stated that they would only challenge the withholdings asserted in the EO Report. On December 13, Plaintiffs made the same representation to this Court. The Court's Order coming out of that conference directed the parties to confer regarding a briefing schedule over Plaintiffs' challenges to this document. *See* Minute Order of December 13, 2022.[1]

However, Plaintiffs then asked Defendants to submit an additional three State Department documents for *in camera* and *ex parte* review, purportedly because they might show that the EO Report was widely disseminated. At the next status conference of December 16, Defendants explained that they would not agree to this request because, among other reasons, the FOIA statute does not permit *in camera* review of documents that are not the subject of any challenge by plaintiffs. In response, Plaintiffs stated that they could decide to challenge the withholdings in these three State Department documents, in an effort to force Defendants to submit them for this *in camera* review. Defendants noted that Plaintiffs had waived challenges to any documents other than the EO Report, and Plaintiffs had made clear that they were attempting to have the three documents submitted in connection with the EO Report.

Despite their disagreement concerning the scope of summary judgment briefing, the parties subsequently conferred and proposed a briefing schedule, and that schedule was adopted

---

[1] The conference with the Court was not on the record and thus not recorded. However, these facts are related to the best of undersigned counsel's recollection.

by the Court.  *See* Joint Status Report, ECF No. 211 ("JSR"); Order of December 22, 2022.  In

accordance with that schedule, and due to this Court's expressed desire to resolve this case

expeditiously, Defendants have provided the EO Report to this Court for review *in camera*, with

only the classified portions redacted.  In addition, Defendants have released to Plaintiffs the

portions of the EO Report Appendix which contain public documents that led to the creation of

the Report, namely Executive Order 13,780 and the Presidential Memorandum of March 6, 2017.

## LEGAL STANDARD

"Summary judgment is the typical method for disposing of cases challenging a

Government agency's FOIA response."  *Johnson v. CIA*, No. 17-CIV-1928 (CM), 2018 WL

833940, at *2 (S.D.N.Y. Jan. 30, 2018); *accord Brayton v. Off. of the U.S. Trade Representative*,

641 F.3d 521, 527 (D.C. Cir. 2011) ("[T]he vast majority of FOIA cases can be resolved on

summary judgment[.]").  Summary judgment is warranted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).

A court reviews an agency's response to a FOIA request *de novo*. 5 U.S.C.

§ 552(a)(4)(B).  Generally, "[i]n order to prevail on a motion for summary judgment in a FOIA

case, the defending agency has the burden of showing that . . . any withheld documents fall

within an exemption to the FOIA."  *N.Y. Times Co. v. FBI*, 297 F. Supp. 3d 435, 445 (S.D.N.Y.

2017) (citation omitted).  "Affidavits or declarations . . . giving reasonably detailed explanations

why any withheld documents fall within an exemption are sufficient to sustain the agency's

burden."  *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994).  "[A]ffidavits submitted

by an agency are 'accorded a presumption of good faith,'" and that presumption "cannot be

rebutted by 'purely speculative claims about the existence and discoverability of other

4

documents.'" *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (citations

omitted). "Ultimately, an agency may invoke a FOIA exemption if its justification 'appears

logical or plausible.'" *ACLU v. Dep't of Just.*, 681 F.3d 61, 69 (2d Cir. 2012) (quoting *Wilner v.*

*Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009)).

## ARGUMENT

**I.    Plaintiffs Waived Challenges to All Documents with the Exception of the EO Report**

As a threshold matter, Plaintiffs voluntarily declined to challenge Defendants'

withholdings in any document other than the EO Report, and they may not properly assert any

such abandoned challenges now.

Plaintiffs represented at least twice that the EO Report would be the only document they

would challenge at summary judgment. Indeed, Plaintiffs made this statement both to

Defendants, via counsel, and to the Court during a status conference. Plaintiffs only tried to

backtrack on their representations once Defendants declined to provide unchallenged documents

for *in camera* and *ex parte* review. But despite their earlier statements, Plaintiffs now attempt to

challenge the withholdings asserted in three additional State Department documents. *See* JSR.

In the FOIA context, just as in any other litigation, "[w]hen the parties make

representations at a conference about which issues remain outstanding, they may fairly be held to

those oral representations." *Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*, 325 F. Supp. 3d 162,

168 (D.D.C. 2018). As a result, "[r]egardless of plaintiffs' reasons, they have waived any

argument that the exemptions [in any other document] were improperly asserted." *See Nat'l Day*

*Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 811 F. Supp. 2d 713, 738

(S.D.N.Y. 2011). Accordingly, this Court should hold that Plaintiffs' only proper challenge

concerns the EO Report, and all other potential claims have been waived.

Out of an abundance of caution, however, because Plaintiffs have insisted that they will attempt to challenge the redactions in the three additional State Department documents, Defendants set forth below why the withholdings in EO Report and the three additional documents were appropriate and justified under FOIA.[2]

## II.    DHS Properly Withheld the EO Report Pursuant to the Presidential Communications Privilege

Turning first to the EO Report, DHS has asserted the Presidential Communications Privilege over the report in full (other than public parts of its Appendix) under FOIA Exemption 5. DHS has also withheld portions of the Report pursuant to Exemption 5 (deliberative process), both DHS and State withheld portions of the Report under Exemption 7(e), and the Office of the Director of National Intelligence ("ODNI"), Central Intelligence Agency ("CIA") and National Security Agency ("NSA") withheld portions of the Report pursuant to Exemptions 1 and 3. Accordingly, if the Court determines that Presidential Communications Privilege was properly asserted over the EO Report in full, it need not adjudicate the other exemptions asserted over portions of the Report. *See Ctr. for Investigative Reporting v. U.S. CBP*, 436 F. Supp. 3d 90, 108 (D.D.C. 2019) (explaining that where documents were "properly withheld in full under FOIA Exemption 3," then "consideration of whether portions of those documents were also properly withheld pursuant to Exemption 4 [was] unnecessary").

FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In other words, Exemption 5 incorporates civil litigation privileges. Unlike in civil litigation, however, in FOIA a court must determine only whether the information

---

[2] Plaintiffs also declined to challenge the adequacy of Defendants' searches, or any withholdings asserted by Defendants CBP and USCIS. *See* JSR (explaining that Plaintiffs purport to challenge only the EO Report and the three additional State documents).

at issue would "routinely" be disclosed in civil litigation.  *United States v. Weber Aircraft Corp*., 465 U.S. 792, 799 (1984) (citation omitted).  Accordingly, for privileges that would in civil litigation require a balancing, such as documents for which a party would have to make a showing of need, no balancing or showing of need is undertaken in FOIA.  *Fed. Trade Comm'n v. Grolier Inc*., 462 U.S. 19, 28 (1983).  Instead, to properly withhold information under Exemption 5, an agency need only make a threshold showing that information would ordinarily be protected by one or more privileges, which include the deliberative process privilege and the presidential communications privilege.  *See Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).

The Presidential Communications Privilege "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."  *United States v. Nixon*, 418 U.S. 683, 708 (1974).  The privilege applies to "communications that directly involve the President," as well as "communications authored or solicited and received by . . . members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate."  *In re Sealed Case*, 121 F.3d 729, 751–52 (D.C. Cir. 1997).  In particular, the privilege applies "to communications in performance of (a President's) responsibilities, . . . and made in the process of shaping policies and making decisions."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (citations omitted).  The privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially."  *Loving*, 550 F.3d at 37; *see Nixon*, 418 U.S. at 708 (describing the privilege as a "presumptive privilege for [p]residential communications").

The privilege "applies to documents in their *entirety*, and covers final and post-decisional materials as well as pre-deliberative ones," *In re Sealed Case*, 121 F.3d at 745 (emphasis added); *ACLU v. Dep't of Def.*, 435 F. Supp. 3d 539, 559 (S.D.N.Y. 2020) (same).

Here, the EO Report was sent by cabinet-level agency heads to the President, following the President's explicit request for this report in Executive Order 13,780, Section 5(b).  *See* Declaration of James V.M.L. Holzer ("Holzer Decl.") ¶¶ 12-15, Attached as Exhibit 1; *see also id*. ¶ 15 (noting that the "Report states that it was sent to the President").  Pursuant to the Executive Order, this report addressed the "progress of the program" ordered by the Executive Order, "to identify individuals who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of violence toward any group or class of people within the United States, or who present a risk of causing harm subsequent to their entry."  Exec. Order 13,780 § 5(a)-(b); *see* Holzer Decl. ¶ 12.  Specifically, the EO Report discussed the progress of an interagency working group formed in response to Executive Order 13,780, which sought to establish a common set of criteria for different immigration screening and vetting procedures, to avoid duplicative and overlapping efforts, and to ensure that all necessary and appropriate information was sought.  *See* Holzer Decl. ¶ 14.  DHS's declaration explains that the EO Report provided a discussion of the respective agency roles in this effort; a proposal for an interagency coordination and governance structure for the vetting and screening processes; and recommendations regarding potential changes to existing programs relating to screening and vetting to achieve the goals of the Executive Order and the potential development of new programs to achieve such goals.  *Id.*  As a high-level communication to the President for the purposes of providing information and proposals regarding immigration, national security, and foreign policy, this report falls squarely within the Presidential Communications Privilege.

*Accord Behar v. U.S. DHS*, 39 F.4th 81, 93 (2d Cir. 2022) ("[T]he public interest is best served by holding that communications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege") (citation omitted).

The FOIA Improvement Act of 2016, 5 U.S.C. § 552(a)(8) directs agencies to assess "whether an agency has reasonably foreseen a specific, identifiable harm" before making a disclosure determination with respect to certain exemptions. H.R. Rep. No. 114-391, at 9 (2016). Congress expressly acknowledged that this amendment "does not alter the scope of information that is covered under an exemption." *Id.* at 10. Rather, with respect to certain FOIA exemptions, § 552(a)(8)(A)(i)(I) simply requires agencies to identify a foreseeable harm to an interest protected within the existing scope of certain exemptions, in line with prior policy. Here, disclosure of the EO Report would threaten significant harm upon the interests that the Presidential Communications Privilege is designed to protect. *See* Holzer Decl. ¶¶ 21-22.

As DHS's declaration explains, the Report advises the President on topics such as the screening and vetting of visa applicants, the admission of aliens into the United States, and methods of combatting threats to public safety. *Id*. ¶ 20. Further, it makes recommendations to the President on potential additional information collection, systems checks, and inter-agency collaboration with respect to the screening and vetting of non-citizens. *Id*. As such, the Report not only contains advice provided by top advisors at the President's request, but also describes the nature of the decision-making process being undertaken, explains the considerations used to guide that decision-making process, and addresses specific issues that should be evaluated to assist the President in making final decisions. *Id*.

As a confidential communication to the President focusing on controversial issues relating to immigration, vetting, and related procedures for ensuring national security, release of

this report would threaten the President's ability to receive frank and candid advice, both generally and specifically concerning the sensitive field of immigration policy and related security matters. *Id*. ¶ 22. Government policymaking would suffer if the President and his advisors are unable to participate in confidential decisionmaking without fear that their deliberations will be unveiled for public view. *See also Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*, No. 18-2622 (ABJ), 2021 WL 4502106, at *23 (D.D.C. Sept. 30, 2021) (finding the foreseeable harm standard was satisfied for the presidential communications privilege where the declarant explained that disclosure would "burden[] the ability of the President and his advisors to engage in a confidential and frank decision-making process and chill[] or inhibit[] their ability to have candid discussions, thus impacting the efficiency of government policy-making"). For all of these reasons, it is reasonably foreseeable that disclosure of the EO Report would harm the interests protected by the Presidential Communications Privilege.

In light of the harm that would result from the compelled disclosure of a confidential report directed to the President, courts have routinely held that similar reports and communications provided to the President in the course of his official duties are protected by the Presidential Communications Privilege, and may be withheld under FOIA. *See, e.g., Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1117 (D.C. Cir. 2004) (explaining that privilege would apply to "[a]ny pardon documents, reports, or recommendations that the Deputy Attorney General submits to the Office of the President"); *In re Sealed Case*, 121 F.3d at 745–46 (explaining that documents requested by the President will "often will be revelatory of the President's deliberations" "for example, when the President decides to pursue a particular course of action, but asks his advisers *to submit follow-up reports* so that he can monitor whether this

course of action is likely to be successful") (emphasis added); *ACLU v. Nat'l Sec. Agency*, No. 13-CIV-09198-KMW-JCF, 2017 WL 1155910, at *12 (S.D.N.Y. Mar. 27, 2017) (upholding privilege with respect to memorandum "from the Attorney General to the President that reveals advice and recommendations relating to an NSA program"), *aff'd,* 925 F.3d 576 (2d Cir. 2019); *Elec. Frontier Found. v. CIA,* No. C 09-3351 SBA, 2013 WL 5443048, at *20 (N.D. Cal. Sept. 30, 2013) (holding that presidential communications privilege protected quarterly reports from the Intelligence Oversight Board and Office of the Director of National Intelligence generated pursuant to Executive Order).

In unusual circumstances, the privilege may not apply if a document has been broadly distributed, such that the confidential nature of the communication is entirely obviated.  The contours of this limited exception are not entirely clear, but in discerning its application, courts have looked at various factors in the context of individual documents, including but not limited to how extensively and/or publicly such dissemination has occurred; *see Brennan Ctr. for Just. at N.Y.  Univ. Sch. of L. v. U.S.  Dep't of State*, No. 17 CIV. 7520 (PGG), 2019 WL 10984173, at *6 (S.D.N.Y. Mar. 29, 2019) (stating that "if the information contained within the withheld documents has been widely and publicly disseminated" the privilege may not apply); whether the document is revelatory of policymaking deliberations, *see Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, 560 F. Supp. 3d 810, 828 (S.D.N.Y. 2021); whether the communication was treated as confidential (including but not only where documents contain classified information), *id.*; and whether a document or its contents was widely publicized, or distributed for non-advisory purposes.  *See ACLU v. Dep't of Just.,* No. 15 CIV. 1954 (CM), 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016).

To the extent Plaintiffs contend that three State Department records demonstrate widespread dissemination or non-confidentiality of the EO Report, that contention is mistaken. The documents to which Plaintiffs have pointed are composed of (1) a "Q&A Document" provided to consular officers regarding implementation of increased visa screening requirements, (2) a State Department cable to diplomatic and consular posts regarding increased screening requirements, and (3) a draft supporting statement for a Paperwork Reduction Act submission to the Office of Management and Budget, concerning a request for approval to promulgate a form seeking additional information from visa applicants.  *See* Declaration of Susan Weetman ("Weetman Decl.") Decl. ¶¶ 28, 30, 33, 36, Attached as Exhibit 2.

As the declaration of Ms. Weetman attests, none of the documents referenced by Plaintiffs "attach nor reproduce, in whole or in part," the EO Report.  *See* Weetman Decl. ¶¶ 29, 32, 36.  Similarly, none of these documents were "derived from the Section 5 Report."  *Id*.  Nor did these documents otherwise disseminate the contents of the EO Report.  The "Operational Q&A" document "concerns vetting issues that consular officers encounter in the field, whereas the Section 5 Report concerned the creation of a uniform vetting apparatus across the government."  Weetman Decl. ¶ 29.  Similarly, the State Department cable addresses "unique, heightened, post-by-post vetting protocols based on localized threats that could elude uniform vetting."  *Id*. ¶ 32.  The final document, a draft supporting statement for a Paperwork Reduction Act submission ("PRA submission"), requests approval to collect certain categories of biographic data in screening and vetting procedures.  *Id*. ¶ 36.  While some of the categories of data sought in the PRA submission are also proposed in the EO Report, the PRA submission also "requests additional information within each category that was not explicitly proposed in the Section 5 Report."  *Id*.  Moreover, the EO Report recommended collecting certain categories of

12

information that were not sought in the PRA submission.  *Id*.  This draft PRA submission accordingly did not describe the contents of the EO Report or otherwise disseminate that communication such that the Presidential Communications Privilege is undermined.

If more were needed, both the Department of State and DHS have submitted declarations explaining that the EO Report and the information therein was not widely distributed.  Mr. Holzer explains that the Report "was, and remains, closely held within the Executive Branch." Holzer Decl. ¶ 15.  Indeed, the final EO Report was transmitted from DHS to the National Security Council, a component of the Executive Office of the President, and to a small number of agencies that had been involved in drafting and reviewing the Report.  *Id*.  The Report was otherwise circulated by DHS only to "to a limited number of offices within certain DHS components[,]" that were involved in drafting the Report.  *Id*.  Similarly, at the Department of State, Ms. Weetman explains that, to the best of the recollection of the subject matter experts consulted, "distribution of the final report was limited to a small group of Department officials who had contributed to the report, . . . or who had a need-to-know for similar advisory purposes."  Weetman Decl. ¶ 24.

The EO Report also was and is classified in part.  *See* Holzer Decl. ¶ 16; Weetman Decl. ¶ 24. As a result, DHS transmitted the final EO Report to the President via a secure Government internet system that allows for the transmittal of classified information.  Holzer Decl. ¶ 15 (describing the "Joint Worldwide Intelligence Communications System").  The declarants of both DHS and State aver that the full and unredacted report resides only on classified networks at their respective agencies.  Weetman Decl. ¶ 24; *see also* Holzer Decl. ¶ 16.  Courts have held that the classified status of a Presidential communication is strong evidence that the record has not been treated in a manner inconsistent with the Privilege.  *Cf. Knight First Amend. Inst. at*

*Columbia Univ.*, 560 F. Supp. 3d at 829 (holding that privilege did not apply, in part, because the "documents were not treated as confidential" and did not contain "independently classified information").

At bottom, the Report was transmitted to the President at his express request, tightly held, never made public, and maintained on classified systems. Given this restrictive handling, and the sensitive discussion of policy in the Report, the Presidential Communications Privilege plainly applies.

Plaintiffs also cannot show that the contents of the EO Report have been "officially acknowledged," such that the privilege is waived. "Since executive privilege exists to aid the governmental decisionmaking process, a waiver should not be lightly inferred." *In re Sealed Case*, 121 F.3d at 741 (citation omitted). The Second Circuit has cautioned that analysis must be "precise and strict," to find "official acknowledgement" of Government information, such that a FOIA exemption is waived. *See N.Y. Times v. CIA*, 965 F.3d 109, 116-17 (2d Cir. 2020). To show an official acknowledgement sufficient to waive a FOIA Exemption, Plaintiffs must show that the information sought "(1) '[is] as specific as the information previously released,' (2) 'match[es] the information previously disclosed,' and (3) was 'made public through an official and documented disclosure.'" *Osen LLC v. U.S. Cent. Command*, 969 F.3d 102, 109 (2d Cir. 2020).[3] Plaintiffs have not identified public government statements that duplicate the contents of the EO Report, and as a consequence the Presidential Communications Privilege applies for this

---

[3] While the Second Circuit has mentioned this test in connection with disclosure of classified information, courts in this Circuit also apply it to agency "exemption claim[s]" generally, and the D.C. Circuit does the same. *See N.Y. Times Co. v. Dep't of Just.*, 390 F. Supp. 3d 499, 518 (S.D.N.Y. 2019) (rejecting claim that information withheld under Exemption 7(A) was "officially acknowledged" because Plaintiffs could not show "that information in the public domain is duplicative of the information they seek"); *BuzzFeed, Inc. v. Dep't of Just.*, 344 F. Supp. 3d 396, 407 (D.D.C. 2018) (similar).

reason as well. *Accord Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879 (D.C.

Cir. 2021) (holding that memorandum was properly withheld under Presidential

Communications Privilege where public report was not "a complete match" to the

memorandum). *Id.* at 891. In sum, the EO Report is properly withheld in full under the

Presidential Communications Privilege and Plaintiffs cannot show otherwise.

### III.    Exemptions 1 and 3 were Properly Applied

In addition to the Presidential Communications Privilege, which justifies withholding of

the entire EO Report, portions of the Report were also withheld pursuant to additional FOIA

exemptions. First, ODNI, CIA and NSA withheld portions of the EO Report under Exemptions

1 and 3, because these portions of the Report are properly classified at the Secret level and/or are

exempt from disclosure by statute.

FOIA Exemption 1 protects records that are: "(A) specifically authorized under criteria

established by an Executive order to be kept secret in the interest of national defense or foreign

policy[,] and (B) are in fact properly classified pursuant to such Executive order[.]" 5 U.S.C.

§ 552(b)(1); *accord, e.g.*, *Weinberger v. Cath. Action of Haw.*, 454 U.S. 139, 144 (1981). In

other words, under Exemption 1 material that has been properly classified is exempt from

disclosure. *Id.* at 144-45. For information to be properly classified pursuant to Exemption 1, it

must meet the requirements of Executive Order 13,526, "Classified National Security

Information," 75 Fed. Reg. 707 (Dec. 29, 2009):

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order 13,526 § 1.1, 75 Fed. Reg. at 707. The Executive Order lists three classification

levels for national security information: top secret, secret, and confidential. *Id.* § 1.2,

When an agency withholds classified information pursuant to Exemption 1, the affidavit

in support of that decision is entitled to "substantial weight." *ACLU*, 681 F.3d at 70.

Accordingly, courts adopt a "deferential posture in FOIA cases regarding the 'uniquely executive

purview' of national security." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009)

(citation omitted); *see also Osen LLC*, 969 F.3d at 115 ("We have repeatedly found that it is

appropriate to 'defer[ ] to executive [declarations] predicting harm to the national security, and

have found it unwise to undertake searching judicial review.'" (citation omitted)). In fact, "little

proof or explanation is required beyond a plausible assertion that information is properly

classified." *Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007); *see also Schwartz v. Dep't of

Def.*, No. 15CV7077ARRRLM, 2017 WL 78482, at *15 (E.D.N.Y. Jan. 6, 2017) (explaining that

the agencies' "burden is a 'light one' in the national security context") (citation omitted).

An original classification authority of ODNI explains in his declaration that the

Exemption 1 information here is currently and properly classified at the Secret level. That is, the

information at issue was produced by and is under control of the United States Government.

Declaration of Gregory Koch ("Koch Decl.") ¶ 24, Attached as Exhibit 3. It also falls within one

of the categories of information listed in Section 1.4 of Executive Order 13526, specifically

Section 1.4(c), because it concerns "intelligence activities (including covert action), [or]

intelligence sources and methods." *Id.* ¶¶ 19, 21, 22. Further, release of the ODNI information

would result in "at least serious damage to national security" because it would reveal "what type

16

of information the [Intelligence Community] uses, and how, to provide classified vetting support to adjudicative agencies (such as the DHS and State) involving foreign applicants for entry into the United States." *Id*. ¶¶ 19, 24.  As a result, that information "could be used by nefarious actors to obfuscate their identity and/or intentions and avoid detection by the U.S. Government, potentially unlawfully gaining entry into the United States." *Id*. ¶ 19.

ODNI has also consulted with original classification authorities at the CIA and NSA, who explained why their information in the EO Report is also properly classified at the Secret level. Specifically, release of the CIA information at issue threatens serious damage to national security because it "could provide the Nation's adversaries with insight into the means by which the CIA supports other departments and agencies under the program, which they in turn could exploit to undermine both the vetting program and the CIA's clandestine intelligence mission." *Id*. ¶ 21. And release of the withheld NSA information could cause serious damage to national security because it would expose "the specific role(s) that NSA plays in the vetting program." *Id*. ¶ 23. If disclosed, this information could provide the Nation's adversaries with "insight into the means by which the NSA supports other departments and agencies under the program." *Id*.  The Exemption 1 information in the EO Report is thus properly classified and appropriately withheld under FOIA.  *Accord N.Y. Times Co. v. U.S. Dep't of Just*., No. 14CIV03776ATSN, 2016 WL 5946711, at *11 (S.D.N.Y. Aug. 18, 2016) (explaining that where "the government offers a logical and plausible basis for determining that the redacted information is properly classified, and that harm to national security may result from its release, non-disclosure is justified under Exemption 1"); *see also Open Soc'y Just. Initiative v. Dep't of Def.*, No. 20-CV-5096 (JMF), 2021 WL 4942846, at *1 (S.D.N.Y. Oct. 22, 2021) (similar).

Turning to FOIA Exemption 3, that provision applies to records "specifically exempted from disclosure by statute," provided that the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). *Wilner*, 592 F.3d at 71. Courts employ a two-prong test to determine the applicability of Exemption 3: "[f]irst, the court must consider whether the statute identified by the agency is a statute of exemption as contemplated by Exemption 3. Second, the court must consider whether the withheld material satisfies the criteria of the exemption statute." *Id*. at 72. Accordingly, the "sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Intell. Prop. Watch v. U.S. Trade Representative*, 134 F. Supp. 3d 726, 743 (S.D.N.Y. 2015) (citation omitted).

Here, ODNI's declaration explains that the agency withheld certain portions of the EO Report pursuant to the National Security Act, which provides that "the [DNI] shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). This statute is well-recognized as an Exemption 3 statute. *See Schwartz*, 2017 WL 78482, at *15 ("There is no dispute that exemption 3 applies to information properly withheld pursuant to the National Security Act."); *see also N.Y. Times Co. v. U.S. Dep't of Just.*, 550 F. Supp. 3d 26, 36 (S.D.N.Y. 2021) (similar). Moreover, the ODNI declaration explains that the withheld information involves "descriptions of data sources, including categories of intelligence holdings and types of checks, that the [Intelligence Community] uses to provide classified vetting support to adjudicative agencies," and accordingly the withheld information constitutes intelligence methods and is appropriately withheld under Exemption 3. Koch Decl. ¶¶ 28-29. Similarly, the CIA information withheld under Exemption 1 is also withheld under Exemption 3 pursuant to the

National Security Act, because it similarly addresses the CIA's support for other departments and agencies in the vetting process. *Id.* ¶ 30.

Information with National Security Agency ("NSA") equities is also withheld under the National Security Agency Act, 50 U.S.C. § 3605. Section 6 of the NSA Act provides that '[n]othing in this chapter or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with response to the activities thereof . . . ." 50 U.S.C. § 402 note (2007). Because this statute bars disclosure of NSA activities, this law also constitutes an Exemption 3 statute. *See Wilner*, 592 F.3d at 71 (affirming FOIA response pursuant to "Exemption 3, under section 6 of the National Security Agency Act"); *Roman v. Nat'l Sec. Agency*, No. 07-CV-4502(JFB)(WDW), 2009 WL 303686, at *5 (E.D.N.Y. Feb. 9, 2009) ("[I]t is well-established that FOIA Exemption 3 properly encompasses Section 6 of the NSAA."). NSA subject matter experts have confirmed that the NSA information withheld under Exemption 1 "would disclose information relating to NSA activities," and therefore this information is also properly withheld under Exemption 3. Koch Decl. ¶ 32; *accord ACLU*, 681 F.3d at 76 (finding that photograph was properly withheld under Exemption 3, in light of the "substantial weight" entitled to declaration in the national security context).[4] This Court should accordingly hold that the Exemption 3 information in the EO Report has been appropriately withheld from disclosure.

## IV.    Exemption 5, Deliberative Process Privilege, was Properly Applied

DHS also withheld portions of the EO Report under Exemption 5, because they are subject to the deliberative process privilege. The deliberative process privilege applies to

---

[4] Thus, while ODNI asserts stand-alone Exemption 3 withholdings, the CIA and NSA Exemption 3 withholdings are co-extensive with their Exemption 1 withholdings.

"decisionmaking of executive officials generally," and protects documents containing deliberations that are part of the process by which government decisions are formulated. *In re Sealed Case*, 121 F.3d at 735, 745.  The deliberative process privilege is founded on the rationale that "those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon,* 418 U.S. at 705 (footnote omitted).  In addition, the "efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to operate in a fishbowl." *EPA v. Mink,* 410 U.S. 73, 87 (1973).

The privilege has two requirements: the document "must be both 'predecisional' and 'deliberative.'" *Grand Cent. P'ship*, 166 F.3d at 482.  "A document is predecisional when it is prepared in order to assist an agency decisionmaker in arriving at his decision[,]" such as "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* (citations omitted). A court considers if the "document precedes, in temporal sequence, the decision to which it relates." *Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592, 614 (S.D.N.Y. 2018) (citation omitted).  Of note, this requirement does not demand a "specific decision" taken "in connection with which a memorandum is prepared," rather "a record is predecisional if it relates to a specific decision *or a specific decisionmaking process* and was generated before the conclusion of that decision or process."  *Nat. Res. Def. Council v. EPA*, 19 F.4th 177, 192 (2d Cir. 2021) (citation omitted).  A document is "deliberative" if it is "actually . . . related to the process by which policies are formulated." *Stinson v. City of New York*, 304 F.R.D. 432, 435 (S.D.N.Y. 2015) (quoting *Sec. & Exchange Comm'n v. Collins & Aikman Corp.*, 256 F.R.D. 403, 416 (S.D.N.Y. 2009)).

The withheld information in the EO Report constitutes quintessentially privileged deliberative process material. *See Grand Cent. P'ship,* 166 F.3d at 482 (holding that the privilege "focus[es] on documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated") (citation omitted). Indeed, the recommendations and pre-decisional discussion concern "whether to institute certain new information collections, system checks, and interagency coordination requirements in the immigration screening and vetting processes." Holzer Decl. ¶ 25. DHS's declaration explains that the portions of the EO Report withheld for deliberative process are pre-decisional "because they were prepared to assist the ultimate decision-maker—the President— in his decision-making process relating to border security and immigration policy." *Id*. Moreover, the withheld parts of the Report are also "deliberative" because they reflect the President's decision-making process, including advice and recommendations by the Secretary of DHS and other Cabinet-level officials regarding the efficacy of certain visa vetting procedures, and the proper implementation of certain travel restrictions, among other topics. *Id*. ¶¶ 26-27.

Because the opinions and recommendations withheld plainly reflect the deliberative process accompanying policy formation, they may be appropriately withheld under Exemption 5. *Accord Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 85 (2d Cir. 1991) (holding that HUD reports were subject to deliberative process privilege because they contained "opinions and recommendations" that "are related to the deliberative process by which HUD policies are formulated"); *Adamowicz v. IRS*, 402 F. App'x 648, 653 (2d Cir. 2010) (holding that documents "generated by a low-level official" that reflect the "consultative process underlying [agency] decisions" were properly withheld as deliberative).

Moreover, Mr. Holzer explains why reasonably foreseeable harm would result if these portions of the EO Report were released.  *Accord* 5 U.S.C. § 552(a)(8).  As he notes: "[i]f Executive Branch personnel who [engage in the pre-decisional process of making] recommendations on matters of national security discern that their preliminary assessments and recommendations, such as those contained in this Report, could be released for public consumption, they are likely to refrain from full and candid statements of their views to final decision-makers."  *See* Holzer Decl. ¶ 27.  As a result, "[t]his lack of candor would seriously impair the Executive Branch's ability to foster forthright, internal discussions necessary for efficient and proper decision-making."  *Id*. ¶ 28.  Moreover, release of the predecisional discussions could "undermine agency efforts to enhance . . . national security by exposing existing and proposed changes to agency operations" concerning immigration screening and vetting.  *Id*.  For all of these reasons, there is foreseeable harm posed by the release of this information, such that it is properly withheld under Exemption 5.

## V.    Exemption 7(e) was Properly Applied

Both DHS and State also properly applied Exemption 7(e) to portions of the EO Report. Exemption 7(e) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  "A threshold requirement for the application of Exemption 7(E) is that the documents must be 'compiled for law enforcement purposes.'"  *Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 386 (S.D.N.Y. 2014) (citation omitted).  Once this threshold

requirement is satisfied, a court must determine if the withheld information constitutes "either (1) 'techniques and procedures for law enforcement investigations,' or (2) 'guidelines for law enforcement investigations' if disclosure of such guidelines 'could reasonably be expected to risk circumvention of the law.'"  *Ahmed v. U.S. Citizenship & Immigr. Servs.,* No. 11-cv-6230, 2013 WL 27697, at *4 (E.D.N.Y. Jan. 2, 2013) (citation omitted).

Here, the EO Report was compiled for law enforcement purposes, as it was specifically requested in an Executive Order to report on the development of a program that would "identify individuals who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of violence toward any group or class of people within the United States, or who present a risk of causing harm subsequent to their entry."  Exec. Order No. 13,780; *see also* Holzer Decl. ¶ 30.  Because the EO Report discussed and proposed law enforcement procedures relating to border security, it is clear that the Report itself was assembled for law enforcement purposes.  *See Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs*., 30 F.4th 318, 328 (2d Cir. 2022) (explaining that in the FOIA context, "law enforcement" materials can reflect "proactive steps designed to prevent criminal activity and to maintain security") (citation omitted).

In addition, the information withheld under this Exemption constitutes both "guidelines" and non-public "techniques" as those terms are understood in this context.  As the DHS declaration explains, "[t]he Report's discussion of certain screening and vetting processes can be considered 'guidelines' because they identify threshold issues that may trigger additional screening, and thus focus law enforcements efforts in specific circumstances."  Holzer Decl. ¶ 31; *see Allard K. Lowenstein Int'l Hum. Rts. Project v. DHS*, 626 F.3d 678, 682 (2d Cir. 2010) (explaining that the term "guidelines" generally references thresholds that implicate "resource

allocation").  And disclosure of this information would reasonably risk circumvention of the law because disclosure of thresholds in certain vetting procedures "would enable individuals to better avoid triggering additional scrutiny and thereby increase their chances of not being identified as persons presenting fraudulent information or having criminal or terrorist intent."  Holzer Decl. ¶ 31; *see also Freedom of Press Found. v. Dep't of Just.*, 493 F. Supp. 3d 251, 272, 273 (S.D.N.Y. 2020) (upholding Exemption 7(e) as applied to FBI "policy guides," because disclosure could "assist those seeking to violate or circumvent the law" and collecting similar cases); *see also Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (explaining that Exemption 7(e) sets a "low bar" to justify the withholding of information).

The remaining information withheld under this Exemption concerns law enforcement "techniques because it describes and highlights processes that would enable the agency to identify persons presenting fraudulent information or having criminal or terroristic intent." Holzer Decl. ¶ 32; *Lowenstein*, 626 F.3d at 682 (explaining that "techniques and procedures" refers to "how law enforcement officials go about investigating a crime").  In this circuit, an agency need not show a risk of circumvention of the law to withhold law enforcement techniques.  *See Freedom of Press Found.* 493 F. Supp. 3d at 270 ("Discussion of law enforcement techniques and procedures is categorically exempt from FOIA disclosure, 'without need for demonstration of harm.'") (citations  omitted).  Rather, an agency need only demonstrate that the techniques at issue are not publicly known.  *See Pickering v. U.S. Dep't of Just.*, No. 19-CV-001F, 2021 WL 5810396, at *17 (W.D.N.Y. Dec. 7, 2021) ("[T]he agency must justify its assertion that its practice . . . at issue in this motion actually shows a 'technique' or 'procedure' and that it is not already known to the public") (citation omitted).

Here, DHS's declaration explains that while certain immigration screening is public knowledge, "it is not publicly known what information DHS considers," the electronic databases or other sources from which that information is derived, "or how DHS weighs and evaluates that information when making admission determinations."  Holzer Decl. ¶ 34.  Indeed, here, DHS's withheld information speaks to "critical data fields on application forms, [and the] types of national security and public safety questions conducted during interviews for benefit adjudication," which is not public information.  *Id*. ¶ 32.  Similarly, the Department of State withheld nonpublic information related to the "specific high value biographic data elements identified by interagency partners as necessary for the uniform baseline vetting process of immigrant and foreign visitor applications," and the "data and vetting capabilities operated by interagency partners in automated system checks. . . ."  Weetman Decl. ¶¶ 26-27.[5]

To the extent it is required, disclosure of this information would lead to reasonably foreseeable harm.  *Accord* 5 U.S.C. § 552(a)(8).  Both the DHS and State Department declarants explained how release of the information at issue could "enable suspects to avoid detection or develop countermeasures to circumvent the ability of the Department and other U.S. federal law enforcement" in the context of border security.  Weetman Decl. ¶ 21; Holzer Decl. ¶¶ 32-34 (similar).  Indeed, courts have recognized that law enforcement records which concern screening processes are appropriately protected under Exemption 7(e).  *See, e.g., Iraqi Refugee Assistance*

---

[5] DHS's Declaration notes that certain matrices in the EO report are currently classified, and DHS is accordingly obligated to treat these portions of Report as classified at the Secret level. However, DHS explains that, because its personnel have questioned whether classification of this material remains appropriate, and DHS intends to undertake a declassification review, DHS is not currently asserting Exemption 1 over this material.  DHS is asserting Exemption 7(e) over this material, however, because the information contained therein would alert adversaries as to the types of potentially derogatory information they may need to overcome in order to enter or remain in the United States.  *See* Holzer Decl. ¶ 33.

*Project v. U.S. Dep't of Homeland Sec.*, No. 12-CV-3461 (PKC), 2017 WL 1155898, at *12 (S.D.N.Y. Mar. 27, 2017) (holding that agency properly withheld "discussions [that] describe the techniques and procedures for adjudicating [refugee] applications"). This Court should conclude the same here.

As a final note, all three declarants complied with their obligations under the FOIA to ensure that all reasonably segregable information was disclosed and no further information could be released. *See* Holzer Decl. ¶ 36; Weetman Decl. ¶ 37; Koch Decl. ¶ 33.[6]

## VI. Even if Plaintiffs Had Preserved their Challenges to Three Additional State Department Documents, Such Challenges Fail

As noted above, Plaintiffs previously disclaimed any intent to challenge documents other than the EO Report, but now seek to challenge the withholdings in three additional State Department documents. These challenges are not properly before the Court. But even if this Court concludes that Plaintiffs have not waived these challenges, they are meritless. Specifically, State properly asserted Exemption 7(e) to withhold portions of two documents, and the agency properly asserted Exemption 5 to withhold the third document in full.

### A. State Properly Asserted Exemption 7(e) over Two Documents

State appropriately redacted portions of two of the documents pursuant to Exemption 7(e). As explained by Ms. Weetman, both the "Operational Q&A" and the "ALDAC: Heightened Screening of Visa Applications" ("Heightened Screening") documents satisfy the threshold requirement of Exemption 7(e), in that they were both compiled for law enforcement purposes. The Operational Q&A, in a question and answer format, addresses "the processes for

---

[6] Notably, a segregation analysis is not required for the withholding of a document in full pursuant to the Presidential Communications Privilege. *See, e.g., Jud. Watch, Inc. v. United States Dep't of Def.*, 913 F.3d 1106, 1113 (D.C. Cir. 2019) (explaining that because the entirety of a record is protected under the privilege, "the question of segregability of non-exempt material is therefore not presented").

identifying and flagging certain ineligibilities or potential ineligibilities in a database, including circumstances where certain types of investigations are required and procedures for collecting information required for those investigations." Weetman Decl. ¶ 31. Accordingly, this document was compiled "for the law enforcement purpose of enforcing the [Immigration and Nationality Act]." *Id.* ¶ 28. Similarly, the Heightened Screening document involves "information discussing and describing the processes for identifying and flagging certain ineligibilities or potential ineligibilities in a database, including circumstances where certain types of investigations are required and procedures for collecting information required for those investigations." *Id.* ¶ 31. Thus, this document as well was compiled for the law enforcement purpose of furthering agency enforcement of the Immigration and Nationality Act. *Id.*

In both documents State withheld nonpublic law enforcement techniques, as well as law enforcement guidelines the disclosure of which could reasonably lead to circumvention of the law. In the Operational Q&A document, State withheld information relating to law enforcement techniques, including "nonpublic information discussing and describing the processes for collecting applicants' information and identifying and flagging certain ineligibilities or potential ineligibilities," as well as "procedures for reviewing and assessing potential fraud in a visa application." *Id.* ¶ 28. Similarly, in the Heightened Screening document State withheld discussion of the nonpublic "specific information to collect, and procedures for such collection, as part of screening for terrorism- and other security-related ineligibilities." *Id.* ¶ 31.

State also withheld guidelines in the Operational Q&A document, such as noting vetting "circumstances where certain types of investigations are required." *Id.* ¶ 28. And from the Heightened Screening document, State withheld information relating to law enforcement guidelines such as a "discussion of factors that trigger certain kinds of investigations" in

screening and vetting protocols. *Id.* ¶ 31. Disclosure of this and similar information could reasonably be expected to risk circumvention of the law and cause foreseeable harm because it could permit circumvention of "the security checks put in place to ensure that terrorists and other bad actors cannot gain visas into the United States." *Id.* ¶¶ 28, 31; *accord Soghoian v. U.S. Dep't of Justice,* 885 F. Supp. 2d 62, 75, No. 11–cv–1080, 2012 WL 3090309, at *10 (D.D.C. July 31, 2012) ("Knowing what information is collected, how it is collected, and more importantly, when it is *not* collected, is information that law enforcement might reasonably expect to lead would-be offenders to evade detection.") (citation omitted). Such information concerning details of State Department vetting is thus properly withheld under Exemption 7(e). *Accord Bishop*, 45 F. Supp. 3d at 391 (upholding use of Exemption 7(e) over information concerning "which databases CBP considers in its targeting process and how such information can lead to the triggering of additional security screening").

### B. State Properly Asserted Exemption 5 over One Document

State also appropriately asserted Exemption 5 over the third and final document challenged by Plaintiffs. That document, a draft version of a supporting statement for a Paperwork Reduction Act submission to OMB, was written by employees in the Bureau of Consular Affairs in consultation with Department attorneys, regarding supplemental questions for visa applicants, an emergency request for additional visa screening, and an application for immigrant visa and alien registration. Weetman Decl. ¶ 33. This document was withheld in full under Exemption 5 pursuant to the attorney-client privilege and the deliberative process privilege.

"The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." *ACLU*, 925 F.3d at

589 (citation omitted). The privilege protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *Id*. (citation omitted). All three requirements are easily met here. The draft submission contains "comments and questions from attorneys in the Department's Office of the Legal Adviser in the Offices of Consular Affairs, Management, and Human Rights and Refugees" which were circulated among those attorneys and their "policy clients, namely the Bureau of Consular Affairs and other bureaus within the Department with equities in the document." Weetman Decl. ¶ 34. Moreover, those communications were "intended to be and were, in fact, kept confidential" as between the attorneys at issue and their clients. *Id*. Finally, the purpose of the attorney questions and comments was for "[t]he purpose of the communications was to provide legal advice," such as ensuring that the submission accurately reflected governing law and was consistent with the "Department's position on the interpretation of domestic and international law." *Id*. This document is plainly a privileged attorney-client communication, and thus properly withheld under Exemption 5. *Accord Austin Sanctuary Network v. U.S. Immigr. & Customs Enf't*, No. 20-CV-01686 (LJL), 2022 WL 4356732, at *25 (S.D.N.Y. Sept. 19, 2022) (holding that "working draft of a memorandum" by agency attorneys was properly withheld as attorney-client privileged) (citation omitted); *Fams. for Freedom v. CBP*, 837 F. Supp. 2d 287, 302 (S.D.N.Y. 2011) (holding that privilege protected DOJ "legal advice prepared at the request of the Border Patrol").

The document is also properly withheld as deliberative. The document is plainly pre-decisional, as a redline draft of a submission created prior to the final version of the document, and the document is also deliberative because it "reflects proposed language for the submission, including edits and comments on the substance of the submission," and disclosure would "reveal

the details of intra-agency discussions regarding the development of the submission to OMB." Weetman Decl. ¶ 35.  State's declaration goes on to articulate that disclosure of the draft report "would foreseeably harm the ability of responsible Executive Branch officials to consider the collection of particular information in visa applications, as well as the justification for such collection, and formulate final opinions by inhibiting candid discussion and the expression of recommendations and judgments regarding draft language and courses of action."  *Id.*  Based on the obvious harms that would result from the release of draft agency documents, courts have routinely held that similar documents are appropriately protected by the deliberative process privilege, especially as here, where the document at issue contains redlines and comment bubbles that highlight the document's draft nature.  *See Nat'l Day Laborer Org. Network v. ICE*, No. 16 CIV. 387 (PAE), 2020 WL 7321396, at *5 (S.D.N.Y. Dec. 11, 2020) (noting that "the Court has no difficulty finding that such records are protected by the deliberative process privilege" where they "include redline edits in the form of track changes and/or comment bubbles") (citation omitted); *Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 161 F. Supp. 3d 120, 129 (D.D.C. 2016) (collecting "many instances" where courts have held that "drafts are protected by the deliberative process privilege").  This document is also appropriately withheld as deliberative pursuant to Exemption 5.

## CONCLUSION

For the foregoing reasons, this Court should grant judgment to Defendants, deny Plaintiffs' forthcoming cross-motion, and close the case.

30

Dated: January 25, 2023

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

*/s/ Michael L. Drezner*
MICHAEL L. DREZNER
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW Washington, DC 20005
Telephone: (202) 514-4505
Facsimile: (202) 616-8470

*Counsel for Defendants*