# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS – CONNECTICUT and MAKE THE ROAD NEW YORK,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, and U.S. DEPARTMENT OF STATE,<br><br>*Defendants.* | Civil Action No.<br>3:17-cv-1061-RMS |

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 216]**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

   I.  President Trump's Orders Implementing Extreme Vetting ....................................2

   II.  The State Department Immediately Begins to Implement Extreme Vetting With White
      House Oversight ...................................................................................................4

   III. Overcoming Legal Barriers, State Quickly Formalizes Extreme Vetting............................6

   IV. President Trump Touts Progress on Extreme Vetting...............................................9

   V.  Muslim Ban Report ..............................................................................................9

   VI. Testimony on Extreme Vetting ...........................................................................10

   VII.  Public Interest in Muslim Ban .........................................................................10

   VIII. Biden Administration's Promises Made, Promises Broken.................................11

PROCEDURAL HISTORY: CAIR-CT AND MRNY'S FOIA LITIGATION ...........................12

STANDARD OF REVIEW ................................................................................................13

ARGUMENT .......................................................................................................................15

   I.  Defendants Should Disclose the Muslim Ban Report ...........................................15

     A) The Report Cannot Be Withheld In Full Under the Presidential Communications
        Privilege.........................................................................................................15

         a.  The Privilege Does Not Apply to Widely Shared Documents ............................15

         b.  The Privilege is Waived by Subsequent Disclosure............................................21

         c.  The Privilege Does Not Apply Where There is No Specific Identifiable Harm ..21

         d.  In the Alternative, Defendants Must Provide Additional Information................24

     B) The Report Cannot Be Partially Withheld Under the Deliberative Process Privilege .....25

     C) The Report Cannot be Partially Withheld Under Exemption 7(E)...................27

     D) The Report Cannot Be Withheld Under Exemptions 1 and 3 .........................31

II. Defendant State Should Disclose the Three Documents that Relate to the Muslim Ban Order's Extreme Vetting Program .......................................................33

   A) Plaintiffs Have Not Waived Their Challenges to State's Withholdings ..........................33

   B) The Cable and Operational Q&A Cannot Be Withheld under Exemption 7(E) .............34

   C) The PRA Supporting Statement Cannot Be Withheld Under Exemption 5 ....................36

      a. Deliberative Process Privilege Does Not Apply ..................................................36

      b. Attorney Client Privilege Does Not Apply ...........................................................38

   D) In the Alternative, the Court Should Order *In Camera* Review of the Three Documents .......................................................................................................40

CONCLUSION........................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Allard K. Lowenstein Intern. Hum. Rgts. Proj. v. Dep't of Homeland Sec.*,
    626 F.3d 678 (2d Cir. 2010) ................................................................................................. 31

*Am. C.L. Union v. Nat. Sec. Agency*,
    925 F.3d 576 (2d Cir. 2019) ................................................................................................. 38

*Am. Civ. Liberties Union v. Dep't of Def.*,
    435 F. Supp. 3d 539 (S.D.N.Y. 2020) .................................................................................. 16

*Am. Civ. Liberties Union v. Dep't of Just.*,
    No. 15 Civ. 1954 (CM), 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016) ............................... *passim*

*Am. Civ. Liberties Union v. Off. of the Dir. of Nat'l Intel.*,
    No. 10 Civ. 4419, 2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) ........................................ 33

*Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*,
    325 F. Supp. 3d 162 (D.D.C. 2018) ..................................................................................... 33

*American Immigration Council v. Customs and Border Protection*,
    590 F. Supp. 3d 306 (D.D.C. 2022) ..................................................................................... 23

*Bloomberg, L.P. v Bd. of Governors of the Fed. Rsrv. Sys.*,
    601 F.3d 143 (2d Cir. 2010) ................................................................................................. 13

*Brennan Ctr for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*,
    697 F.3d 184 (2d Cir. 2012) ................................................................................................. 38

*Brennan Ctr. for Just. at N. Y. Univ. Sch. of L. v. U.S. Dep't of State*,
    17 Civ. 7520 (PGG), 2019 WL 10984173 (S.D.N.Y. Mar. 29, 2019). ............................. *passim*

*Cause of Action Inst. v. U.S. Dep't of Justice*,
    330 F. Supp. 3d 336 (D.D.C. 2018) ........................................................................... 38, 39, 40

*CLEAR v. U.S. Customs & Border Prot.*,
    No. 19-cv-7079 (RER), 2022 WL 16636686 (E.D.N.Y. Nov. 2, 2022) ........................... 14, 36

*Ctr. for Effective Gov't v. U.S. Dep't of State*,
    7 F. Supp. 3d 16 (D.D.C. 2013) ................................................................................. 16, 17, 19

*Defs. of Wildlife v. U.S. Border Patrol*,
    623 F. Supp. 2d 83 (D.D.C. 2009) ....................................................................................... 15

*Ecological Rights Found. v. EPA*,
    No. 18-cv-394-DMR, 2021 WL 2258554 (N.D. Cal. June 3, 2021) .................................... 24

*Estle v. Int'l Bus. Machs. Corp.*,
    23 F.4th 210 (2d Cir. 2022) ................................................................ 36

*Ethyl Corp v. EPA*,
    25 F.3d 1241 (4th Cir. 1994) ............................................................... 37

*Food Mktg. Inst. v. Argus Leader Media*,
    139 S. Ct. 2356 (2019) ....................................................................... 20

*Friends of Animals v. Bernhardt*,
    15 F.4th (10th Cir. 2021) .................................................................... 32

*Grand Cent. P'ship, Inc. v. Cuomo*,
    166 F.3d 473 (2d Cir. 1999) ......................................................... *passim*

*Halpern v. FBI*,
    181 F.3d 279 (2d Cir. 1999) ......................................................... *passim*

*Harris v. Gonzales*,
    488 F.3d 442 (D.C. Cir. 2007) ............................................................ 19

*Hawai'i v. Trump*,
    245 F. Supp. 3d 1227 (D. Haw. 2017) ................................................. 6

*Hertzberg v. Veneman*,
    273 F. Supp. 2d 67 (D.D.C. 2003) ...................................................... 14

*Hopkins v. U.S. Dep't of Hous. & Urban Dev.*,
    929 F.2d 81 (2d Cir. 1991) ............................................................ 25, 26

*Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*,
    891 F.2d 414 (2d Cir. 1989) ............................................................... 33

*In re Cnty. Of Erie*,
    473 F.3d 413 (2d Cir. 2007) ............................................................... 39

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ..................................................... *passim*

*Int'l Refugee Assist. Proj. v. Trump*,
    241 F. Supp. 3d 539 (D. Md. 2017) ..................................................... 6

*Jud. Watch, Inc. v. Dep't of Just.*,
    365 F.3d 1108 (D.C. Cir. 2004) .......................................................... 16

*Judge Rotenberg Educ. Ctr., Inc. v. Food & Drug Admin.*,
    376 F. Supp. 3d 47 (D.D.C. 2019) ...................................................... 26

iv

*Judicial Watch v. Commerce*,
    375 F. Supp. 3d 93 (D.D.C. 2019) ....................................................................... 23

*King v. Dep't of Just.*,
    830 F.2d 210 (D.C. Cir. 1987) ..................................................................... 14, 29

*Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*,
    560 F. Supp. 3d 810 (S.D.N.Y. 2021) ........................................................ *passim*

*Knight First Amend. Inst. v. U.S. Citizenship & Immigr. Servs.*,
    30 F.4th 318 (2d Cir. 2022) ............................................................................... 28

*Leopold v.Dep't of Justice*,
    487 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................... 24

*100Reporters LLC v. Dep't of Justice*,
    248 F. Supp. 3d 115 (D.D.C. 2017) .................................................................. 26

*Londrigan v. FBI*,
    670 F.2d 1164 (D.C. Cir. 1981) ....................................................................... 19

*Mehl v. EPA*,
    797 F. Supp. 43 (D.D.C. 1992) ........................................................................ 21

*N.Y. Times Co. v. U.S. Dep't of Def.*,
    499 F. Supp. 2d 505 (S.D.N.Y. 2007) .............................................................. 36

*Nat. Day Lab. Org. Network v. Immigr. & Customs Enf't*,
    811 F. Supp. 2d 713 (S.D.N.Y. 2011) .............................................................. 33

*Nat. Day Lab. Org. Network v. Immigr. & Customs Enf't*,
    486 F. Supp. 3d 669 (S.D.N.Y. 2020) .............................................................. 23

*New York Times v. DHHS*,
    513 F. Supp. 3d 337 (S.D.N.Y. 2021) .............................................................. 23

*Providence J. Co. v. U.S. Dep't of Army*,
    981 F.2d 552 (1st Cir. 1992) ............................................................................. 37

*Reporters Co. for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021) ............................................................................ 27

*Scholtisek v. Eldre Corp.*,
    441 F. Supp. 2d 459 (W.D.N.Y. 2006) ............................................................. 39

*Schwartz v. Dep't of Def.*,
    15-CV-7077, 2017 WL 78482 (E.D.N.Y. Jan. 6, 2017) ............................... 29, 34

*Seife v. U.S. Food & Drug Admin.*,
   43 F.4th 231 (2d Cir. 2022) ........................................................................ 13, 14

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
   523 F. Supp. 3d 24 (D.D.C. 2021) ...................................................................... 36

*Stolt-Nielsen Transp. Grp. Ltd. v. United States*,
   534 F.3d 728 (D.C. Cir. 2008) ........................................................................... 14

*Tax Analysts v. Internal Revenue Serv.*,
   117 F.3d 607 (D.C. Cir. 1997) ........................................................................... 38

*Trea Senior Citizens League v. U.S. Dep't of State*,
   923 F. Supp. 2d 55 (D.D.C. 2013) ...................................................................... 36

*Trump v. Hawai'i*,
   138 S. Ct. 2392 ................................................................................... *passim*

*U.S. Dep't of Treasury v. Pension Benefit Guar. Corp.*,
   222 F. Supp. 3d 38 (D.D.C. 2016) ...................................................................... 38

*United States v. Mejia*,
   655 F.3d 126 (2d Cir. 2011) ............................................................................... 39

*Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*,
   No. 18-2622(ABJ), 2021 WL 4502106 (D.D.C. Sept. 30, 2021) ..................... 21, 24

*Wiener v. FBI*,
   943 F.2d 972 (9th Cir. 1991) .............................................................................. 14

**Statutes**

44 U.S.C. § 3501 *et seq.* ........................................................................................ 6

5 U.S.C. § 552(a) ........................................................................................ *passim*

5 U.S.C. § 552(b) ........................................................................................ *passim*

50 U.S.C. § 3024 .................................................................................................. 31

FOIA Improvement Act of 2016 .................................................................... 14, 22

Immigration and Nationality Act § 221(g) ................................................. 5, 6, 34

Fed. R. Civ. P. 56 ............................................................................................ 13, 19

Plaintiffs Council on American-Islamic Relations-Connecticut and Make the Road New York brought this action pursuant to the Freedom of Information Act ("FOIA") in 2017 seeking documents relating to the implementation of then-President Trump's second Muslim Ban. After campaigning on a message that "Islam hates us," President Trump issued successive executive orders, commonly referred to as "Muslim Bans," that were designed to prevent people from Muslim-majority countries from entering the United States. These orders imposed outright suspensions on entry of nationals of certain countries and also ordered executive agencies to implement so-called "extreme vetting" that Trump claimed was needed to keep "radical Islamic terrorist[s] the hell out of our country."

In the years since this case was filed, a lot has changed: the United States has a new President who has denounced the Muslim Bans and formally revoked them. At the same time, much has not changed. Specifically, as Defendants' declarations in support of their summary judgment motion make clear, many of the policies implementing the Muslim Bans—including the controversial collection of social media identifiers—remain in effect to this day and continue to keep people from Muslim-majority countries out of the United States. And despite President Biden's admonition that the Muslim Ban was a "stain on our national conscience" and his professed commitment to shine a light on its abuses, the Biden Administration continues to hide from public view some of the most important documents related to implementation of the Bans.

Plaintiffs have sought—for nearly six years—to bring those documents to light. This is the purpose of their motion today. Plaintiffs seek disclosure of four documents: (i) an internal report describing executive agencies' actions taken to implement the "extreme vetting" program ordered by the Second Muslim Ban (withheld in full); (ii) two State Department ("State") guidance documents implementing "extreme vetting" that were sent to the agency's overseas officers; and

(iii) a State document seeking emergency authorization to collect additional data from "certain" visa applicants, as needed to implement "extreme vetting."  *See* Declaration of Adam Bates ("Bates Decl."), Exs. A, B, C.

Defendants seek to keep these documents out of the public eye, relying on overbroad assertions of the limited exceptions to the public's right to information under the FOIA. Defendants should not defend these withholdings.  Nor can they, as described below.  Plaintiffs respectfully request that the Court grant their motion for summary judgment and deny Defendants' motion, *see* ECF No. 216.

## FACTUAL BACKGROUND

### I.   President Trump's Orders Implementing Extreme Vetting

President Trump's 2016 presidential campaign was driven in no small part by anti-Muslim xenophobia; Trump asserted that "Islam hates us," warned that "we're having problems with Muslims coming into the country," and promised to enact a "total and complete shut down of Muslims entering the United States." *See Trump v. Hawai'i*, 138 S. Ct. 2392, 2438 (Sotomayor, J., dissenting).  Upon taking office, Donald Trump quickly put his words into action.  During his first week in office, he issued an Executive Order barring individuals from seven Muslim-majority countries from entering the United States.  *See* Bates Decl., Ex. E.  The Executive Order also directed the Secretary of Homeland Security, in conjunction with the Secretary of State, the Director of National Intelligence, and the Director of the Federal Bureau of Investigation, to enhance screening and vetting procedures—*i.e.*, the "extreme vetting" that Trump had also promised to implement while a presidential candidate.  *Id.* § 4.

President Trump's Order wreaked havoc for days during which it quickly became apparent that the President had not consulted with his executive agencies before issuing the order, and the

order was swiftly enjoined by multiple courts. *See* Bates Decl., Ex. MM. Five weeks later, Trump's second iteration of the Muslim ban and extreme vetting followed. *See* Bates Decl., Exh. D ("Muslim Ban Order" or "the Order"). Explaining that it was easier to issue a new order than to wait to be vindicated by the courts, Trump largely tracked the first order's language and substance in the Second Muslim Ban, while making clear that this was the promised Muslim Ban, albeit a bit "watered-down." Bates Decl., Ex. T; *see id.*, Exs. D, E.

The Second Muslim Ban directed several executive agencies to implement a wide range of actions, perhaps most famously: another ban on travelers from six Muslim-majority countries, a suspension of the U.S. Refugee Admissions program, and a "worldwide review" of the information provided by foreign countries to the U.S. for adjudicating visas and other benefits. *See* Bates Decl., Ex. D §§ 2(a) & (c), 6(a). In addition, as relevant here, Section 5 of the Order directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence to "implement a program, as part of the process for [visa] adjudications," which was to include "development of a uniform baseline for screening and vetting" and "amended application forms with new questions[.]" *Id.* § 5(a). In addition, the Order directed the Secretary of Homeland Security, in conjunction with the Secretary of State, the Attorney General, and the Director of National Intelligence to submit a "report[] on progress of the program . . . within 60 days." *Id.* § 5(b). Defendants' withholding of the resulting report is at issue here ("Muslim Ban Report" or "the Report"). *See* Bates Decl. ¶ 7.

In tandem with the Order, President Trump also issued on March 6, 2017 a Memorandum related to "Implementing Immediate Heightened Screening and Vetting of Applications for Visas and Other Immigration Benefits[.]" *See* Bates Decl., Ex. D ("Muslim Ban Memorandum" or "the Memorandum"). The Memorandum explained that while the worldwide review of countries'

information sharing was pending, "this nation cannot delay the immediate implementation of additional heightened screening and vetting protocols and procedures for issuing visas[.]" *Id.* § 1. To that end, Trump directed the Secretary of State and Secretary of Homeland Security, in consultation with the Attorney General, to "implement protocols and procedures as soon as practicable that in their judgment will enhance the screening and vetting of applications for visas and all other immigration benefits." *Id.* § 2.  He further ordered that such measures should focus on "ensuring the proper collection of all information necessary to rigorously evaluate all grounds of inadmissibility or deportability, or grounds for the denial of other immigration benefits," and "preventing the entry . . . of foreign nationals who may aid, support, or commit violent, criminal, or terrorist acts[.]"  *Id.* § 2(a)-(b).  Finally, in relevant part, the Memorandum directed the agency heads "to rigorously enforce all existing grounds of inadmissibility[.]" *Id.* § 3.

## II.  The State Department Immediately Begins to Implement Extreme Vetting With White House Oversight

State complied: within a week, the Department had exchanged multiple drafts of guidance implementing the Memorandum's "heightened vetting" with senior White House policy advisor Stephen Miller.  *See* Bates Decl., Exs. F, G.  In an email entitled "Language for Stephen," State officials provided Miller with a draft that had been edited by State's Office of the Legal Advisor (referred to as "L").  *Id.*, Ex. F at 3-5.  Miller proposed language urging consular officers to use "the greater degree of discretion that the President has empowered them to exercise."  *See id.* at 2. The next morning, State officials had revised their draft "incorporating Mr. Miller's guidance," and were ready for his next review.  *See id.* at 1; *id.*, Ex. G at 1.

The email correspondence of State officials speaks to the pressure they felt to quickly turn around drafts to Mr. Miller.  *See, e.g.*, *id.*, Ex. F at 1 ("Sorry there wasn't time to consult all of you," and referring to the draft as reflecting "short-fuse input").  The following day—March 15,

4

the State Department sent out the guidance in the form of a cable to all overseas posts.  *See* Bates Decl., Ex. H at 4; *id.*, Ex. U.  The cable described the Muslim Ban Order and Memorandum, highlighting that new screening processes were to be "implement[ed] immediately . . . for all visa applicants."  *Id.*, Ex. U ¶ 5.  Reflecting Mr. Miller's contributions, the cable directed consular officers that they "should not hesitate to refuse any case presenting security concerns under § 221(g) of the Immigration and Nationality Act[.]"  *Id.* ¶ 4.

The cable directed each post to convene committees of individuals already involved in vetting known or suspected terrorists[1] to establish a list of criteria identifying sets of visa applicants "warranting increased scrutiny."  *Id.* ¶ 6.  Thereafter, consular officers were directed to identify individual visa applicants within those sets.  *Id.* ¶ 7.  For such individuals, consular officers were to consider requesting a type of security check known as a "Donkey Security Advisory Opinion (SAO)."  *Id.*  And where officers requested SAOs based on the new guidance, they were instructed that they "must ask additional questions," and record the responsive information: travel, address, and employment history for last fifteen years; phone numbers, email addresses, and social media handles used for the last five years; prior passport numbers; and data on any siblings, children, and former spouses.  *Id.*

For most visa applicants who were nationals of the six countries subject to the Muslim Ban Order,[2] counselor officers were informed that the SAO check was mandatory.  *Id.* ¶ 9.  Officers were directed to ask individuals from the banned countries the same questions, as well as if they

---

[1] Specifically, under the auspices of the Visas Viper program or existing law enforcement and intelligence working groups.  *See* Ex. U ¶ 6; *see also* Ex. A ¶ 4.

[2] The guidance was limited to individuals who were at least 16 years old and less than 65 years old and a small number of visa types were excluded. *Id.* ¶ 9. For Iraqi nationals, the guidance applied only if the individual had ever been present in a territory controlled by ISIS.  *Id.* ¶ 17.

had been present in territory controlled by ISIS, and if the answer was yes, their cases had to be referred to the fraud prevention unit for mandatory review.  *Id.* ¶ 12.

The same day that DOS issued the cable—on March 15—a Hawai'i federal court preliminarily enjoined aspects of the Muslim Ban Order, including the ban on nationals of six countries.  *See Hawai'i v. Trump*, 245 F. Supp. 3d 1227, 1239 (D. Haw. 2017); *see also Int'l Refugee Assist. Proj. v. Trump*, 241 F. Supp. 3d 539, 566 (D. Md. 2017). The following day, State sent a new cable to its overseas posts, notifying them that the ban on certain nationals could not be implemented, but stressing that "[p]osts should continue to follow the guidance . . . on heightened screening and vetting of populations of visa applicants to be defined by posts."  Bates Decl., Ex. I ¶¶ 1-2.  It clarified that posts were to implement the guidance on SAO checks and additional data collection for these populations, but not for nationals of the six banned countries.  *Id.* ¶ 2; *see id.*, Ex. U ¶¶ 6-8, 9-12.

### III.   Overcoming Legal Barriers, State Quickly Formalizes Extreme Vetting

At some point on March 15, State officials appear to have realized that in their haste to implement the new screening and vetting, they had overstepped the legal limits on agencies' collection of information from the public.  *See* 44 U.S.C. § 3501 *et seq*.  The Paperwork Reduction Act requires that the Office of Management and Budget ("OMB") approve any new information collection affecting at least 10 people, *id.* § 3502(3)(A)(1), but OMB had not approved State's new mandatory collection of information from certain visa applicants.  State officials began discussing "OMB approval for additional interview questions" from the cable guidance sent "this morning." *See* Bates Decl., Ex. J at 2-5.  As before, State officials looped in the White House: after getting internal clearances from inside State, they made plans to send a draft "to WH contacts for approval."  *See id.* at 1.  Thereafter, on March 17, State sent "supersed[ing]" guidance to all

overseas posts informing consular officers to "disregard" the March 15 cable "to the extent the guidance sets out specific questions to ask of applicants, unless and until" notified that OMB has approved "those specific questions."   Bates Decl., Ex. K, V [unredacted] ¶ 8.   And Deputy Assistant Secretary of State Ed Ramotowski met with Stephen Miller to discuss the implementation of extreme screening and vetting.  *See* Bates Decl., Ex. L.

State acted quickly to get OMB approval needed to implement extreme vetting.  By early April, State officials had drafted the new information collection form (DS-5355), a corresponding Federal Register Notice, and a memo discussing political and legal considerations.  *See* Bates Decl., Ex. M.  They sent these documents to the Secretary of State in an "Action Memo" requesting approval of their proposal to codify the new information collections for certain visa applicants. *See id.* The Action Memo noted that if approved, the State Department "will request emergency OMB approval for this information collection" because of "the urgency" reflected in "our communications with senior White House staff" and in the Memorandum.  *Id*.  The Secretary approved on April 13, 2017.  *See* Bates Decl., Ex. N at 2.

Two weeks later, State Department officials sent an Action Memo to the Acting Assistant Secretary of State for Consular Affairs recommending that he sign off—that day—on their proposal to seek emergency OMB authorization of their new extreme vetting data collection in DS-5355.  *See id*.  Again they stressed the pressure to move quickly in light of "the urgency conveyed . . . in our communications with senior White House staff" and in the Muslim Ban Memorandum.   *Id*.  They attached the proposed information collection form, as well as the emergency justification request and supporting statement for OMB and the Federal Register notice. *Id*.  The Acting Assistant Secretary approved, *see id.*, and the State Department submitted the

emergency authorization request to OMB that same day, *see* Bates Decl., Ex. O; *see also id.*, Ex. W (federal register notice of request for emergency OMB approval).

In its cover letter to OMB, State explained that it sought *emergency* approval for Form DS-5355 because consular officers needed to collect the information to implement the Muslim Ban Order's directive to "'ensur[e] the proper collection of information necessary to rigorously evaluate' individuals seeking U.S. visas or other immigration-related benefits." Ex. O at 1. State further explained that it needed emergency authorization within fourteen days—far less than the six to nine months usually associated with PRA clearance[3]—because "[a]dhering to ordinary time frames for review . . . would mean that these supplemental questions could not routinely be asked . . . for a matter of months," and such delay "would impede the purposes behind the [Muslim Ban] Memorandum and its call for immediate steps including the proper collection of all information necessary" from visa applicants. *Id.* at 2. State estimated that 65,000 people would need to submit the information annually. *See id.*, Ex. W at 20957.

OMB approved the information collection on May 23. *See id.*, Ex. X. Two days later, the State Department sent another cable—one of the documents at issue in this motion—to all overseas posts, to guide their implementation of the information collection. *See id.*, Ex. A ¶ 2. The cable directed the committees that had already been convened to develop criteria identifying sets of applicants that "warrant increased scrutiny" to report their criteria no later than June 9, and described the review process that would follow. *Id.* ¶¶ 4-5. The committees were directed to "reconvene as necessary to periodically review and consider further local criteria to identify applicants warranting increased scrutiny" and to report their findings. *Id.* ¶ 7. With respect to individual applicants meeting each post's criteria, the cable directed officers to continue to collect

---

[3] *See* Bates Decl., Ex. VV at 1.

the categories of additional information identified in the March cables, noting that they could collect the information during the visa interview, by email, or using "new form DS-5355." *Id.* ¶¶ 8-9. State sent additional guidance on the cable in an "Operational Q&A"—another document at issue in this motion, *see id.*, Ex. B.

Simultaneous with the State Department's efforts, U.S. Customs and Border Protection ("CBP") engaged in a similar process, seeking OMB authorization to add a new question requesting social media handles to its Electronic Visa Update System (EVUS), which it used to screen certain non-immigrant visa applicants before their travel to the U.S. *Id.*, Ex. YY.

### IV. President Trump Touts Progress on Extreme Vetting

As his executive agencies implemented extreme vetting, President Trump began publicly touting their progress. In April, he informed the public in a Washington Post Op-Ed that his Administration had achieved "nothing short of historic" changes to immigration enforcement and that "[v]isa processes are being reformed to substantially improve vetting and screening." *Id.*, Ex. Y at 3. At a rally later that month, President Trump told supporters that his Administration "has taken historic steps to improve screening and vetting for those seeking visas to enter the United States," and "[w]e are going to keep radical Islamic terrorist the hell out of our country." *Id.*, Ex. Z at 8. In early May, he tweeted "we are EXTREME VETTING people coming into the U.S. in order to help keep our country safe." *Id.*, Ex. AA. A few months later, President Trump described how the uniform baseline screening and vetting standards developed in the visa context had served as a model for changes to screening and vetting of refugees. *See id.*, Ex. BB §§ 1(b), (d). And the White House issued a number of press releases touting the success of the extreme vetting implemented under President Trump. *See e.g.*, *id.*, Ex. CC.

### V. Muslim Ban Report

In May 2017, Executive Secretary for the State Department Joseph Macmanus sent the Executive Secretary for the Department of Homeland Security ("DHS") a document indicating that Secretary Tillerson had approved the attached copy of the 60-Day Report to the President "regarding uniform vetting standards," as ordered by the Muslim Ban Order.  *See id*., Ex. P.

## VI. Testimony on Extreme Vetting

Trump Administration officials provided specific details on interagency vetting and changes associated with extreme vetting to Congress and the public.  For example, in March 2017, Acting Assistant Secretary of State David Donahue provided detailed descriptions to the Senate Judiciary Committee of processes associated with interagency vetting of visa applicants, including the names of specific security checks, the agencies and components responsible for them, the type of information checked and the circumstances triggering particular checks, and details of interagency cooperation in conducting additional reviews. *See id*., Ex. DD at 6-8.  And in May 2017, high level officials from agencies including DHS, State, and the Government Accountability Office testified in hearing entitled "Denying Terrorists Entry to the United States: Examining Visa Security" before the House Committee on Homeland Security providing additional details about inter-agency security and vetting checks and information sharing through the Visa Waiver Program, as well as describing actions taken to improve vetting.  *See id*., Ex. EE at 9-20, 22, 24, 31-32, 35-36, 39, 43-44, 46, 52-53, 57-61.  In June 2017, State presented on security and vetting changes associated with the Executive Order to the annual conference of the American Immigration Lawyers Association.  *Id*., Ex. R.

## VII. Public Interest in Muslim Ban

News reporting during this period reflected the significant public interest in President Trump's Muslim Ban and the implementation of his promised extreme vetting.  Major national

news outlets published, for example, the full text of the first executive order, as well as State Department cables implementing the Muslim Ban Order. *See id*., Exs. FF at 2-9, GG at 4.

Plaintiffs filed FOIA Requests seeking records from the State Department, USCIS, and CBP related to their implementation of the Muslim Ban on April 12, 2017, and sued when the agencies failed to respond.  ECF No. 1; ECF No. 4, Exs. A, C, H.  Muslim Advocates, the Brennan Center, and other advocacy organizations filed another FOIA case seeking similar records in Fall 2017.  *See* Complaint for Declaratory and Injunctive Relief, *Brennan Ctr. for Just. v. U.S. Dep't of State*, 17-cv-7520 (PGG) (S.D.N.Y. Oct. 2, 2017).

### VIII.   Biden Administration's Promises Made, Promises Broken

President Biden campaigned on a pledge to revoke the Muslim Ban, *see* Bates Decl., Ex. HH at 1, and on his first day in office, he revoked the Muslim Ban Order, saying that the Ban was "a stain on our national conscience" that was "inconsistent with" our values, "undermined our national security," and was "just plain wrong," *id.*, Ex. II Prefatory Language and § 1.  Biden ordered the Secretary of State and Secretary of Homeland Security, in consultation with the Director of National Intelligence, to produce a report describing screening and vetting procedures for visa applicants, including an evaluation of the "usefulness of form DS-5535" and whether the use of social media identifiers "has meaningfully improved screening and vetting."  *Id.* § 3(a), (d).  President Biden also directed the Secretary of State to oversee resumption of "visa processing in a manner consistent with the revocation," and to produce both a report detailing the number of visa applicants impacted by the Muslim Ban Order and a plan to reconsider their applications.  *Id.* § 2.

More than 40,000 people were barred from entering the United States as a result of the ban, according to State Department data.  *Id.*, Ex. JJ at 2.  The State Department announced in 2021 that it would accept new visa applications from affected individuals, *id*. at 1-2, but the Department

has refused to rescind policies implementing the ban, such as the social media registration requirement, *see* Defs.' Notice Regarding Policy Review & Resp. to Pltfs.' Notice of Supp. Authority, *Doc Society v. Blinken*, No. 1:19-cv-03632-TJK (D.D.C. Feb. 11, 2022), ECF No. 58; *see also* Bates Decl., Ex. KK at 2-8 (describing ongoing harms). Notably, Form DS-5355 remains in use. *See, e.g.*, Bates Decl., Ex. LL. A declaration submitted by Defendants in support of their summary judgment motion confirm that guidance documents and "most procedures" they describe that implemented Extreme Vetting "remain active." *See* Decl. of Susan C. Weetman ("Weetman Decl.") ¶¶ 28, 31, ECF No. 216-4. In addition, as described *supra*, the extreme vetting implemented in the visa processing context served as a model for similar measures put in place in the refugee context, and the Biden Administration has made no promises to review vetting procedures or to allow denied applicants to reapply in that context.

Finally, notwithstanding its stated commitment to erasing the "stain on our national conscience" imposed by the Muslim Ban Order, Bates Decl., Ex. II, the Biden Administration has repeatedly refused to shed light on this dark period of our history. It has refused to release the Reports detailing the Administration's progress in implementing the Muslim Ban in this litigation and in the *Brennan Center* case. *See* Pltfs.' Statement of Undisputed Material Facts ("SUMF") 10; *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of State*, 17 Civ. 7520 (PGG), 2019 WL 10984173, at *3 (S.D.N.Y. Mar. 29, 2019). Continued public interest in the Reports has spurred additional litigation seeking answers. *See* Complaint, *Cato Inst. v. U.S. Dep't of Homeland Sec.*, 1:22-cv-1940 (D.D.C. July 5, 2022).

## PROCEDURAL HISTORY: CAIR-CT AND MRNY'S FOIA LITIGATION

After Defendants failed to respond to Plaintiffs' FOIA requests within the statutory timeframe, Plaintiffs filed the instant case in June 2017 to enforce their rights to the Records under

12

the FOIA.  *See* ECF No. 1.  The parties ultimately narrowed their disputes to Defendants' withholdings of the four documents at issue here.  *See* ECF No. 211 ¶ 2; Bates Decl. ¶¶ 3-8.  The specific documents at issue are: (1) the 60-day Report on agencies' progress in implementing the Muslim Ban Order the screening and vetting program ("Muslim Ban Report" or "Report"); (2) a version of the State Department's submission to OMB in support of its request for emergency authorization of its new form collecting information associated with extreme vetting ("PRA Supporting Statement"); and (3) the State Department cable ("Cable") and (4) the State Operational Q&A ("Operational Q&A") document which State sent to all overseas posts with guidance on implementing extreme vetting after OMB authorized the new information collection in DS-5355.  Bates Decl. ¶¶ 7-8.  Defendants have submitted the Report for *in camera* review. ECF No. 211 ¶ 6.

## STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The government has the burden to show that the records fall squarely within one or more FOIA exemptions.  *See* 5 U.S.C. § 552(a)(4)(B).  If exemptions apply to only portions of the records, the government must disclose all reasonably segregable non-exempt portions.  *Id*. § 552(b).

In analyzing whether the government has met its burden, the Court must construe the exemptions narrowly, with "[a]ll doubts . . . resolved in favor of disclosure."  *Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231, 235 (2d Cir. 2022).  The FOIA statute requires de novo review of the agency's withholdings, *see* 5 U.S.C. § 552(a)(4)(B), and as such, "[t]he agency's decision that the information is exempt from disclosure receives no deference," *Bloomberg, L.P. v Bd. of Governors of the Fed. Rsrv. Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).

13

To meet its burden to show that the claimed exemptions apply to the relevant portions of the documents, the agency must "describe in reasonably specific terms the nature of the documents and the justification for nondisclosure." *Halpern v. FBI*, 181 F.3d 279, 285 (2d Cir. 1999). Such justifications may be in the form of declarations and/or an index (collectively known as a *Vaughn* index). *See id.* at 291. "Specificity is the defining requirement of the *Vaughn* index," because "[u]nless the agency discloses 'as much information as possible without thwarting the [claimed] exemption's purpose,' the adversarial process is unnecessarily compromised." *Wiener v. FBI*, 943 F.2d 972, 979 (9th Cir. 1991) (quoting *King v. Dep't of Just.*, 830 F.2d 210, 219, 224 (D.C. Cir. 1987)). Justifications that are "conclusory and generalized," or "explanations [that] read more like a policy justification" and "give[] no contextual description[s] either of the documents subject to redaction or of the specific redactions made to the various documents" are insufficient. *Halpern*, 181 F.3d at 290, 293.

Even where an agency demonstrates that an exemption applies, Congress recently imposed an "additional, independent burden" upon the agency to show that it "reasonably foresees that disclosure would harm an interest protected by an exemption, or [that] disclosure is prohibited by law." *Seife*, 43 F.4th at 235 (describing the FOIA Improvement Act of 2016). With respect to segregability, the agency has the burden to "'demonstrate that it cannot segregate the exempt material from the non-exempt material and disclose as much as possible.'" *CLEAR v. U.S. Customs & Border Prot.*, No. 19-cv-7079 (RER), 2022 WL 16636686, at *3 (E.D.N.Y. Nov. 2, 2022) (quoting *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 74 (D.D.C. 2003)). The Court "must make specific findings of segregability" before approving application of a FOIA exemption. *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008).

The Court is authorized to examine withheld documents *in camera*.  *See* 5 U.S.C. § 552(a)(4)(B).  If the Court concludes that the government has failed to sustain its burden to justify withholdings, it may order the government to disclose the records, *see id.*, or alternatively, it may require further justification for the claimed exemption, *see, e.g.*, *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 93 (D.D.C. 2009).

## ARGUMENT

Defendants have failed to meet their burden to show that the claimed exemptions apply in full or in part.  With respect to each of the claimed exemptions, the record is sufficient for the Court to rule that the exemption does not apply in this case and to grant summary judgment for the Plaintiffs.  In the alternative, if the Court believes the record is insufficient to grant summary judgment to Plaintiffs, the Court should order Defendants to provide further information, correlated to the specific portions of the documents for which the exemptions are claimed, and should order the Defendants to produce the Cable, the Operational Q&A, and the PRA Supporting Statement for *in camera* review.

### I.   Defendants Should Disclose the Muslim Ban Report

#### A)  The Report Cannot Be Withheld In Full Under the Presidential Communications Privilege

##### a.  The Privilege Does Not Apply to Widely Shared Documents

DHS alone—not a Defendant in this case—withholds the Muslim Ban Report in full under the presidential communications privilege, see Defs.' Mem. of Law iso Mot. for Summ. J. ("Defs.' Mot.") at 6-15, ECF No. 216-1.[4]  That privilege is "rooted in the need for confidentiality to ensure

---

[4] The presidential communications privilege and the deliberative process privilege are subsumed within Exemption 5, which incorporates into FOIA "all the normal civil discovery privileges." *Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991); *see* 5 U.S.C. §

that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge," *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997).   The presidential communications privilege is limited: "[c]ourts have long been hesitant to extend the presidential communications privilege" in light of our "democratic form of government where the public's right to know how its government is conducting its business has long been an enduring and cherished value." *Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1122 (D.C. Cir. 2004).   As a result, the privilege must be construed "'as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected.'"   *Id.* at 1116 (quoting *In re Sealed*, 121 F.3d at 752).   Because the Muslim Ban Report has been widely shared within the executive branch, the privilege does not apply.   In the alternative, the privilege has been waived at least in part as a result of subsequent public disclosure of its contents, and because Defendants have failed to identify a specific harm linked to disclosure of its contents.

While the Second Circuit has not considered whether widespread sharing of a document within the executive branch for non-advisory purposes defeats the privilege, every court to consider the issue has held that it does.   *See, e.g.*, *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 27 (D.D.C. 2013) (granting summary judgment to plaintiffs); *Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, 560 F. Supp. 3d 810, 827–30 (S.D.N.Y. 2021) (same); *Brennan Ctr.*, 2019 WL 10984173, at *5 (government failed to meet burden and ordering *in camera* review); *Am. Civ. Liberties Union v. Dep't of Just.*, No. 15 Civ. 1954 (CM), 2016 WL 889739, at *2–6 (S.D.N.Y. Mar. 4, 2016) (same); *see also Am. Civ. Liberties Union v. Dep't of Def.*, 435 F. Supp. 3d 539, 559 at n.16 (S.D.N.Y. 2020) ("[T]he transmittal of a

---

552(b)(5) (exempting "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency…").

document to persons who are unlikely to be in a position to give advice to the President waives the privilege.").

This makes sense because the purpose of the privilege is to protect the "confidentiality" of presidential decisionmaking, *In re Sealed Case*, 121 F.3d at 750, and widespread sharing does not further that purpose.  As Judge Huvelle explained in holding that the presidential communications privilege did not attach in a case involving broad distribution of a document within the executive branch: "[t]he purpose . . . is paramount.  If distribution is limited to advisory purposes, the privilege may apply; but if distribution is far broader, the purposes animating the privilege will not justify its application." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 29.  Relying on Judge Huvelle's analysis, Judge Gardephe reasoned—in a case also involving Muslim Ban Reports—that "if the information contained within the withheld documents has been widely and publicly disseminated, the rational for applying the presidential communications privilege is much less compelling." *Brennan Ctr.*, 2019 WL 10984173, at *6; *see also Knight*, 560 F. Supp. 3d at 829 (documents distributed for non-advisory purposes simply do "not implicate[]" the need for confidentiality in presidential decisionmaking).

Here, there can be little doubt that the Report was distributed within the executive for non-advisory purposes, SUMF 20; and, at minimum, Defendants have failed to satisfy their burden to demonstrate otherwise.  In his declaration for DHS, Mr. Holzer conclusorily asserts that that the Report was "closely held within the executive branch," Decl. of James V.M.L. Holzer ("Holzer Decl.") ¶ 15, ECF No. 216-3, but "closely held" is meaningless where the executive branch employs more than 4 million Americans.  SUMF 21.  In any event, the privilege does not generally "extend to staff outside the White House in executive branch agencies," *In re Sealed Case,* 121 F.3d at 752, and Defendants admit to a long list of executive branch agencies and subcomponents

17

that had access to the Report: Department of Justice; Department of State; Office of the Director of National Intelligence; Central Intelligence Agency; U.S. Customs and Border Protection; DHS Office of Intelligence and Analysis; DHS Office of Policy; and the National Security Council. SUMF 15.  Nor does Mr. Holzer assert this is an exhaustive list of the agencies that received it. SUMF 17.

The government fails to recognize that the privilege applies only to those *individuals*—not agencies—"who have broad and significant responsibility for investigating and formulating advice to be given to the President *on the particular matter* to which the communications relate." *In re Sealed*, 121 F.3d at 758 (emphasis added).  Indeed, Mr. Holzer does not even attempt to identify the individuals who received the Report, SUMF 16, much less their respective job titles and whether they acted in an advisory capacity to the President on the Report specifically.  SUMF 18; *see In re Sealed*, 121 F.3d at 752 (the privilege applies "only" to individuals acting in an advisory capacity, and even then, "[n]ot every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege").  Nor does Mr. Holzer assert that recipients received any instructions not to share the Report.  SUMF 19. In *Brennan Center*, Judge Gardephe held that nearly identical language from Mr. Holzer was "not illuminating as to the extent to which the information contained in [other Muslim Ban Reports] has been distributed," and he denied Defendants' summary judgment motion and ordered Defendants to produce the Muslim Ban Reports for *in camera* review.  2019 WL 10984173, at *5– 7.

Moreover, while Mr. Holzer and Ms. Weetman both assert that the "full and unredacted version" of the Report was distributed on an amorphously defined "need to know" basis, Holzer Decl. ¶ 16; Weetman Decl. ¶ 24, the question is not whether disclosure was limited in some way,

but whether disclosure was specifically limited to *presidential advisors involved in advising the President on the Report*.  Defendants have provided no reason to believe that every official who "contributed to the report" or who had an undefined "need-to-know" basis to receive it was closely involved in advising the President.  *See In re Sealed*, 121 F.3d at 752.  Indeed, in *Center for Effective Government*, Judge Huvelle specifically addressed record evidence that information was limited on a "need to know" basis, and held that the privilege only applies where "the *reason* a given recipient 'needs to know' . . . implicate[s] the purposes that animate the privilege: the promotion of candor and effective presidential decision-making." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26; *see also ACLU*, 2016 WL 889739, at *4 (same).  In any event, Mr. Holzer and Ms. Weetman assert limitations on disclosure only within their respective agencies—not within the many other agencies that received the Report.  Holzer Decl. ¶ 16; Weetman Decl. ¶¶ 24-25.

Furthermore, Ms. Weetman asserts that "[t]o the best of the subject matters experts' recollection," State Department officials did not share the Report outside the Department, *see* Weetman Decl. ¶ 24, but the D.C. Circuit has held that such affidavits "based upon belief are inadequate to support a motion for summary judgment."  *See Harris v. Gonzales*, 488 F.3d 442, 446 (D.C. Cir. 2007) (citing *Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981)); Fed. R. Civ. P. 56(c) (requiring admissible evidence).  And notwithstanding the State Department's claim that distribution within the Department was limited, it has declined to identify the name, title, or advisory role of the "official" who provided the Report that Defendants processed in this case.  *See* Weetman Decl. ¶ 23.

Defendants do not engage with the weight of the caselaw on disclosure, simply noting that courts "have looked at various factors."  Defs.' Mot. at 11.  But while courts have highlighted different facts arising in different circumstances, the overwhelming judicial consensus is that the

purpose of the presidential communications privilege—to maintain the confidentiality of presidential decisionmaking—is not served when a communication is shared beyond presidential advisors.  *See generally Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019) ("[I]t is hard to see how information could be deemed confidential if its owner shares it freely.").

Finally, Defendants' assertion that the presence of classified information in a document is "strong evidence" that a record "has not been treated in a manner inconsistent with the Privilege," Defs.' Mot. at 13-14, misrepresents the lone case they cite, in which the court noted the absence of classified information in a long discussion about how the documents had been "distributed throughout the Executive Branch." *Knight*, 560 F. Supp. 3d at 829-30.  The *Knight* court held the presidential communications privilege did not apply.  *Id.*

More relevant here, in cases involving documents containing classified information, courts have focused on the purpose of the privilege and whether that purpose was or may have been defeated by widespread disclosure.  For example, in *ACLU v. Department of Justice*—a case involving partially classified presidential guidance relating to actions against terrorist targets— Judge McMahon emphasized that she did "not know how widely the document has been distributed, or to whom, or for what purposes it has been used" or whether "there may be portions of the document that must be disclosed because all privileges and FOIA exemptions have been waived."  *ACLU*, 2016 WL 889739, at *5.  Judge McMahon ordered the government to produce the document for *in camera* review and to "advise the court of who has received the [document] (including persons who received it from its original recipients) and for what purpose."  *Id.* at 6. Judge Gardephe similarly ordered *in camera* review of the Muslim Ban Reports containing some classified information upon finding that the government had failed to meet its burden to show that the privilege applied.  *Brennan Ctr.*, 2019 WL 10984173, at *7.

20

### b.  The Privilege is Waived by Subsequent Disclosure

To the extent the government publicly disclosed information contained with the Report, at minimum, it has waived the privilege "for the document or information specifically released." *In re Sealed*, 121 F.3d at 741.   Moreover, a partial waiver is possible notwithstanding the government's contention that the privilege "'applies to documents in their *entirety*,'" Defs.' Mot. at 8 (quoting *In re Sealed*, 121 F.3d at 745), because—as courts have recognized—subsequent government actions can waive the privilege in part, *see, e.g.*, *Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*, No. 18-2622(ABJ), 2021 WL 4502106, at *21 (D.D.C. Sept. 30, 2021) (ordering disclosure of portions of documents withheld under the presidential communications privilege); *ACLU*, 2016 WL 889739 at *5-6 (ordering *in camera* review to determine the "extent" to which, if at all, the privilege was waived by public disclosure of its substance); *see generally Mehl v. EPA*, 797 F. Supp. 43, 49 (D.D.C. 1992) (considering whether a public report citing and discussing information in separate documents waived the deliberative process privilege as to those other documents). Where the government has waived a privilege, it has an obligation to assess whether the non-privileged information is segregable from the rest of the document.  *See* 5 U.S.C. § 552(b).

Here, President Trump ordered the Secretary of Homeland Security to submit a Report on the executive agencies' progress in implementing the Muslim Ban Order.  SUMF 4.  By the time the Report was due, the agencies—and in particular, the State Department—had made demonstrable progress in implementing President Trump's directives related to screening and vetting of visa applicants in the Order and the Memorandum.  SUMF 22-26, 28-30, 33-35.  And within weeks after the release of the Report, OMB granted the State Department emergency authorization to formalize its new data collection using Form DS-5355, SUMF 65, and State

21

distributed related guidance to overseas posts, *see* Bates Decl., Exs. A, B.  Moreover, President

Trump and his Administration publicly touted their progress in implementing extreme vetting in

tweets, op-eds, press releases, and at rallies.  SUMF 31.  In addition, Administration officials

repeatedly gave public testimony to Congress describing security and vetting changes associated

with President Trump's Muslim Ban.  SUMF 32.  And government documents provided even more

information about the implementation of the Report, including the creation of the National Vetting

Center to oversee inter-agency collaboration on screening and vetting.  SUMF 40, 41.

The breadth and depth of the public disclosures related to the subjects ordered to be covered

in the Report strongly suggest that, at minimum, partial waiver is appropriate.  Accordingly, if the

Court reaches the waiver issue in this case, Plaintiffs respectfully request that the Court consider

during its *in camera* review whether the government's many public disclosures have waived the

privilege in full or in part.

### c.  The Privilege Does Not Apply Where There is No Specific Identifiable Harm

Even if the Court were to find that the Report falls within the presidential communications

privilege, the FOIA Improvement Act of 2016 ("FIA") imposes an additional burden on DHS to

identify a specific identifiable harm to an interest protected by an exemption.  *Seife*, 43 F.4th at

240-41.  Defendants minimize their burden under the FIA, *see* Defs.' Mot. at 9, and make only

generalized assertions of harm—that if "such communications" as the Report are disclosed,

"[c]andid discussions will naturally be chilled or inhibited" and the "quality of the Presidential

decision-making process would be damaged," Holzer Decl. ¶¶ 21-22.[5]  This does not come close

---

[5] The additional articulations of harm are no more than alternative phrasings of Defendants'
conclusory assertions.  *See* Holzer Decl. ¶¶ 21, 22 ("Presidents and their advisors will be unable
to confidently engage in confidential decision-making without fear that their deliberations will be
open to public view"; "the full and candid exploration of issues and options that is essential to

to articulating a "link between the specified harm and the specific information contained in the material withheld," as Congress required.  *See* H.R. Rep. No. 391, 114th Cong., 2d Sess. 9 (2016).[6]

Courts routinely hold that such general, formulaic statements fail to satisfy an agency's additional burden under the FIA to justify its withholdings pursuant to Exemption 5—particularly where Congress's concerns about "excessive" withholdings under Exemption 5 were its primary motivation in enacting the FIA.  *See Nat. Day Lab. Org. Network v. Immig. & Customs Enf't*, 486 F. Supp. 3d 669, 691 (S.D.N.Y. 2020) ((citing FIA legislative history, including a Senate Report discussing a "growing and troubling trend towards relying on these discretionary exemptions— especially Exemption 5—to withhold large swaths of Government information, even though no harm would result from disclosure." (internal citations omitted)); *see, e.g.*, *Judicial Watch v. Commerce*, 375 F. Supp. 3d 93, 100-01 (D.D.C. 2019) (rejecting as insufficient the "boiler plate" statements that disclosure could "have a chilling effect" on agency deliberations or "discourage[] a frank and open dialogue among interagency staff"); *New York Times v. DHHS*, 513 F. Supp. 3d 337, 353-54 (S.D.N.Y. 2021) (same and collecting cases).  In *American Immigration Council v. Customs and Border Protection*, the court cautioned that the agency's attempts to rely on conclusory assertions were "close to arguing that any material covered by the . . . privilege also meets the foreseeable harm standard," contrary to Congress's express intent when it enacted the FIA.  590 F. Supp. 3d 306, 332-34 (D.D.C. 2022).

---

effectively prepare advice and recommendations for the President" would "necessarily [be] inhibit[ed]"; "[R]elease of this report would plainly threaten [the] President's ability to receive frank and candid advice concerning the sensitive field of immigration policy and related security reforms").

[6] The idea that the "quality" of this decisionmaking process, predicated on anti-Muslim animus, must be protected is seriously undermined by President Biden's statements the Muslim Ban Order was "inconsistent with" our values.  *See supra* Factual Background § VIII.

While there are very few cases discussing the FIA in the context of the presidential communications privilege, and none do so in depth, courts have held the government to its additional burden. *See Ecological Rights Found. v. EPA*, No. 18-cv-394-DMR, 2021 WL 2258554, at *11 (N.D. Cal. June 3, 2021) (even where document was protected by the presidential communications privilege, the agency "may not withhold any portions" where it had failed to make a showing of foreseeable harm under the FIA); *Leopold v.Dep't of Justice*, 487 F. Supp. 3d 1, 10 n.4 (D.D.C. 2020) (agency satisfied FIA where it connected particular type of material at issue— deliberations related to presidential transition, with specific harm— "undermin[ing] the ability to protect the confidentiality of discussions on the same matters after the President-elect takes office" and thereby "damag[ing] the quality of presidential decision-making). Defendants do not engage with these cases, and rather cite the one case in which a court accepted conclusory, boilerplate assertions as sufficient under the FIA. *See* Defs.' Mot. at 10 (citing *Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*, No. 18-2622 (ABJ), 2021 WL 4502106 (D.D.C. Sept. 30, 2021)). But the context of that case was very different, where the government had provided a 22-page Vaughn index, addressing each document "in detail describing both its contents as well as why the material was withheld." *Wash. Post*, 2021 WL 4502106, at *6. In any event, Plaintiffs respectfully submit that *Washington Post* is not persuasive, as it purported to rely on *Leopold*, in which the government had done more to meet its burden, and otherwise failed to explain its reasoning. Defendants have not met their burden under the FIA and therefore must disclose the Report.

### d. In the Alternative, Defendants Must Provide Additional Information

If the Court believes that more information is required for it to determine whether the presidential communications privilege applies, Plaintiffs respectfully request that the Court—like

Judge McMahon in *ACLU v. Department of Justice*—order Defendants to "advise the court of who has received the [document] (including persons who received it from its original recipients) and for what purpose." *ACLU*, 2016 WL 889739, at *6.

B)  **The Report Cannot Be Partially Withheld Under the Deliberative Process Privilege**

DHS also withholds unspecified "portions" of the Report under the deliberative process privilege, another executive privilege encompassed within Exemption 5.  That privilege "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999) (cleaned up).

"To qualify for the deliberative process privilege, a document must be both 'predecisional' and 'deliberative.'" *Id.* at 482.  A document is predecisional when it is "prepared in order to assist an agency decisionmaker in arriving at [their] decision." *Id.* (quoting *Hopkins*, 929 F.2d at 84).  A document is deliberative when it is "actually related to the process by which policies are formulated." *Id.* (cleaned up).  The privilege "does not . . . as a general matter, cover 'purely factual' material." *Id.* (quoting *Hopkins*, 929 F.2d at 85).

DHS fails to meet its burden at each step of the analysis.  On the predecisional prong, the agency must "pinpoint the specific agency decision to which the document correlates," and "verify that the document precedes, in temporal sequence, the decision to which it relates." *Id.* (internal quotation marks omitted).  Far from being specific, the decision Mr. Holzer identifies has no

endpoint.  *See* Holzer Decl. ¶ 25 (The Report formed part of the President's "decision-making process related to border security and immigration policy," and did not "constitute the government's final position on *these issues*." (emphasis added)).  Courts have rejected similar attempts by agencies to describe their decisionmaking at a high level of generality and thereby shield records relating to "subsidiary decisions" from public disclosure.  *See, e.g.*, *100Reporters LLC v. Dep't of Justice*, 248 F. Supp. 3d 115, 153 (D.D.C. 2017) (rejecting agency argument that "would create a four-year umbrella effectively shielding all agency action from review without accounting for any subsidiary agency decisions"); *Judge Rotenberg Educ. Ctr., Inc. v. Food & Drug Admin.*, 376 F. Supp. 3d 47, 67 (D.D.C. 2019) (rejecting exemption where "the withheld records may in fact pertain to a litany of subsidiary decisions that defendants fail to acknowledge").[7]

Moreover, by obscuring the nature of specific decisionmaking discussed in the Report, DHS deprives Plaintiffs of the opportunity to meaningfully dispute the predecisional and deliberative prongs.  Plaintiffs do not have sufficient information about the substance of the Report to, for example, verify that the Report "precedes, in temporal sequence, the decision to which it relates."  *Grand Cent. P'ship*, 166 F.3d at 482 (cleaned up).  Nor do Plaintiffs have sufficient information to determine if all privilege withholdings in the Report "reflect[] the personal opinions of the writer rather than the policy of the agency."  *Id.*  As described *supra*, the State Department took immediate action to implement the extreme vetting described in the Muslim Ban Order, which included engaging in a regular consultative process with senior White House advisor Stephen

---

[7] To the extent Defendants suggest that the Second Circuit in *Natural Resources Defense Council* reduced the government's burden by permitting it to identify "a specific decisionmaking process," rather than a specific decision, they misinterpret that case. 19 F.4th 177, 192 (2d Cir. 2021) (the government's process must be "specific" and citing as an example a "critical review of . . . the agency's methodology for conducting cost-benefit analyses when it regulates").

Miller.  SUMF 53, 54.  Decisions that grew out of that process included the decision as to which additional data to collect from certain visa applicants, and the decision to seek emergency OMB authorization to use a supplemental data collection form—DS-5355—to do so.  SUMF 22-26, 28-30.  President Trump's Order directed his executive agencies to "report[ ] on progress" related to their implementation of Extreme Vetting, SUMF 4, and it is abundantly clear that State had progress on which to report, SUMF 22-34.  Reports of such progress would not be predecisional or deliberative.

Finally, with respect to the FIA, Mr. Holzer's vague, conclusory assertion that disclosure would hinder "candid analysis" and negatively impact the quality of agency decisionmaking is insufficient to meet the government's additional, meaningful burden.  Holzer Decl. ¶ 28; *see supra* Argument § I(A)(c); *see also Reporters Co. for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021) ("A perfunctory statement that disclosure of all the withheld information— regardless of category or substance—would jeopardize the free exchange of information . . . will not suffice" and "what is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward" (cleaned up)).  Particularly where, as here, the Report reflects some decisions that were already made at the time, SUMF 22-34, and widely publicized, SUMF 31-32, as well as proposed decisions that were later adopted (and also publicized), SUMF 40-41, it is hard to imagine any harm to the agency in disclosing the information now, for the reasons discussed at length, *supra*.

### C)  The Report Cannot Be Partially Withheld Under Exemption 7(E)

Both DOS and DHS withhold unspecified "portions" of the Report pursuant to Exemption 7(E).[8] To satisfy their burden to demonstrate that the exemption applies, Defendants must make a two-part showing.  First, they must demonstrate that the document was "compiled for law enforcement purposes," and second, that it withheld information that "either (1) 'would disclose techniques and procedures for law enforcement investigations or prosecutions'; (2) or 'would disclose guidelines for law enforcement investigations or prosecutions' and 'such disclosure could reasonably be expected to risk circumvention of the law.'" *Knight First Amend. Inst. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 327 (2d Cir. 2022) (emphasis omitted) (quoting 5 U.S.C. § 552(b)(7)).  More specifically, the agencies must provide "a relatively detailed analysis of the withheld material in manageable segments without resort to conclusory and generalized allegations of exemptions," and must "provide an indexing system that would subdivide the withheld document under consideration into manageable parts cross-referenced to the relevant portion of the Government's justification."  *Id.* at 330 (quoting *Halpern*, 181 F.3d at 290).  Moreover, the Second Circuit has recognized a "public domain exception" to Exemption 7 for information that is "generally available to the public at large."  *Id.* at 332-33.

At the threshold, the declarations do not clarify whether the categories of information described as withheld constitute an exhaustive list—as required under binding precedent.  *See id.* at 330 (each agency must provide a "relatively detailed analysis of the withheld material in

---

[8] While Defendants' brief and the declarations do not specify how much of the Report they seek to redact or the extent to which each agency's withholdings overlap, DHS appears to withhold more and broader types of information.  *Compare* Holzer Decl. ¶¶ 32-33 ("processes that would enable the agency to identify persons presenting fraudulent information or having criminal or terroristic intent"; "ways in which Executive branch agencies collaborate in vetting and screening processes"; and "types of immigration-related adjudications and categories of information"), *with* Weetman Decl. ¶¶ 26-27 ("specific high value biographic data elements" and "non-public data and vetting capabilities operated by interagency partners").

manageable segments").   Specifically, Ms. Weetman states that the withheld information "includes" and "concerns" the two categories she identifies, Weetman Decl. ¶¶ 26-27, but she offers no assurance that hers is an exhaustive list.  So too with Mr. Holzer. Holzer Decl. ¶ 30.  This ambiguous language fails to meet Defendants' burden.  *See Schwartz v. Dep't of Def.*, 15-CV-7077, 2017 WL 78482, at *18 (E.D.N.Y. Jan. 6, 2017) (describing redactions to "include" certain information fails to provide the "particularized description" *Halpern* requires).

Moreover, DHS's descriptions of withheld categories are so vague and general—particularly in the context of a document that has been fully withheld from Plaintiffs—as to deprive Plaintiffs of the ability to meaningfully challenge the withholdings through the adversary process.  *See King*, 830 F.2d at 218 ("detailed" *Vaughn* index is "required . . . to permit adequate adversary testing of the agency's claimed right to an exemption").  For example, Mr. Holzer's nebulous description—"existing and proposed ways in which Executive branch agencies collaborate . . . ensuring there is adequate harmonization across agencies for full visibility on individuals" —fails to provide Plaintiffs with enough detail to determine whether the withholding concerns, as Defendants assert, a law enforcement "guideline," *see* Holzer Decl. ¶ 32.  So too with DHS's vague reference to "types of immigration-related adjudications and categories of information."  *See id.* ¶ 33.  While DHS at least provides examples with respect to the category consisting of "processes that would enable the agency to identify persons," *see id.*, ¶ 32, the broad language of the category may well include far more than the enumerated examples.  The vague, general language in DHS's *Vaughn* is a far cry from the specific language Second Circuit held to be sufficient in *Knight*, where the document at issue had only limited redactions, and the agency provided specific information as to each.  *Knight*, 30 F.4th at 328-29; *see also Halpern*, 181 F.3d at 293 (specifying the categories

falling within the exemption, and then cross-referencing each of the categories against redactions in the documents).

Even with Defendants' insufficient showing, at least some of the information the agencies withhold under Exemption 7(E) appear to be in the public domain, and thus not subject to the Exemption. *See Knight*, 30 F.4th at 332. For example, the "specific high value biographic data elements . . . necessary for [] uniform baseline vetting," *see* Weetman Decl. ¶ 26, appears to refer to the list of biographic elements added to the State Department's screening process, as documented in a series of cables published by Reuters, SUMF 22-28, 35, discussed in agency testimony to Congress, SUMF 36, 37, 39, and described in government statements, Bates Decl., Ex. R. These data elements were in turn obtained using the supplemental extreme vetting questions, which was implemented first by cable and later published in the Federal Register, *see id.*, SUMF 22-28, resulting in a supplemental application form, SUMF 29, and were reported in the media, SUMF 35. The "data and vetting capabilities operated by interagency partners in automatic systems checks," Weetman Decl., ¶ 27, appear to reference the Security Advisory Opinion and other checks operated by several agencies and components, upon which State relies, and which have also been discussed at length in Congressional testimony and government report, SUMF 36, 37, 39. And the "existing and proposed ways in which Executive branch agencies collaborate in vetting and screening processes," Holzer Decl., ¶ 32, appears to refer to what would become National Vetting Center, a new subcomponent housed at DHS, and publicly announced and described, SUMF 40-41.

To the extent that withheld information is in the public domain, it not only qualifies for the exception to Exemption 7(E), but it must also be released for the independent reason that there is no foreseeable harm in disclosure. 5 U.S.C. § 552(a)(8)(A)(i). Each of the foreseeable harms

DHS and DOS identify in disclosure are premised on the idea that the information is not already publicly available to bad actors who seek to evade detection.  *See* Holzer ¶¶ 34-35; Weetman Decl. ¶ 31.  And while no court in the Second Circuit appears to have considered the issue, at minimum the FIA requires an agency to specify whether it "reasonably foresees that disclosure would harm an interest," 5 U.S.C. § 552(a)(8)(A)(i)—even where withholding of law enforcement "techniques and procedures" did not previously require such a showing in this circuit, *see generally Allard K. Lowenstein Intern. Hum. Rgts. Proj. v. Dep't of Homeland Sec.*, 626 F.3d 678, 681-82 (2d Cir. 2010) (construing requirement to show "risk [of] circumvention of the law" to modify "guidelines" only).  Finally, Defendants must disclose any reasonably segregable non-exempt material, 5 U.S.C. § 552(b), and their boilerplate, conclusory assertions fail to satisfy their burden, *see* Holzer Decl. ¶ 36; Weetman Decl. ¶ 31.

### D)  The Report Cannot Be Withheld Under Exemptions 1 and 3

ODNI submits a declaration—on behalf of itself and on behalf of the CIA and NSA—defending each agency's withholding of its respective "equities" in the Report under Exemptions 1 and 3*, see* Decl. of Gregory M. Koch ("Koch Decl.") ¶¶ 9 n.1, 12-13, ECF No. 216-5.  Exemption 1 permits agencies to withhold records that have been "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order," 5 U.S.C. § 552(b)(1), and ODNI defends the withholdings under Executive Order 13526, Koch Decl. ¶¶ 17-18.  And Exemption 3 applies to records "specifically exempted from disclosure by statute," 5 U.S.C. § 552(b)(3), and ODNI defends the withholdings under the National Security Act, 50 U.S.C. § 3024(i)(1), Koch Decl. ¶ 27.  As with all withholdings under the FOIA, the government bears the burden to demonstrate that the exemptions apply, and it must "describe with reasonable

specificity" the information withheld and the justifications for the withholdings.  *Halpern*, 181 F.3d at 291-94 (internal quotation marks omitted).  To meet its burden, the government must provide "particularized descriptions of the context surrounding each of the individual redactions and/or documents," and the Second Circuit has cautioned that "conclusory" statements and those that read "like a policy justification" are insufficient.  *Id.* at 293-94.

As noted above, Mr. Koch of ODNI defends the withholdings not only of ODNI—in which he has been delegated authority as an original classification authority, Koch Decl. ¶ 3—but also of CIA and NSA, relying on his conversations with unidentified "[s]ubject matter experts and original classification authorities" at those agencies, *id.* ¶ 13.  But Mr. Koch's vague and conclusory assertions are insufficient to demonstrate that the specific requirements of Executive Order 13526 have been satisfied—notwithstanding that information about original classification authorities at the other agencies is necessarily readily available.  *See* Exec. Order 13526 § 1.3(a) & (c) (strictly limiting delegation of original classification authority and requiring "[e]ach delegation" to be "in writing" and to "identify the official by name and position").  The lack of specificity is particularly troubling because Mr. Koch relies on hearsay statements of individuals outside of ODNI to defend withholdings of other agencies—evidence at least some courts have held is inadmissible, *see Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1273 n.17 (10th Cir. 2021) (in FOIA cases, "no [hearsay] exception applies where the hearsay declarant is a party outside the agency").  Here, that hearsay contradicts the classification information on the face of the Report.  Koch Decl. ¶ 19 n.2 (classification category on document "was an error").

Moreover, Mr. Koch's descriptions of the information withheld and surrounding context are too general and conclusory to meet the "reasonable specificity" standard.  *See Halpern*, 181 F.3d at 292-94.  For example, the vague, conclusory description of the information withheld by

CIA as "the specific role(s) that CIA plays in the vetting program," Koch Decl. ¶¶ 21, 30, reads

like the "bureaucratic double-talk" that the Second Circuit rejected as insufficient in *Halpern*. 181

F.3d at 293 (collecting circuit precedent).  Such descriptions also fail to establish that the activities

concern "intelligence sources and methods" within the meaning of the National Security Act, as

required under Exemption 3.  *See Am. Civ. Liberties Union v. Off. of the Dir. of Nat'l Intel.*, No.

10 Civ. 4419, 2011 WL 5563520, at *10 (S.D.N.Y. Nov. 15, 2011) (rejecting as insufficient similar

"conclusory" language).

Finally, to the extent that the withheld information includes security checks and databases

that the U.S. government has officially acknowledged to be part of its visa vetting process,

Exemptions 1 and 3 do not apply.  *See Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891

F.2d 414, 421 (2d Cir. 1989) (collecting cases).  Mr. Koch's vague references to "types of checks"

and "data sources" that the intelligence community uses to vet visa applicants, *see* Koch Decl. ¶¶

14, 28, are insufficient where the government has officially acknowledged the relevant checks and

databases in that context.

## II.   Defendant State Should Disclose the Three Documents that Relate to the Muslim Ban Order's Extreme Vetting Program

### A)  Plaintiffs Have Not Waived Their Challenges to State's Withholdings

Defendants spill considerable ink arguing that Plaintiffs have waived their challenges to

State's withholdings in these documents, *see* Defs.' Mot. at 1, 3, 5, 26—but the only caselaw they

cite stands for the proposition that a party cannot expand the scope of the issues after a briefing

schedule is set and an opening brief is filed.  *See Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*, 325

F. Supp. 3d 162, 168-69 (D.D.C. 2018); *see also Nat. Day Lab. Org. Network v. Immigr. &*

*Customs Enf't*, 811 F. Supp. 2d 713, 738 (S.D.N.Y. 2011) (plaintiffs waive arguments not

presented in their brief).  Here, just as in *ACLU*, Plaintiffs raised the issues before the briefing

schedule was set.  SUMF 46.  Indeed, the parties' jointly proposed briefing schedule contemplated that these issues would be raised.  SUMF 46.

### B)  The Cable and Operational Q&A Cannot Be Withheld under Exemption 7(E)

State withholds the Cable and Q&A in part under Exemption 7(E).  *See* Defs.' Mot. at 31-32; *see also supra* Argument § I(C) (describing two-prong legal standard). As to the first prong of the Exemption, State's assertion that the records were compiled for law enforcement purposes because they "enforc[e] the Immigration and Nationality Act," Defs.' Mot at 27, strains credulity. By that logic, every document State touches is a "law enforcement" record, but it is beyond cavil that State is a "mixed-function agency" that performs both administrative and law enforcement functions. *See Knight*, 30 F.4th at 328.  Thus, courts must "scrutinize with some skepticism" the particular purpose State claims for documents withheld under Exemption 7. *Id.* at 324.

With respect to the second prong of the Exemption, State fails to meet its burden under the "reasonable specificity" standard. *See Halpern*, 181 F.3d at 293-94.  Specifically, once again, Ms. Weetman asserts that the withheld material "includes" several categories of information, *see* Weetman Decl. ¶¶ 28, 31, but she fails to confirm that this is an exhaustive list of the withholdings, as the law requires, *see Schwartz*, 2017 WL 78482, at *18.  Her declaration is insufficient to satisfy the requirement that State provide "a relatively detailed analysis of the withheld material in manageable segments … cross-referenced to the relevant portion[s] of the" documents. *See Halpern*, 181 F.3d at 290 (cleaned up); *cf. Knight*, 30 F.4th at 330 (agency's evidence sufficient where it "provide[d] separate, detailed explanations for each redaction").

Worse still, Ms. Weetman defends withholdings of information already in the public domain and information that the agency has already disclosed in this case, which are outside the scope of Exemption 7(E) and for which there is no foreseeable harm associated with disclosure.

34

For example, Ms. Weetman defends withholdings in the Cable of references to consular officers requesting "Donkey SAO,"—a type of security check—using additional data collection implemented as part of Extreme Vetting, even though this information has already been publicly disclosed.  SUMF 47, 48.  Ms. Weetman also defends withholding of the Cable's instruction to consular officers that they may refuse visa applications raising national security concerns pursuant to § 221(g) in order to request an SAO security check and explore local leads,[9] but this information is in the public domain as well, SUMF 49, 50.  Notably, even as she defends these withholdings, Ms. Weetman conspicuously fails to assert they are *not* in the public domain.  *Compare* Weetman Decl. ¶ 28 (asserting Q&A "includes non-public information"); *with id*. ¶ 31 (omitting this assertion when describing cable); *but see* Defs.' Mot. at 27 (claiming State withheld "nonpublic" techniques in both documents).

Moreover, Ms. Weetman defends withholding of information that State *already provided to Plaintiffs*.  She defends withholding of "Visa Viper" in the Cable even though State disclosed that information to Plaintiffs in an earlier production of the same Cable.  SUMF 51.  And Ms. Weetman defends withholding of section headings in the Operational Q&A even though State already disclosed the same headings in the document's table of contents.  SUMF 52.

Ms. Weetman's defense of withholdings that are clearly outside the scope of Exemption 7(E) raises serious concerns about whether the agency considered—as it is required to do under FOIA—whether any withheld information constituted reasonably segregable non-exempt

---

[9] As described at Factual Background § II, *supra*, White House advisor Stephen Miller appears to have specifically requested that this guidance be inserted into the cable. *See also* SUMF 53.  To the extent that the Biden Administration may be embarrassed that substantive changes closely associated with President Trump's Extreme Vetting remain part of active policies and guidance, *see generally* Weetman Decl. ¶ 31, government embarrassment is not a justification for withholding information under the FOIA.

portions.  *See* 5 U.S.C. § 552(b).  This is particularly so here as Ms. Weetman asserts that State met its burden in conclusory, boilerplate language, *see* Weetman Decl. at ¶¶ 28, 31, which courts regularly reject as insufficient, *see, e.g.*, *CLEAR*, 2022 WL 16636686, at *12; *Sierra Club v. U.S. Fish & Wildlife Serv.*, 523 F. Supp. 3d 24, 39 (D.D.C. 2021); *see also Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 70 (D.D.C. 2013) (agency failed to describe withholdings in sufficient detail).  Perhaps it is no accident that Defendants do not even argue in their brief that State met its burden to segregate exempt information with respect to the cable and the Operational Q&A, and arguments not made in the opening brief are waived. *See Estle v. Int'l Bus. Machs. Corp.*, 23 F.4th 210, 215 n.3 (2d Cir. 2022).

### C) The PRA Supporting Statement Cannot Be Withheld Under Exemption 5

State withholds the PRA Supporting Statement under Exemption 5, asserting that the deliberative process privilege and attorney client privilege apply.  State does not distinguish between its withholdings under each privilege, and thus apparently takes the position that each privilege justifies withholding all substance of the document.  *See* Bates Decl., Ex. C.

### a.    Deliberative Process Privilege Does Not Apply

With respect to the predecisional prong of the privilege, State's *Vaughn* fails to satisfy the "reasonable specificity" standard.  *See Halpern*, 181 F.3d at 293-94.  Specifically, State defines the relevant decision as "the final content and framing of the submission," Weetman Decl. ¶ 35, but this formulation amounts to a restatement that the document is a draft, and "the mere fact that a document is a draft is not a sufficient reason to automatically exempt it from disclosure." *N.Y. Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 505, 515 (S.D.N.Y. 2007) (cleaned up). Moreover, by defining the decision at such a high level of generality, State fails to demonstrate that the relevant decisionmaking reflected "policy-oriented judgment," as it must to qualify for the

privilege.  *See Grand Cent. P'ship*, 166 F.3d at 482.  And State failed to provide the date of the document, which makes it impossible to determine whether it preceded or postdated specific agency policy decisions—such as finalization of the DS-5355 form for which State sought OMB authorization (decision made on April 13, 2017, *see* Bates Decl., Ex. N); or the decision to seek expedited OMB authorization (decision made on April 28, 2017, *see id.*); *see also Grand Cent. P'ship*, 166 F.3d at 482 (temporal sequence is key).

State's Vaughn is also insufficient to satisfy the deliberative prong of the privilege.  Ms. Weetman does not provide any identifying details about the authors, *see* Weetman Decl ¶ 33 (document was "*primarily* drafted by the Bureau of Consular Affairs") (emphasis added)—one factor courts consider in determining whether a document reflects "the give and take" associated with consultation.  *See, e.g.*, *Ethyl Corp v. EPA.*, 25 F.3d 1241, 1248 (4th Cir. 1994) (considering author's "place . . . within the decisional hierarchy").  Nor does she state whether the document reflects "the personal opinions of the writer, rather than the policy of the agency"—a relevant factor in determining whether privilege applies, *see Providence J. Co. v. U.S. Dep't of Army*, 981 F.2d 552, 559 (1st Cir. 1992).  If anything, her description of withheld matter as "[State's] position on the interpretation of domestic and international law" and "the requirements of the Paperwork Reduction Act," Weetman Decl. ¶ 34, suggests the document merely "describe[s] the agency's current practices," and is not covered by the privilege.  *See Nat. Res. Def. Council*, 19 F.4th at 189 n.9.  And even where a document reflects the give-and-take of consultation, the agency still bears the burden of demonstrating that deliberations bore on the agency's "policy-oriented judgment" rather than "standard or routine computations or measurements" which do not implicate agency discretion.  *See id.* at 184-85, 190 (holding Vaughn was insufficient).  Indeed, various parts of the required agency statement in support of a proposed information collection relate to routine

computations, so there is every reason to believe that State included such information here. SUMF 58-64.

Finally, even if the deliberative process attached, the sparse information in the *Vaughn* makes it impossible to know whether the document has subsequently been adopted and lost its predecisional character. *See U.S. Dep't of Treasury v. Pension Benefit Guar. Corp.*, 222 F. Supp. 3d 38, 42 (D.D.C. 2016) (predecisional document "can lose that status if it is adopted formally or informally, as the agency position on an issue") (citation omitted). Certainly, the form and substance of this proposed information collection, and the fact that the agency sought authorization on an emergency basis are now public. *See Brennan Ctr for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*, 697 F.3d 184, 195 (2d Cir. 2012) (documents may lose Exemption 5 protection if they are "used by the agency in its dealings with the public") (citation omitted). And to the extent that the information contained within the document is in the public domain, the agency has failed to demonstrate that it meets its additional burden under the FIA.

### b. Attorney Client Privilege Does Not Apply

State also withholds the PRA Supporting Statement under the attorney-client privilege, subsumed within Exemption 5. That privilege protects "[i] confidential communications [ii] between client and counsel [iii] made for the purpose of obtaining or providing legal assistance." *Am. C.L. Union v. Nat. Sec. Agency*, 925 F.3d 576, 589 (2d Cir. 2019) (citation omitted). With respect to the confidentiality prong, the agency must demonstrate that the communication is predicated on "confidential information concerning the agency," *Cause of Action Inst. v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336, 349 (D.D.C. 2018) (quoting *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 619 (D.C. Cir. 1997), and that the communication was made in confidence and that the confidence has been kept, *Brennan Ctr*, 697 F.3d at 207. With respect to

the purpose prong, the agency bears the burden of demonstrating the "predominant purpose of the communication is legal advice," *In re Cnty. Of Erie*, 473 F.3d 413, 420 (2d Cir. 2007), and the privilege "does not extend to a government attorney's advice on political, strategic, or policy issues." *Cause of Action*, 330 F. Supp. 3d at 347 (cleaned up). The privilege must be "narrowly" construed and applies "only where necessary to achieve its purpose," *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (citation omitted); *see also Scholtisek v. Eldre Corp.*, 441 F. Supp. 2d 459, 462 (W.D.N.Y. 2006) (any ambiguities as to whether the essential elements have been met are construed against the party asserting the privilege).

Defendants' *Vaughn* fails to meet their burden on each prong of the analysis. On the confidentiality prong, Ms. Weetman's description of the document as reflecting States' "interpretation of domestic and international law," and compliance with the Paperwork Reduction Act, Weetman Decl. ¶ 34, fails to demonstrate that the communication was predicated on "confidential information concerning the agency," as required for this narrow privilege to apply, *see Cause of Action*, 330 F. Supp. 3d at 349.

With respect to the attorney-client prong, the Vaughn notably fails to identify all authors or even to assert that all authors worked at the State Department. *See* Weetman Decl. ¶ 33 (document was "primarily drafted" by the Bureau of Consular Affairs). And the record strongly suggests that external parties—specifically senior White House counsel Stephen Miller—assisted in drafting it, *see* SUMF 53-54, but State concedes that any attorney-client relationship was limited to individuals in the Department, Weetman Decl. ¶ 34.

And with respect to the purpose of the communications, the Vaughn fails to establish that the predominant purpose was legal advice, as opposed to advice on political, strategic, or policy issues. Notably, as described in the Vaughn, OLA attorneys play a dual role, providing legal and

non-legal advice.  *See id*. (attorneys advise on "consular functions," "issues related to human rights and refugee law," and "compliance with administrative law").  To the extent communications related to "the defensibility of the positions advanced," *see id*., they may have related to the agency's concerns about the political fallout resulting from its request for social media vetting information, *see* Bates Decl., Ex. Z, and such advice is outside the scope of the privilege, *Cause of Action*, 330 F. Supp. 3d at 348 (government bears "burden to show that this particular communication involved a request for legal advice").

Finally, the Department fails to identify *any* foreseeable harm from disclosure of the withheld information, as required by the FIA.  And because State has failed to identify the date of the document (and by extension, how close in time it was to the final version), it is impossible to assess the likelihood that the PRA Supporting Statement was "expressly adopted" by the final version.  *See ACLU*, 925 F.3d at 593 n.84, 595-96.

### D) In the Alternative, the Court Should Order *In Camera* Review of the Three Documents

Plaintiffs respectfully submit that they are entitled to summary judgment as to each of the three documents because Defendants have failed to meet their burden, and the record evidence either demonstrates that they have withheld non-exempt material or otherwise casts serious doubt on their assertions.  However, if the Court believes that more information is required, Plaintiffs respectfully request that the Court order Defendants to produce the documents for *in camera* review.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for summary judgment and deny Defendants' motion for summary judgment.

Dated: February 13, 2023

Respectfully submitted,


 /s/   Linda B. Evarts                          

Linda B. Evarts, *pro hac vice**
Adam Bates, *pro hac vice*
Steven Poellet, *pro hac vice*
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
Tel: (516) 838-1655
Fax: (516) 324-2267
levarts@refugeerights.org
abates@refugeerights.org
spoellet@refugeerights.org


*\*D. Conn. petition for admission approved,
pending oath ceremony*




*Counsel for Plaintiffs*

 /s/   Muneer I. Ahmad                          

Muneer I. Ahmad, Supervising Attorney,
ct28109
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 902020
New Haven, CT 06520
muneer.ahmad@ylsclinics.org
Telephone: (203) 432-4800
Fax: (203) 432-1426


Nicholas Espiritu, *pro hac vice*
Joshua Stehlik, *pro hac vice*
National Immigration Law Center
3450 Wilshire Blvd. #108-62
Los Angeles, CA 90010
Telephone: (213) 639-3900
Fax: (213) 639-3911
espiritu@nilc.org
stehlik@nilc.org