**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| COUNCIL ON AMERICAN-ISLAMIC RELATIONS – CONNECTICUT and MAKE THE ROAD NEW YORK,<br><br>    *Plaintiffs,*<br><br>        v.<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, and U.S. DEPARTMENT OF STATE,<br><br>    *Defendants.* | Civil Action No.<br>3:17-cv-1061-RMS |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

    I.      The Presidential Communications Privilege Applies to the EO Report in Full ..... 2

         A.      Application of the Privilege Here Preserves the Confidentiality of
                  Presidential Decisionmaking ........................................................................ 2

         B.      The Presidential Communications Privilege was Not Waived by
                  Official Acknowledgement of Information ............................................... 10

         C.      Disclosure of the EO Report Would Cause Reasonably Foreseeable
                  Harm ........................................................................................................... 12

    II.     DHS Adequately Supported the Withholding of Deliberative Portions of the
          EO Report ......................................................................................................... 15

    III.    Portions of the Report Were Properly Withheld Under Exemption 7(E) ............. 17

    IV.   Portions of the Report Were Properly Withheld Under Exemptions 1 and 3 ....... 23

    V.     Plaintiffs Waived Any Challenges to Additional Documents ............................. 26

    VI.   The Three State Department Documents Were Appropriately Withheld in
          Part .................................................................................................................... 27

         A.      The Cable and Q&A Documents Were Properly Withheld in Part
                  Pursuant to Exemption 7(E) ...................................................................... 28

         B.      The PRA Supporting Statement is Appropriately Withheld in Full
                  Pursuant to Exemption 5 ........................................................................... 29

CONCLUSION ............................................................................................................... 33

i

# TABLE OF AUTHORITIES

## CASES

*Am. C.L. Union v. Dep't of Just.*,
   681 F.3d 61 (2d Cir. 2012)...................................................................... 23

*Am. C.L. Union v. Dep't of Just.*,
   No. 15 Civ. 1954 (CM), 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016).................................... 5, 6

*Am. C.L. Union v. Nat'l Sec. Agency*,
   No. 13-Civ-09198 (KMW)(JCF), 2017 WL 1155910 (S.D.N.Y. Mar. 27, 2017),
   *aff'd*, 925 F.3d 576 (2d Cir. 2019) ............................................................ 30

*Am. C.L. Union v. Nat'l Sec. Agency*,
   925 F.3d 576 (2d Cir. 2019)...................................................................... 30

*Am. C.L. Union v. U.S. Dep't of Def.*,
   628 F.3d 612 (D.C. Cir. 2011) ............................................................... 10, 11

*Am. C.L. Union v. U.S. Dep't of Def.*,
   901 F.3d 125 (2d Cir. 2018)................................................................ 9, 10, 23

*Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*,
   325 F. Supp. 3d 162 (D.D.C. 2018) ............................................................. 27

*Amnesty Int'l USA v. CIA*,
   728 F. Supp. 2d 479 (S.D.N.Y. 2010)........................................................... 24

*Ashton v. Dep't of Veterans Affs.*,
   198 F.3d 233 (2d Cir. 1999).................................................................... 18

*Berman v. CIA*,
   378 F. Supp. 2d 1209 (E.D. Cal. 2005).......................................................... 9

*Bishop v. U.S. Dep't of Homeland Sec.*,
   45 F. Supp. 3d 380 (S.D.N.Y. 2014)............................................................ 20

*Brennan Center for Just. of New York University School of L. v. U.S. Dep't of State*,
   No. 17 Civ. 7520 (PGG), 2019 WL 10984173 (S.D.N.Y. Mar. 29, 2019)................................ 7

*Canning v. U.S. Dep't of State*,
   134 F. Supp. 3d 490 (D.D.C. 2015) ............................................................ 25

*Cayuga Nation v. U.S. Dep't of Interior*,
No. 20-2642 (ABJ), 2022 WL 888178 (D.D.C. Mar. 25, 2022)................................. 27

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*,
514 F. Supp. 2d 36 (D.D.C. 2007) ..................................................... 5, 6, 8

*CLEAR v. U.S. Customs & Border Prot.*,
No. 19-CV-7079 (RER), 2022 WL 16636686 (E.D.N.Y. Nov. 2, 2022) ........................... 19, 20

*Clevenger v. U.S. Dep't of Just.*,
No. 18 CV 1568 (LB), 2020 WL 1846565 (E.D.N.Y. Apr. 3, 2020) ................................ 24, 25

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ............................................................ 32

*Competitive Enter. Inst. v. U.S. Dep't of State*,
486 F. Supp. 3d 171 (D.D.C. 2020) ....................................................... 14, 15

*Ctr. for Effective Gov't v. U.S. Dep't of State*,
7 F. Supp. 3d 16 (D.D.C. 2013) ....................................................... *passim*

*Dudman Commc'ns Corp. v. Dep't of the Air Force*,
815 F.2d 1565 (D.C. Cir. 1987) ............................................................ 33

*Eberg v. U.S. Dep't of Def.*,
193 F. Supp. 3d 95 (D. Conn. 2016) ....................................................... 28

*Emanuel v. Gap. Inc.*,
No. 19-CV-03617 (PMH), 2022 WL 3084317 (S.D.N.Y. Aug. 3, 2022) ........................... 21

*Flores v. U.S. Dep't of Just.*,
No. 15-CV-2627 (JMA), 2016 WL 7856423 (E.D.N.Y. Oct. 4, 2016) ................................ 25

*Gonzalez v. U.S. Citizenship & Immigr. Servs.*,
475 F. Supp. 3d 334 (S.D.N.Y. 2020)....................................................... 29

*Grand Cent. P'ship, Inc. v. Cuomo*,
166 F.3d 473 (2d Cir. 1999)............................................................ 15, 32

*Halpern v. FBI*,
181 F.3d 279 (2d Cir. 1999)............................................................ 18, 24

*Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
243 F. Supp. 3d 155 (D.D.C. 2017) ......................................................... 33

iii

*Harris v. Gonzales,*
    488 F.3d 442 (D.C. Cir. 2007) .................................................................. 9

*Hopkins v. U.S. Dep't of Hous. & Urb. Dev.,*
    929 F.2d 81 (2d Cir. 1991) .................................................................... 32

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) ................................................... 2, 3, 5, 12

*James Madison Project v. Dep't of Just.,*
    208 F. Supp. 3d 265 (D.D.C. 2016) ....................................................... 32

*Jordan v. U.S. Dep't of Just.,*
    591 F.2d 753 (D.C. Cir. 1978) .............................................................. 13

*Jud. Watch, Inc. v. Consumer Fin. Prot. Bureau,*
    60 F. Supp. 3d 1 (D.D.C. 2014) .............................................................. 4

*Jud. Watch, Inc. v. Dep't of Just.,*
    365 F.3d 1108 (D.C. Cir. 2004) .............................................................. 4

*Jud. Watch, Inc. v. U.S. Dep't of Com.,*
    No. 17-cv-1283 (EGS), 2020 WL 6939807 (D.D.C. Nov. 25, 2020) ...................................... 12

*Jud. Watch, Inc. v. U.S. Dep't of Def.,*
    245 F. Supp. 3d 19 (D.D.C. 2017) .................................................. 2, 3, 4

*Jud. Watch, Inc. v. U.S. Dep't of Just.,*
    319 F. Supp. 3d 431 (D.D.C. 2018) .......................................................... 9

*Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention,*
    560 F. Supp. 3d 810 (S.D.N.Y. 2021) ............................................... 5, 6, 7

*Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.,*
    30 F.4th 318 (2d Cir. 2022) ............................................................ *passim*

*Lardner v. U.S. Dep't of Just.,*
    No. Civ.A.03-0180(JDB), 2005 WL 758267 (D.D.C. Mar. 31, 2005) ...................................... 9

*Leopold v. U.S. Dep't of Just.,*
    487 F. Supp. 3d 1 (D.D.C. 2020) ........................................................... 14

*Loving v. Dep't of Def.,*
    550 F.3d 32 (D.C. Cir. 2008) ............................................................ 3, 8

*Machado Amadis v. U.S. Dep't of State*,
    971 F.3d 364 (D.C. Cir. 2020) ..................................................................... 33

*N.Y. Times Co. v. Dep't of Health & Hum. Servs.*,
    513 F. Supp. 3d 337 (S.D.N.Y. 2021), *aff'd*, 15 F.4th 216 (2d Cir. 2021) .................. 12, 13, 14

*N.Y. Times Co. v. Off. of Mgmt. & Budget*,
    531 F. Supp. 3d 118 (D.D.C. 2021) ............................................................... 12

*N.Y. Times v. CIA*,
    965 F.3d 109 (2d Cir. 2020) ..................................................................... 10, 11

*Nat'l Labor Rels. Bd. v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ............................................................................. 15, 16

*Nat'l Sec. Archive v. CIA*,
    752 F.3d 460 (D.C. Cir. 2014) ..................................................................... 9

*Norton v. Sam's Club*,
    145 F.3d 114 (2d Cir.1998) ....................................................................... 21

*Oglesby v. U.S. Dep't of Army*,
    79 F.3d 1172 (D.C. Cir. 1996) .................................................................... 19

*Osen LLC v. U.S. Cent. Command*,
    969 F.3d 102 (2d Cir. 2020) ..................................................................... 10, 23

*People for the Am. Way Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*,
    462 F. Supp. 2d 21 (D.D.C. 2006) ................................................................ 25

*Perez v. U.S. Immigr. & Customs Enf't*,
    No. 19-CV-3154 (PGG)(JLC), 2020 WL 4557387 (S.D.N.Y. Aug. 6, 2020) ......................... 31

*Project on Gov't Oversight, Inc. v. U.S. Dep't of Homeland Sec., Off. for C.R. & C.L.*,
    No. 1:18-CV-2051-RCL, 2023 WL 2139380 (D.D.C. Feb. 21, 2023) ............................. 26, 27

*Prop. of the People, Inc. v. Off. of Mgmt. & Budget*,
    394 F. Supp. 3d 39 (D.D.C. 2019) ................................................................. 9

*Protect Democracy Project, Inc. v. Nat'l Sec. Agency*,
    10 F.4th 879 (D.C. Cir. 2021) .................................................................... 11

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.*,
    320 F. Supp. 3d 162 (D.D.C. 2018) ................................................................ 3

v

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) .......................................................................... 29

*Taylor Energy Co. v. U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt.*,
    271 F. Supp. 3d 73 (D.D.C. 2017) ...................................................................... 25

*Tobias v. U.S. Dep't of the Interior, Off. of the Sec'y*,
    No. 1:18-cv-01368 (CJN), 2021 WL 4262488 (D.D.C. Sept. 20, 2021) ................................ 13

*Nat. Res. Def. Council v. U.S. Env't Prot. Agency*,
    19 F.4th 177 (2d Cir. 2021) ...................................................................... 15, 16

*Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*,
    No. 18-2622 (ABJ), 2021 WL 4502106 (D.D.C. Sept. 30, 2021) ........................................ 14

*Westcon Grp., Inc. v. CCC Techs., Inc.*,
    No. 19-CV-02303 (PMH), 2022 WL 4134578 (S.D.N.Y. Sept. 12, 2022) ............................ 21

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009)............................................................................ 10

*Wilson v. Dep't of Just.*,
    No.  87-2415-LFO, 1991 WL 111457 (D.D.C. June 13, 1991)................................ 32

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ........................................................................ 23

## STATUTES

5 U.S.C. § 552(a)(8)............................................................................ 12

50 U.S.C. § 3024(i)(1) ........................................................................ 25

## REGULATIONS

Executive Order 13,526,
    75 Fed. Reg. 707 (Dec. 29, 2009) .......................................................... 25

Executive Order 13,780,
    82 Fed. Reg. 13,209 (Mar. 6, 2017).......................................................... 1

## INTRODUCTION

Plaintiffs seek to force the disclosure of a confidential report to the President concerning sensitive issues of immigration policy and national security, but Plaintiffs' request was correctly denied.  The Presidential Communications Privilege protects from public disclosure materials exactly like the Report ("EO Report"), ordered in Section 5(b) of Executive Order 13,780, where release would infringe on the President's ability to receive candid and unfettered advice.  The Report bears all the hallmarks of a protected communication.  It was sent from agency heads to the President upon his express request; it reveals the President's decisionmaking process about the subjects of the Report; and the Report was closely held, as reflected by its partially-classified status and limited distribution.  That limited distribution of the Report supports the application of privilege, rather than undermining it.  The Report was provided only to the agencies and components that helped prepare it, which is not really a distribution at all, as those entities were likely already aware of their own recommendations, and were entitled to keep a record of those recommendations to the President.  And because the Presidential Communications Privilege does not require segregation, the Report is properly protected from disclosure in full.  Plaintiffs' attempt to defeat the application of Exemption 5 therefore fails.

While the Court need not reach the additional Exemptions applied to portions of the Report, they are also properly supported.  The partial withholdings under Exemptions 1, 3, 5 and 7(E) were justified by the three different declarations submitted in connection with Defendants' Motion for Summary Judgment.  Plaintiffs fail to show that any additional detail is necessary to find that Defendants' withholdings logically and plausibly fall within the scope of an applicable Exemption.  Nor can Plaintiffs demonstrate that certain information withheld under Exemption 7(E) in the Report is in the public domain, requiring disclosure.  To the extent Plaintiffs'

argument on this point can be discerned, they fail to show that specific withheld information is both duplicated in publicly available sources, and is freely available without an exhaustive effort to theorize as to the content of the EO Report.

The same conclusions apply with respect to the three other State Department documents challenged by Plaintiffs.  Plaintiffs do not materially dispute that they twice waived all challenges in this matter, except for those concerning the EO Report.  Those representations are binding, and Plaintiffs' claimed challenges to additional documents are therefore not properly before the Court.  Moreover, even if Plaintiffs' abandoned arguments were considered, they would not succeed.  With the exception of certain minor discrepancies, all of the withholdings under Exemption 5 and 7(E) are properly supported and should be upheld.  The Court should accordingly grant Defendants' Motion for Summary Judgment, deny Plaintiffs' Cross-Motion, and close this case.

## ARGUMENT

## I.     The Presidential Communications Privilege Applies to the EO Report in Full

### A.     Application of the Privilege Here Preserves the Confidentiality of Presidential Decisionmaking

The Presidential Communications Privilege "ensur[es] that the confidentiality of the President's decisionmaking process is adequately protected."  *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 245 F. Supp. 3d 19, 29–30 (D.D.C. 2017) (quoting *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997)).  Indeed, "[c]onfidentiality is the touchstone of the privilege, for '[c]onfidentiality is what ensures the expression of candid, objective, and even blunt or harsh opinions and the comprehensive exploration of all policy alternatives before a presidential course of action is selected.'"  *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 24–25 (D.D.C. 2013) (citation omitted).  Accordingly, the privilege safeguards documents "'solicited

2

and received' by the President," which reflect "presidential decisionmaking and deliberations[.]" *Jud. Watch, Inc.*, 245 F. Supp. 3d at 28.

There can be no plausible dispute that the privilege applies to the EO Report on its face. The EO Report is a confidential communication from multiple agency heads, and expressly states that it was solicited by, and sent to, the President. *See* Declaration of James Holzer ¶¶ 14-15, ECF No. 216-3 ("Holzer Decl."). The EO Report provides for the President's consideration assessments and recommendations on numerous topics related to immigration and national security policy, and such agency advice to the President is quintessentially privileged. *See, e.g., Loving v. Dep't of Def.*, 550 F.3d 32, 40 (D.C. Cir. 2008) (agreeing that privilege applied to recommendation, "forwarded by the Army Secretary to the President," because the "President solicited and received [the document] in a manner sufficient to bring it within the [privilege]"); *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F. Supp. 3d 162, 173 (D.D.C. 2018) (explaining that if a Presidential advisor "were to solicit a document related to a national security decision being contemplated by the President, it would no doubt be protected by the presidential communications privilege").

Yet Plaintiffs argue that the privilege cannot apply because the EO Report was sent from individuals who are not themselves advisors to the President. But this argument is founded on a misreading of case law. For instance, Plaintiffs cite *In re Sealed Case*, 121 F.3d at 752, for the proposition that "the privilege does not generally 'extend to staff outside the White House in executive branch agencies,'" and thus because the EO Report was sent from and shared with Executive Branch agencies, the privilege is inapplicable. Pls.' Mem. of Law in Supp. of Pls.' Cross-Mot. for Summ. J. & in Opp'n to Defs.' Mot. for Summ. J., at 17, ECF No. 217-1 ("Pls.' Mot."); *see also id.* at 18-19 (repeatedly citing *In re Sealed* to argue that the privilege applies

"only" to Presidential advisors).  Courts have repeatedly corrected this misconception, however, rejecting the argument that the privilege is obviated where communications occur between the President and agency personnel.  As one court recognized, Plaintiffs' cited case law "refers to agency communications which do not involve the president's advisers at all, but rather are only between and among agency personnel."  *See Jud. Watch, Inc. v. Consumer Fin. Prot. Bureau*, 60 F. Supp. 3d 1, 13 n.5 (D.D.C. 2014); *cf. Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1122 (D.C. Cir. 2004) (holding that privilege did not apply to documents exchanged only with DOJ Office of the Pardon Attorney, in part because concern as to "President's confidentiality and access to candid advice" was "far more attenuated for working documents of an agency that were never submitted to the Office of the President").  By contrast, it is uncontroverted here that the EO Report was communicated from agency heads to the President.

Indeed, the Presidential Communications Privilege demands only that a communication is received by or sent from the President or one of his close advisors, as is the case here.  There is no requirement that a privileged communication may only occur *within* the circle of the President and his advisers.  *See Jud. Watch, Inc.*, 245 F. Supp. 3d at 29-30 (explaining that privilege applied to memoranda drafted by "agency lawyers" who were "not 'close presidential advisors'" because the documents were "solicited and received" by such advisors) (citations omitted); *Consumer Fin. Prot. Bureau*, 60 F. Supp. 3d at 12-13 (holding that the privilege protected communications between the President or his advisors and the staff of Federal agencies).

Because communications between the President and Executive agency personnel may be protected by the Presidential Communications Privilege, Plaintiffs must show that additional circumstances somehow take the EO Report outside the scope of the privilege.  Plaintiffs concede that in evaluating whether a communication falls outside the privilege, courts have

engaged in a highly fact-dependent inquiry involving multiple factors.  *See* Pls.' Mot. at 19

(noting that "courts have highlighted different facts arising in different circumstances"); *see also*

*Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, 560 F.

Supp. 3d 810, 828 (S.D.N.Y. 2021) (looking to "a number of factors that determine when the

presidential communications privilege applies"); *Am. C.L. Union v. Dep't of Just.*, No. 15 Civ.

1954 (CM), 2016 WL 889739, at *3 (S.D.N.Y. Mar. 4, 2016) (highlighting numerous

"principles" from the case law, directing the court's analysis).

 Yet Plaintiffs argue that this nuanced approach should be collapsed to a single binary

analysis, focusing simply on whether there was "widespread sharing of a document within the

[E]xecutive [B]ranch[.]"  *See* Pls.' Mot. at 16.  But Plaintiffs' analysis makes little sense in light

of the nuanced and context-specific inquiry courts have applied to presidential communications.

Here, the circumstances surrounding the EO Report establish that the privilege applies.

 *First*, the EO Report is plainly "'revelatory of the President's deliberations' such that its

public disclosure would undermine future decision-making."  *See Ctr. for Effective Gov't*, 7 F.

Supp. 3d at 25 (quoting *In re Sealed Case*, 121 F.3d at 745-46); *cf. Knight First Amend. Inst.*,

560 F. Supp. 3d at 829 (explaining that privilege did not apply there because disclosure would

not "undermine future presidential decision-making").  The EO Report sets forth the detailed

assessments and recommendations of multiple agencies involved in immigration and national

security policy, for the purposes of Presidential review.  Disclosure of the confidential EO

Report, designed explicitly to assist with "presidential decision-making," would impair the

President's ability to receive unfettered advice and recommendations.  *Accord Citizens for Resp.*

*& Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 36, 48 (D.D.C. 2007)

(holding that FEMA "easily met its burden" to withhold "communications" between "FEMA and

other agency officials" and "[t]he President's advisers or staff," regarding "advice and recommendations" on Hurricane Katrina response) (citation and emphasis omitted).

*Second*, the fact that the EO Report was consistently treated as a confidential – indeed classified – communication, further supports application of the privilege.   And while Plaintiffs accuse Defendants of "misrepresent[ing]" case law concerning classification, Pls.' Mot. at 20, this precedent establishes that the classified status of a document, and other facts relating to its handling, are highly relevant to determining whether the privilege applies.   Indeed, in *Center for Effective Government* the Court pointed out no fewer than ten separate times that the document at issue was "unclassified," in support of its holding that the privilege did not apply.   7 F. Supp. 3d at 19-21, 23, 25, 28 nn. 6, 11-12; *see also Am. C.L. Union*, 2016 WL 889739, at *4 (agreeing that "the fact that the document was not classified proved very important" in *Center for Effective Government*); *Knight First Amend. Inst.*, 560 F. Supp. 3d at 829 (finding that the "documents were not treated as confidential for purposes of the privilege" given that "[t]he Government does not assert that they contain independently classified information").

Here, the Report was treated as a confidential and classified communication.   It was transmitted to the President via a classified system, and the full report resides solely on classified networks at the respective agencies.   Holzer Decl. ¶¶ 15-16; Declaration of Susan C. Weetman ¶ 24, ECF No. 216-4 ("Weetman Decl.").   The Report was not, and could not have been, "freely forwarded" within the Government, or otherwise handled in a manner inconsistent with a classified and confidential communication to the President.   *Cf. Knight First Amend. Inst.*, 560 F. Supp. 3d at 829 (holding that communication was non-privileged in part because there was no "limitation on forwarding" an email).

*Third*, and finally, the limited distribution of the Report does not undermine application of the Privilege.  Plaintiffs elide a key distinction from many of the cases that have examined this question.  That is, much of the limited case law on this issue concerned *post-decisional* documents *from* the President or his staff that were then distributed outside of the White House. For instance, *Center for Effective Government* examined a Presidential Policy Directive, sent from the White House throughout the Executive Branch.  7 F. Supp. 3d at 19.  Similarly, *Knight First Amendment Institute* examined non-classified email chains, from the White House, forwarded to government and non-government personnel.[1]  560 F. Supp. 3d at 827.

This distinction, between final directives issued from the President and his advisors on the one hand, and recommendations from agencies to the President on the other, is significant. For one thing, the cases cited above emphasized the fact that Presidential decisionmaking was not likely to be undermined by disclosure of final policy documents that had issued from the White House.  That is, the distribution of a document that reflects the culmination of a Presidential deliberation is unlikely to be revelatory of the considerations that went into the decisionmaking process, the point at which the Privilege is at its zenith.  *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 25 (explaining that document at issue was not privileged in part because it was a final, "forward-looking" directive that provided "clear policy guidance") (citation omitted).  In highlighting the lack of advisory content, *Center for Effective Government* analogized the distribution of a final directive from the President outward to "agency advisory

---

[1] While *Brennan Center for Justice of New York University School of Law v. United States Department of State*, No. 17 Civ. 7520 (PGG), 2019 WL 10984173, at *6 (S.D.N.Y. Mar. 29, 2019*)* questioned the distribution of Reports similar to the one at issue here, its discussion was brief and did not thoroughly examine whether the privilege applied.  *See id.* (questioning whether "the information contained within the withheld documents has been widely and publicly disseminated").

7

documents *that never reach* the Office of the President."  *Id*. at 27 (emphasis added).  Moreover, distribution of such a final document throughout the Executive Branch may indicate that the communication was not intended as a confidential communication, but rather a generally-applicable governmental directive.

By contrast, where, as here, agencies collaborate to prepare an advisory, classified report to provide recommendations and inform ongoing policymaking, and the report is provided to the President, and the only agencies receiving copies are the very agencies that helped prepare the document, the confidentiality and privilege attaching to that document is clear.  It is well-established, moreover, that a Presidential communication "does not lose its privileged status simply because it traveled up the chain of command before the President received it."  *Loving*, 550 F.3d at 40.  The same result necessarily obtains when the recommendation travels back down the same chain of command, or agencies would be bizarrely prohibited from retaining their own Presidential recommendations.

Nor are agencies required to provide the name and title of all personnel who received the Report.  Pls.' Mot. at 19.  In *Citizens for Responsibility & Ethics in Washington*, 514 F. Supp. 2d at 48-49, for instance, the court rejected the argument that an agency must "name the White House advisers participating in the communications," since the agency had satisfied the "crux" of the privilege, namely that the communications were sent to Presidential advisers and their staffs.  Similarly here, there is no question that the Report was transmitted to the President, bringing it within the privilege.  And it is sufficient to demonstrate its confidentiality to show

that the communication was sent to only agencies and components that helped prepare the Report.  *See* Holzer Decl. ¶ 15.[2]

To require more would endanger Presidential communications that pre-date an agency's institutional memory.  That is, where an agency could not specifically point to every person who received a given communication, Plaintiffs' theory would entirely preclude application of the Presidential Communications Privilege.  But Courts have regularly upheld the Privilege for communications of prior Presidents, where such a "chain of custody" showing was likely impossible.  *See, e.g., Lardner v. U.S. Dep't of Just.*, No. Civ.A.03-0180(JDB), 2005 WL 758267, at *10 (D.D.C. Mar. 31, 2005) (upholding privilege as applied to documents from administration of President Reagan); *Berman v. CIA,* 378 F. Supp. 2d 1209, 1218–22 (E.D. Cal. 2005) (finding daily briefings from President Lyndon Johnson's term of office protected).  And courts have roundly rejected "such an unfair bait and switch," where privileges "intended to facilitate candid communication[s]" somehow "evaoporate over time."  *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 464–65 (D.C. Cir. 2014) (Kavanaugh, J.).

Documents are instead appropriately protected under FOIA when they are shown to "logically fall[]" in the "scope of the privilege."  *See Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 394 F. Supp. 3d 39, 48 (D.D.C. 2019); *see also Am. C.L. Union v. U.S. Dep't of Def.*,

---

[2] Plaintiffs' are wrong in arguing that State's declaration is inadequate because it recounts certain information "[t]o the best of the subject matters experts' recollection." Pls.' Mot. at 19 (quoting Weetman Decl. ¶ 24).  This is distinguishable from *Harris v. Gonzales*, where the court found unreliable an affidavit that used the phrase "[t]o the best of my knowledge and belief," because it called into question whether reliable information was being provided. 488 F.3d 442, 446 (D.C. Cir. 2007) (citation omitted).  By contrast, there is no deficiency created by use of the phrase "to the best of [one's] recollection."  *See Jud. Watch, Inc. v. U.S. Dep't of Just.*, 319 F. Supp. 3d 431, 439 (D.D.C. 2018) ("Not only is it customary for a declarant or affiant to qualify sworn statements by using the phrase 'to the best of [one's] recollection,' federal courts have required this phrase to be used when, for example, ordering a witness to verify the truthfulness of his answers.") (citation omitted).

901 F.3d 125, 133 (2d Cir. 2018) ("[T]he agency's justification is sufficient if it appears logical and plausible.").  As explained above, and in Defendants' Motion for Summary Judgment, disclosure of the EO Report would infringe upon the confidentiality of Presidential decision-making.  Defendants have logically and plausibly shown that the EO Report falls within the Presidential Communications Privilege, and therefore Exemption 5 properly applies.

B.    The Presidential Communications Privilege was Not Waived by Official Acknowledgement of Information

Plaintiffs next assert that the Presidential Communications Privilege may have been waived in whole or in part due to certain "public disclosures related to the subjects ordered to be covered in the Report."  Pls.' Mot. at 22.   But Plaintiffs fail to set forth any standard by which this Court could determine if some or all of the Report has been sufficiently "disclosed."

As Defendants previously explained, the Second Circuit employs a "precise and strict" test to determine whether information in a withheld document has been "officially acknowledged," and corresponding FOIA exemptions thereby waived.  *See N.Y. Times v. CIA*, 965 F.3d 109, 116-17 (2d Cir. 2020).  Indeed, Plaintiffs must show that the information sought "(1) '[is] as specific as the information previously released,' (2) 'match[es] the information previously disclosed,' and (3) was 'made public through an official and documented disclosure.'" *Osen LLC v. U.S. Cent. Command*, 969 F.3d 102, 109 (2d Cir. 2020) (quoting *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009)).  The Second Circuit has taken pains to note that, to establish an official acknowledgement, "there cannot be *any* 'substantive differences between the content of the [publicly] released government documents and the withheld information.'" *Id.* at 110 (quoting *Am. C.L. Union v. U.S. Dep't of Def.*, 628 F.3d 612, 620-21 (D.C. Cir. 2011)) (emphasis added).  And "even a 'substantial overlap' between the requested information and previously disclosed information is not enough to establish waiver." *Id.* at 112

(quoting *N.Y. Times*, 965 F.3d at 119).  Rather, two records must "match – in other words, that they present the same information about the same subject." *Id*. (citation omitted).

Plaintiffs do not even attempt such a showing, and instead generalize about certain agency actions "related to screening and vetting of visa applicants," State Department "related guidance," and even Administration statements in "op-eds" and "press releases," among others. *See* Pls.' Mot. at 21-22.  Plaintiffs do not assert, and cannot show, that any of these documents and statements even reference the document at issue here, let alone contain information that is as specific and precisely "matches" the information contained in the EO Report.

The D.C. Circuit recently held that the Presidential Communications Privilege was not waived as to a memorandum by the NSA Deputy Director, where a public government report contained information similar to that withheld in the memorandum.  *See Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879 (D.C. Cir. 2021).  In that case, the court explained that the question is "whether the information disclosed is a close enough match to the information withheld," but in that case "the report and the memo [were] not a complete match; the memo contains details and statements that were not disclosed in the report." *Id*. at 891. Accordingly, the court held that even though the report "contains much information similar to information found" in the memo, the absence of a "complete match," precluded a finding of waiver. *Id.*

Again, Plaintiffs do not even assert that any of their numerous cited materials contain information that is specific to and matches statements in the EO Report.  And for good reason, although the EO Report and certain of Plaintiffs' materials concern similar topics, Plaintiffs fail to point to a single instance in which the public materials revealed the precise recommendations and analysis provided in the EO Report. And following their review, Defendants are similarly

11

unaware of any such documents which provide a "complete match," to the EO Report, either in whole or in part.  *See* Supplemental Declaration of James Holzer ("Supp. Holzer Decl.") ¶ 3; Supplemental Declaration of Susan C. Weetman ("Supp. Weetman Decl.") ¶ 6.

At bottom, Plaintiffs do not come close to meeting the exacting analysis required to show waiver of the Presidential Communications Privilege by official disclosure.  Nor is it appropriate to apply any lesser standard, given that "[c]ongressional or judicial negation of the presidential communications privilege is subject to greater scrutiny than denial of the deliberative privilege."  *N.Y. Times Co. v. Off. of Mgmt. & Budget*, 531 F. Supp. 3d 118, 128 (D.D.C. 2021) (quoting *In re Sealed Case*, 121 F.3d at 745).  Plaintiffs thus fail to show that the Presidential Communications Privilege has been waived through public disclosure.

C.     Disclosure of the EO Report Would Cause Reasonably Foreseeable Harm

Plaintiffs finally argue that Defendants were overly "formulaic" in asserting that harm that will result from forced disclosure of a confidential report to the President on sensitive topics of immigration and national security policy.  Pls.' Mot. at 23.  But the explanation provided by Defendants on this point is more than sufficient.

As Defendants previously explained, 5 U.S.C. § 552(a)(8) directs agencies to assess "whether an agency has reasonably foreseen a specific, identifiable harm" before making a disclosure determination with respect to certain exemptions. Defs.' Mem. in Supp. of their Mot. for Summ. J., at 9, ECF No. 216-1 ("Defs.' Mot.") (citation omitted).  At the summary judgment stage, this requirement is satisfied where the agency identifies the specific foreseeable harms that would result from disclosure and "connect[s] the harms in a meaningful way to the information withheld."  *Jud. Watch, Inc. v. U.S. Dep't of Com.*, No. 17-cv-1283 (EGS), 2020 WL 6939807, at *4 (D.D.C. Nov. 25, 2020) (citation omitted); *see also N.Y. Times Co. v. Dep't of Health & Hum.*

*Servs.*, 513 F. Supp. 3d 337, 353 (S.D.N.Y. 2021) (explaining that the agency must point to the "link between this harm and the specific information contained in the material withheld") (citation omitted), *aff'd*, 15 F.4th 216 (2d Cir. 2021).  In the specific context of exemptions that protect the confidential exchange of opinions and advice, "the government must establish that disclosure would harm 'debate and candid consideration of alternatives within an agency[.]'" *Tobias v. U.S. Dep't of the Interior, Off. of the Sec'y*, No. 1:18-cv-01368 (CJN), 2021 WL 4262488, at *2 (D.D.C. Sept. 20, 2021) (quoting *Jordan v. U.S. Dep't of Just.*, 591 F.2d 753, 772 (D.C. Cir. 1978)).  "So long as the agency 'specifically focused on the information at issue . . . under review, and it concluded that disclosure of that information would chill future internal discussions,'" then the required showing has been made.  *Id.* (citation omitted).

Plaintiffs do not dispute that compelled disclosure of the EO Report would threaten the candor of Presidential communications.   Plaintiffs only urge that such assertions are overly "conclusory," Pls.' Mot. at 24, or that some other harm must be articulated.  Not so.

Defendants have pointed to the reasonably, indeed obviously, foreseeable harms that would result from disclosure of the EO Report.  As DHS's declarant explained in part, "the Report is a confidential communication to the President focusing on controversial issues relating to immigration, vetting, and related procedures for ensuring national security."  Holzer Decl. ¶ 22.  Accordingly, "[c]ompelled release of this report would plainly threaten President's ability to receive frank and candid advice concerning the sensitive field of immigration policy and related security reforms."  *Id.*; *see also id.* (explaining that disclosure would "necessarily inhibit presidential advisors from engaging in the full and candid exploration of issues and options that is essential to effectively prepare advice and recommendations for the President on sensitive topics such as immigration policy").

Further, the interests protected by the Presidential Communications Privilege are focused on ensuring the confidentiality of exchanges with the President, to ensure that his decisionmaking process is appropriately protected.  As even Plaintiffs concede, foreseeable harm in this context may be satisfied where the agency plausibly demonstrates how release of a specific document would reasonably threaten the confidentiality of communications with the President.  *See, e.g., Leopold v. U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 10 n.4 (D.D.C. 2020) (finding standard met because "disclosing transition deliberations would jeopardize the ability of future Presidents-elect to have full and candid discussions with their advisers") (citation omitted); *Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*, No. 18-2622 (ABJ), 2021 WL 4502106, at *23 (D.D.C. Sept. 30, 2021) (finding the foreseeable harm standard was satisfied for the presidential communications privilege where the declarant explained that disclosure would "burden[] the ability of the President and his advisors to engage in a confidential and frank decision-making process and chill[] or inhibit[] their ability to have candid discussions, thus impacting the efficiency of government policy-making") (citation omitted).

Neither explanation of the foreseeable harm from release of presidential communications represents "boilerplate," Pls.' Mot. at 24, but rather detailed findings that the release of the specific documents at issue would infringe on the free and candid exchange of Presidential communications.  Similarly, in the context of the related deliberative process privilege, courts have regularly held that specific threats to the confidentiality of agency deliberations satisfies the foreseeable harm requirement.  *See, e.g., N.Y. Times Co.*, 513 F. Supp. 3d at 355 (explaining that "disclos[ure] [of] discussions by agency staff formulating policy . . . would naturally inhibit future discussions if staff thought their advice might be revealed to the public"); *Competitive Enter. Inst. v. U.S. Dep't of State*, 486 F. Supp. 3d 171, 180 (D.D.C. 2020) (finding foreseeable

harm was demonstrated where disclosure would "interfere with the ability of the Secretary to receive candid, thorough advice on the possible legal risks of potential decisions, harming the quality of future decision-making") (citation omitted).

In sum, the compelled release of classified, confidential advice to the President, providing recommendations on sensitive immigration and national security matters, would foreseeably chill the sharing of opinions and advice with the President on these and similar issues.

As noted in Defendants' Motion, if the Court concludes, as it should, that the EO Report is appropriately withheld in full pursuant to the Presidential Communications Privilege, there is no need to adjudicate the additional withholdings over specific portions of that document.

## II.   DHS Adequately Supported the Withholding of Deliberative Portions of the EO Report

Plaintiffs next challenge DHS's withholding of portions of the EO Report under the deliberative process privilege, but this argument also fails.  As a threshold issue, Plaintiffs err by arguing that the deliberative process privilege may only apply to materials that relate to a "specific agency decision" with an identified "endpoint."  Pls.' Mot. at 25-26 (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)).

The Second Circuit recently held that "[r]equiring that a record 'relate to a specific decision facing the agency,' . . . places an unduly restrictive gloss on the deliberative process privilege's predecisional requirement."  *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 19 F.4th 177, 192 (2d Cir. 2021).  Indeed, "[a]gencies are, and properly should be, engaged in a continuing process of examining their policies," and "courts should be wary of interfering with this process."  *Id.* (quoting *Nat'l Labor Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975)).  As a result, "a record is predecisional if it relates to a specific decision *or a*

*specific decisionmaking process* and was generated before the conclusion of that decision or process." *Id.* (emphasis in original).

Defendants sufficiently identified the decisionmaking processes at issue, noting that the withheld portions pertain to Presidential decisiomaking "relating to border security and immigration policy." Holzer Decl. ¶ 25. Contrary to Plaintiffs' argument, the explanation did not end there, and DHS in fact explained that "*[s]pecifically*, the recommendations and pre-decisional discussion were included in the report to assist the President in making decisions on whether to institute certain new information collections, system checks, and interagency coordination requirements in the immigration screening and vetting processes." *Id*. (emphasis added). Plaintiffs make no argument as to whether and why such decisionmaking processes are insufficiently described, and accordingly have waived any such argument.

Nor can Plaintiffs plausibly claim that this explanation "obscur[es]" the decisionmaking at issue. Pls.' Mot. at 26. DHS properly set forth the specific policymaking processes at issue, all that is required. *Accord Nat. Res. Def. Council*, 19 F.4th at 193 (explaining that the agency could properly withhold documents where the "information contained . . . was collected and curated to assist in an agency decisionmaking process related to the role of epidemiology data"); *see also Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 330 (2d Cir. 2022) (explaining that agency affidavit was "sufficient where it provided a high-level explanation of categories of information falling within the exemption").

It is hard to fathom what more DHS could offer apart from explicitly stating what precise recommendations were being made on each topic, which of course would reveal the deliberations to be shielded from disclosure. *Accord Knight First Amend. Inst.*, 30 F.4th at 330 ("[I]t would

not be reasonable to expect DOS to provide more specific descriptions; doing so would effectively require disclosure of the isolated material it chose to redact.").

Plaintiffs' remaining assertions are similarly meritless.  Contrary to Plaintiffs' arguments, DHS makes clear that the withheld portions did not reflect the "policy of the agency," Pls.' Mot. at 26 (citation omitted), at the time.  *See* Holzer Decl. ¶ 25 (explaining that the "recommendations and discussion in this Report did not constitute the government's final position on these issues and accordingly do not contain binding policy or other guidance").  And the portions withheld as deliberative do not merely report on progress, Pls.' Mot. at 27, but provide "recommendations" and "proposals" on the issues set forth above, and advised as to suggested "next steps on these issues."  Holzer Decl. ¶ 25.

Finally, DHS adequately demonstrated how and why the disclosure of the withheld portions of the EO Report would impede agency deliberations.   Among other things, DHS described how, if the preliminary recommendations on "immigration policy and national security" contained in the EO Report are disclosed, agency and other Executive Branch personnel "are likely to refrain from full and candid statements of their views to final decision-makers."  Holzer Decl. ¶ 27.  As explained above, such harm, logically connected to the specific document and information at issue, satisfies the requirement to show foreseeable harm.

## III.    Portions of the Report Were Properly Withheld Under Exemption 7(E)

Plaintiffs also take issue with the withholding of certain information in the EO Report under Exemption 7(E).  Once again, Plaintiffs do not argue that the withheld information does not or cannot meet the criteria for withholding, but rather that the descriptions of the information provided are too vague.  Pls.' Mot. at 29.  But here too, no more precise description is required

for Defendants to demonstrate that the withheld material logically and plausibly falls within the scope of the Exemption.

Defendants explained in detail the types of information withheld under Exemption 7(E), and set forth why that information is in fact properly withheld. While the categories of information withheld are thus apparent, Plaintiffs argue that the declarants do not state whether the categories described constitute an exhaustive list. *See* Pls.' Mot. at 28 (arguing that the "declarations do not clarify whether the categories of information described as withheld constitute an exhaustive list"). But no such additional showing is required here. For instance, the two categories of information identified by Ms. Weetman account for the material redacted by State under this Exemption, Weetman Decl. ¶¶ 26-27, and the Court can verify this fact since the document has already been submitted for the Court's *in camera* inspection.

Similarly, to the extent Plaintiffs assert that a specific format for agency affidavits or Vaughn indices is required in FOIA briefing, Pls.' Mot. at 28, that is incorrect. As the Second Circuit has explained, it "eschew[s] rigid adherence to any particular indexing format under the *Vaughn* standard, opting instead for a functional approach." *Halpern v. FBI*, 181 F.3d 279, 291 (2d Cir. 1999). Accordingly, agencies may submit "affidavits to the court that describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure[.]" *Id.* (citation omitted); *see also Ashton v. Dep't of Veterans Affs.*, 198 F.3d 233 (2d Cir. 1999) (rejecting as "frivolous" the argument that agency "explanations are inadequate because they failed to compile proper *Vaughn* indices"). The agency has met this obligation here.

The remainder of Plaintiffs' challenges to the 7(E) withholdings are in tension with each other. On one hand Plaintiffs argue that Defendants declarations are so vague that Plaintiffs

cannot discern what is being withheld.  On the other hand, Plaintiffs assert that they *can* evaluate

the claimed withholdings, and aver that some of the information therein has been publicly

disclosed.

As Plaintiffs' contradictions demonstrate, their first argument falls flat; there is more than

sufficient description of the types of information withheld under Exemption 7(E).  While

Plaintiffs extract two clauses out of context and argue that, standing alone, they are overly

"nebulous," Pls.' Mot. at 29, once again the declarations provide sufficient information to

explain the information withheld, without compromising the withheld information.  For instance,

DHS explains that it withheld information "relating to existing and proposed ways in which

Executive branch agencies collaborate in vetting and screening processes," and this information

constitutes a law enforcement technique because it relates to the Department's "law enforcement

function" of "screening and vetting persons seeking to enter or remain in the United States."

Holzer Decl. ¶ 32.  This explanation, in conjunction with the entire detailed justification of

DHS's declaration, Holzer Decl. ¶¶ 30-35, is more than sufficient to demonstrate that the

information at issue logically and plausibly falls within Exemption 7(E)'s coverage.  To require

more would improperly require that the agency describe publicly the precise inter-agency

collaborations described in the EO Report, the exact material subject to both Exemption 7(E) and

the Presidential Communications Privilege.  *Accord Oglesby v. U.S. Dep't of Army,* 79 F.3d

1172, 1178 (D.C. Cir. 1996) (explaining that an affidavit must be as detailed as possible

"without, of course, disclosing the privileged material itself").  And specific immigration

procedures, such as non-public agency collaboration efforts in the immigration screening and

vetting process, are also appropriately withheld under Exemption 7(E).  *Accord CLEAR v. U.S.*

*Customs & Border Prot.*, No. 19-CV-7079 (RER), 2022 WL 16636686, at *10 (E.D.N.Y. Nov.

2, 2022) (affirming the withholding of information pertaining to CBP "interview and vetting methods and techniques") (citation omitted).

Plaintiffs' remaining assertion on this score, that DHS's reference to "types of immigration-related adjudications and categories of information" is overly ambiguous, is also misplaced. Pls.' Mot. at 29.  That clause is taken from a paragraph that explains that the withheld information includes "matrices" that set forth certain immigration adjudications and types of information, "which was being evaluated for use in the screening and vetting processes for those respective adjudications," and which, if released, "would alert adversaries as to the types of potentially derogatory information they may need to overcome in order to enter or remain in the United States."  Holzer Decl. ¶ 33.  Such a proposed, non-public method of information analysis, and the specific categories of material for use therein, in the context of screening and vetting, is also appropriately withheld under Exemption 7(E).  *See Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 391 (S.D.N.Y. 2014) (holding that information concerning "which databases CBP considers in its targeting process" was exempt).

Plaintiffs next briefly assert, in conclusory fashion, that "at least some" of the information withheld under Exemption 7(E) is so clearly described that it "appear[s] to be in the public domain," and thus not appropriately withheld.  Pls.' Mot. at 30.  However, Plaintiffs fail to provide any actual legal argument as to how the Court can properly evaluate whether certain information is sufficiently "in the public domain," such as through application of an appropriate legal standard.  *See also id.* at 28 (referencing without elaboration that the "Second Circuit has recognized a 'public domain exception' to Exemption 7 for information that is 'generally available to the public at large'") (citation omitted).   While it appears that Plaintiffs wish to argue waiver pursuant to *Knight First Amendment Institute*, 30 F.4th at 332, that case held

explicitly: "[t]he burden of establishing prior public disclosure is on the requester."  Plaintiffs

have failed to carry their burden.  For one thing, their arguments vaguely direct the Court (and

Defendants) to review reams of exhibits, in highly convoluted fashion, without any guidance as

to the specific, purportedly relevant information therein.

　　　　To take just one clause from this argument, Plaintiffs contend that certain "biographic

data elements" withheld in the EO Report "appears to refer to the list" of such data elements

purportedly "documented in a series of cables published by Reuters, SUMF 22-28, 35[.]"  Pls.'

Mot. at 30.  Most of the eight different statements of material fact Plaintiffs cite for this single

proposition in turn reference multiple exhibits.  For example, Plaintiffs' Statement No. 23

references no fewer than eight different exhibits, with two such exhibits noted without any pin-

cite.  The Court is not required to sift through the numerous referenced exhibits to determine

what, if anything, supports Plaintiffs' purported statement of material fact, and only then return

back to the original proposition in Plaintiffs' brief. And this is just for one of the seven different

statements of fact cited for this *single clause*.  Parties "cannot simply dump papers on the court

and expect the court to sift through them to determine if some nugget is buried somewhere in

that mountain." *Emanuel v. Gap. Inc.*, No. 19-CV-03617 (PMH), 2022 WL 3084317, at *5

(S.D.N.Y. Aug. 3, 2022) (citation omitted).  Simply put, neither Defendants nor Judges are "like

pigs, hunting for truffles buried in briefs or the record."  W*estcon Grp., Inc. v. CCC Techs., Inc.*,

No. 19-CV-02303 (PMH), 2022 WL 4134578, at *3 (S.D.N.Y. Sept. 12, 2022) (citation

omitted).  Where, as here, Plaintiffs have failed to clearly articulate and support their arguments,

they have been abandoned and may not be revived on reply.  *See Norton v. Sam's Club*, 145 F.3d

114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived[.]").

Even an attempt to evaluate Plaintiff's mass of arguments and exhibits would meet the same result.  The Second Circuit has explicitly limited "the public domain exception to information that is 'freely available.'"  *Knight First Amend. Inst.*, 30 F.4th at 332 (citation omitted).  Thus, to meet this burden, "the requesting party 'must . . . point[ ] to specific information in the public domain that appears to duplicate that being withheld.'"  *Id.* (citation omitted).  But Plaintiffs fail to clearly explain which "specific information" is purportedly duplicated in the public domain, and via which exact source.  More critically, assuming that Plaintiffs had made such a clear argument, their effort would still fall well short.  As DHS and State explain in their supplemental declarations, none of the materials provided by Plaintiff "duplicate" the list of "high value biographic data elements" withheld, or the "data and vetting capabilities operated by interagency partners in automated system checks," or the "existing and proposed ways in which Executive branch agencies collaborate in vetting and screening processes," as that information is set forth in the EO Report.  Pls.' Mot. at 30; Supp. Holzer Decl. ¶ 4; Supp. Weetman Decl. ¶¶ 5-6.

Further, "[i]n the FOIA context, information is in the public domain if it is generally available to the public at large, not simply if it happens to be known by select members of the public." *Knight First Amend. Inst.*, 30 F.4th at 332-33.  In that case, the court rejected the argument that certain questions used in the immigration context were in the public domain because they were "asked in interviews or mailed" to applicants.  *Id.* at 332.  The court explained that, even if an "enterprising researcher" took the time to determine the relevant questions from their public use, "the necessity of the reconstruction exercise itself demonstrates that the information in question is not in the public domain."  *Id*. at 333.

So too here.  Plaintiffs undertake an exhaustive exercise to try and reconstruct the content of the Exemption 7(E) withholdings.  For instance, Plaintiffs try to connect news articles, agency testimony to congress, and other "government statements," to certain withheld information, to then speculate that the information in the EO Report must be the same or similar to that publicly discussed.  Pls.' Mot. at 30.  But the sheer effort required by Plaintiffs to arrive at their theories further demonstrates that the withheld information is not in the public domain.  "Put another way, the possibility that a savvy law-evader might be able to infer the substance of some withheld documents by carefully observing an agency's actions does not remove those documents from the ambit of Exemption 7(E)."  *Knight First Amend. Inst.*, 30 F.4th at 333. Under this binding precedent, Plaintiffs fail to demonstrate that any withheld information is duplicated and freely available in the public domain, and therefore falls outside Exemption 7(E)'s reach.

## IV.    Portions of the Report Were Properly Withheld Under Exemptions 1 and 3

In their final argument concerning the EO Report, Plaintiffs aver once more that the justifications for Exemption 1 and 3 withholdings are overly "vague and conclusory."  Pls.' Mot. at 32.

Yet Plaintiffs fail to acknowledge the Second Circuit's repeated admonishments that courts should "defer[] to executive [declarations] predicting harm to the national security," and the court of appeals has "found it unwise to undertake searching judicial review.'"  *Osen LLC*, 969 F.3d at 115 (quoting *Am. C.L. Union*, 901 F.3d at 134); *see also Am. C.L. Union v. Dep't of Just.*, 681 F.3d 61, 69 (2d Cir. 2012) (recognizing that "we 'must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record.'") (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).  Indeed, agency declarations need

only "contain sufficient detail to forge the logical connection between the information [withheld] and [Exemption 1]." *Clevenger v. U.S. Dep't of Just.*, No. 18 CV 1568 (LB), 2020 WL 1846565, at *17 (E.D.N.Y. Apr. 3, 2020) (quoting *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 506 (S.D.N.Y. 2010)).  Defendants have certainly satisfied that standard.

Indeed, the only specific complaint raised by Plaintiffs on this point is that the ODNI declaration was insufficiently clear in explaining how classified information in the document concerns "the specific role(s) that CIA plays in the vetting program." Pls.' Mot. at 33 (citation omitted).  But the declaration explains how disclosure of this information could reveal "the means by which the CIA supports other departments and agencies under the program, which [adversaries] in turn could exploit to undermine both the vetting program and the CIA's clandestine intelligence mission."  Declaration of Gregory M. Koch, Chief, Info. Mgmt. Off., Off. of the Director of Nat'l Intel. ¶ 21, ECF No. 216-5 ("Koch Decl.").[3]  Plaintiffs' apparent demand that the declaration describe the actual role played by the CIA would force the disclosure of the very classified information that is appropriately protected from disclosure.

This is nothing like *Halpern*, 181 F.3d at 293, cited by Plaintiff, where the affidavit at issue gave "no contextual description either of the documents subject to redaction or of the specific redactions made to the various documents."  Rather, Defendants have set forth specific explanations as to why information from ODNI, CIA and NSA are all appropriately withheld as classified, and certainly have not been "officially acknowledged," Pls.' Mot. at 33. Under the "high degree of deference to which an agency is entitled regarding classification," these

---

[3] Similarly, because the CIA's efforts concern its support for immigration vetting, there can be no plausible dispute that the agency's efforts concern intelligence sources and methods, especially given the fact that release of the withheld material could "undermine both the vetting program and the CIA's clandestine intelligence mission."  Koch Decl. ¶ 30.

withholdings should be upheld. *Clevenger*, 2020 WL 1846565, at *18; *People for the Am. Way Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.,* 462 F. Supp. 2d 21, 33 (D.D.C. 2006) ("Because of the deference due to the NSA in matters of national security, and in the absence of any evidence to the contrary, the Court must accept defendant's reasonable explanation that the materials were classified in order to prevent damage to the national security").

Plaintiffs' other arguments are equally meritless. Plaintiffs seem to dispute that ODNI has shown that all information at issue is properly classified pursuant to Executive Order 13526, because only ODNI provided a declaration, rather than the CIA and NSA submitting their own declarations. But in support Plaintiffs oddly cite to EO 13526's requirements for delegating original classification authority. Pls.' Mot. at 32. Procedures for the delegation of original classification authority within agencies do not bear on whether and when declarants, in the FOIA context, may properly attest to the classified status of documents. And Plaintiffs similarly err in arguing that ODNI's statements as to the classification of CIA and NSA information are inadmissable "hearsay." *Id.* For one thing, ODNI is charged by statute with protecting intelligence sources and methods for the entire "intelligence community," including the CIA and NSA. *See* 50 U.S.C. § 3024(i)(1). Moreover, Courts have overwhelmingly acknowledged that "FOIA does not require agency declarations to be based solely on the declarant's personal knowledge." *Flores v. U.S. Dep't of Just.*, No. 15-CV-2627 (JMA), 2016 WL 7856423, at *10 n.13 (E.D.N.Y. Oct. 4, 2016); *see also Taylor Energy Co. v. U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt.*, 271 F. Supp. 3d 73, 92 n.11 (D.D.C. 2017) ("[T]he use of hearsay in agency FOIA affidavits is generally acceptable"); *Canning v. U.S. Dep't of State*, 134 F. Supp. 3d 490, 510 (D.D.C. 2015) (concluding that an agency declarant "who is familiar with FOIA procedures and has reviewed the documents in question [ ] may make a decision based in part on

information obtained in the course of h[er] official duties without triggering a need for additional declarations from the individuals [s]he consulted"). ODNI's declaration supporting the Exemption 1 and 3 withholdings is sufficient, and those withholdings should be upheld.

## V.    Plaintiffs Waived Any Challenges to Additional Documents

Apart from those concerning the EO Report, no other challenges are properly before the Court. Defendants previously recounted how Plaintiffs represented both to Defendants and the Court that Plaintiffs would only "challenge the withholdings asserted in a single document," namely the EO Report. Defs.' Local Rule 56(a)(1) Stmt. of Undisputed Material Facts ¶ 4, ECF No. 216-2 ("Defs.' SOF"). Plaintiffs *do not* substantively dispute this fact. Rather, Plaintiffs aver that their own representations to this Court are not "material[]," and that this fact is not supported by specific parts of the "record" in this case. *See* Pls.' Local Rule 56(1)(2) Stmt. of Facts in Opp'n to Summ. J. ¶ 4(a), ECF No. 217-3 ("Pls.' Resp to Defs.' SOF"). Defendants previously explained that the conference call with the Court was not recorded and so there is unfortunately no transcript to cite. However, in failing to substantively contest this point, Plaintiffs tacitly admit that they repeatedly represented that their summary judgment challenges would be restricted to the EO Report.

The only remaining question is whether Plaintiffs' representations should bind them now. They should. While Plaintiffs aver that waiver of FOIA challenges can only occur "after a briefing schedule is set and an opening brief is filed," Pls.' Mot. at 33, no principle of law supports such an arbitrary rule. Rather, courts frequently hold that FOIA plaintiffs have waived challenges by, as here, voluntarily agreeing to narrow the issues to be presented to the Court, prior to any briefing. Indeed, one court explained just this month that, "waiver of a FOIA challenge typically happens in joint status reports," and "the common law concept of waiver . . . includes inferences from the words and actions of the parties." *Project on Gov't*

*Oversight, Inc. v. U.S. Dep't of Homeland Sec., Off. for C.R. & C.L.*, No. 1:18-CV-2051-RCL,

2023 WL 2139380, at *5-6 (D.D.C. Feb. 21, 2023) (finding waiver through an "email to DHS

and through joint status reports") (quoting *Cayuga Nation v. U.S. Dep't of Interior*, No. 20-2642

(ABJ), 2022 WL 888178, at *4 (D.D.C. Mar. 25, 2022)).  And there is no sound basis to

distinguish a representation in a joint status report from an oral representation to the Court.  *See*

*Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*, 325 F. Supp. 3d 162, 168 (D.D.C. 2018) (finding

waiver of FOIA challenge and explaining that the Federal Rules of Civil Procedure "allow the

parties to give up important procedural rights orally or in writing").

      The Government has a strong interest in ensuring that FOIA litigation can appropriately

narrow over time, and to that end plaintiffs should not be permitted to revive claims they have

knowingly and explicitly abandoned, regardless of when and how the waiver occurs.  *Accord*

*Cayuga Nation*, 2022 WL 888178, at *3 (explaining that where parties have reached "explicit

agreements" courts have "held plaintiffs to their previous concessions narrowing the terms of

FOIA disputes").

      Again, Plaintiffs do not dispute that on two separate occasions they knowingly and

voluntarily waived all challenges apart from those concerning the EO Report.  Nor do Plaintiffs

make any argument that this waiver should be excused.  Under these circumstances, this Court

may properly conclude that any other challenges have been waived.

## VI.    The Three State Department Documents Were Appropriately Withheld in Part

      Even if Plaintiffs had preserved their challenges to additional documents, they would fail.

Specifically, State properly applied Exemption 7(E) to two documents, and properly applied

Exemption 5 to a third document.

A.  The Cable and Q&A Documents Were Properly Withheld in Part Pursuant to Exemption 7(E)

As for the Cable and Q&A documents withheld in part under Exemption 7(E), Plaintiffs briefly contest that the documents were compiled for law enforcement purposes, an argument they do not raise with respect to the EO Report.  Plaintiffs aver that the documents may not constitute law enforcement records, which "enforce the Immigration and Nationality Act," because then "every document State touches is a 'law enforcement' record."  Pls.' Mot. at 34 (citation omitted).  But this argument makes little sense.  Much of State's mission does not concern the INA, and many State documents do not concern that statute at all.  In any event, Plaintiffs' argument omits the specific function of these documents, which in turn illuminates their law enforcement purpose.  In short, the documents address the processes for "identifying and flagging certain ineligibilities or potential ineligibilities in a database, including circumstances where certain types of investigations are required and procedures for collecting information required for those investigations," and guidance to consular officers on how to incorporate increased visa screening requirements in the field, including how to apply additional vetting in certain security sensitive scenarios and how to conduct certain elements of the vetting process.  Weetman Decl. ¶¶ 28, 31.  There can be little doubt that these records were created for law enforcement purposes when they address specific investigative procedures in the context of immigration.

Plaintiffs again err in claiming that Ms. Weetman was required to say something more to make clear that the information described constitutes all of the withheld information at issue.  Her affidavit, to the contrary, is "relatively detailed and nonconclusory" and sets forth the types of information withheld, easily meeting the required standard.  *See Eberg v. U.S. Dep't of Def.*, 193 F. Supp. 3d 95, 114 (D. Conn. 2016) (citation omitted).

Finally, for the same reasons explained above, Plaintiffs fail to demonstrate that the

withheld information has entered the public domain such that Exemption 7(E) is waived.

Plaintiffs do correctly note that State inadvertently made inconsistent redactions in a few

instances, such as by erroneously releasing certain material in a duplicate copy of the Cable, and

by not withholding certain section headings in a table of contents of the Operational Q&A

document.  Pls.' Mot. at 35; Supp. Weetman Decl. ¶ 8.  Similarly, State has determined, as a

matter of discretion, to no longer withhold the term "Donkey SAO" where it is contained within

other, non-exempt and reasonably segregable text, *id* and will re-release the documents at issue

accordingly.[4]  Supp. Weetman Decl. ¶ 9.  But apart from these spare instances, Plaintiffs fail to

show that any 7(E) withholdings were in error.

Further while Plaintiffs aver that a statement concerning INA § 221(g) "is in the public

domain," Pl.'s Mot. at 35, the withheld information is not duplicated in Plaintiffs' referenced

sources.  Supp. Weetman Decl. ¶ 10.  Moreover, the basis for Plaintiffs' argument is that this

information entered the "public domain" by way of unofficial disclosures, that is, through leaks

of otherwise confidential communications.  *Id*. ¶ 7.  But courts have explained that such

unauthorized disclosures cannot show official acknowledgement, and thereby waive applicable

exemptions.  For instance, in *Osen LLC v. United States Dep't of State*, 360 F. Supp. 3d 258, 265

(S.D.N.Y. 2019), the court distinguished between "unofficially and officially disclosed

---

[4] Defendants also properly complied with their obligations to release reasonable segregable
material.  Indeed, "[a]gencies are entitled to a presumption that they complied with the obligation
to disclose reasonably segregable material."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106,
1117 (D.C. Cir. 2007).  The declarations provided by Defendants adequately explain their
conclusions as to withholdings and segregability therein, *see, e.g.*, Supp. Weetman Decl. ¶ 12,
and Defendants' willingness to re-review their produced documents and release additional
material only "bolsters the Government's declarations with respect to segregability."  *Gonzalez v.
United States Citizenship & Immigr. Servs.*, 475 F. Supp. 3d 334, 354 (S.D.N.Y. 2020).

information," and explained that unauthorized disclosures of information there did not

undermine the agency's withholdings.  "Holding otherwise would afford unwarranted power to

leakers to force official government disclosure. It would, in effect, reward theft."  *Id.*; *see also*

*Am. C.L. Union v. Dep't of State*, 878 F. Supp. 2d 215, 224 (D.D.C. 2012) (holding that

unauthorized disclosure "is no substitute for an official acknowledgement and [plaintiff] has not

shown that the Executive has officially acknowledged that the specific information at issue was a

part of the [leak]").  State accordingly explains in its supplemental declaration that Plaintiffs'

cited material, specifically the references to Section 221(g) discretion, have not been officially

acknowledged.  For this reason as well, State's withholdings should be upheld.

> B.  The PRA Supporting Statement is Appropriately Withheld in Full Pursuant to
>     Exemption 5

Plaintiffs' last purported challenge concerns a draft supporting statement for a Paperwork

Reduction Act submission to OMB.  This document is properly withheld in full under Exemption

5, both because it is attorney-client privileged, and subject to the deliberative process privilege.

Looking first to the attorney-client privilege, the parties agree on the requirements that

must be met, namely that privileged documents must be "communications (1) between a client

and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the

purpose of obtaining or providing legal advice."  *ACLU v. NSA*, 925 F.3d 576, 589 (2d Cir.

2019).

Plaintiffs raise a myriad of arguments again quibbling with the exactitude of Defendants'

declarations, but none undermines the clear application of the privilege here.   For instance,

Plaintiffs argue that State "fails to identify all authors," Pls.' Mot. at 39, of the document, but no

case law "requires so detailed a description." *Am. C.L. Union v. Nat'l Sec. Agency*, No. 13-Civ-

09198 (KMW)(JCF), 2017 WL 1155910, at *9 (S.D.N.Y. Mar. 27, 2017), *aff'd*, 925 F.3d 576

(2d Cir. 2019).  Rather, "Defendants need only indicate that the documents withheld as attorney-client communications are, indeed, confidential communications seeking or providing legal advice from government attorneys to their clients."  *Id*.  While Plaintiffs speculate about whether external parties may have helped draft the submission itself, State makes clear that this specific draft of the document "contains comments and questions from attorneys in the Department's Office of the Legal Adviser in the Offices of Consular Affairs, Management, and Human Rights and Refugees" specifically intended for their policy clients, and this draft was "was only circulated between the attorneys and their policy clients, namely the Bureau of Consular Affairs and other bureaus within the Department with equities in the document."  Weetman Decl. ¶ 34.  It is accordingly clear that the document at issue is a communication between Government attorneys and their clients.

Similarly, Plaintiffs offer little resistance on the confidentiality prong, instead questioning how this communication concerning the agency's "'interpretation of domestic and international law,'" and compliance with the Paperwork Reduction Act could contain "confidential information concerning the agency."  Pls.' Mot. at 39 (citation omitted).  Plaintiffs, however, cannot rebut the common-sense averment that these attorney communications on a draft submission, "were intended to be and were, in fact, kept confidential[.]"  Weetman Decl. ¶ 34.  And such confidential information, including on the "interpretation of domestic and international law," *id.*, certainly "concern[s]" the agency.  Pls.' Mot. at 39.

Finally, Plaintiffs speculate that the "predominant purpose" of the attorney communications may have been "political, strategic, or policy" oriented, rather than to provide "legal advice."  Pls.' Mot. at 39 (citations omitted).  But this unsupported guesswork does not rebut State's averment that "[t]he purpose of the communications was to provide legal advice"

on multiple topics.  Weetman Decl. ¶ 34.  *Accord Perez v. U.S. Immigr. & Customs Enf't*, No.

19-CV-3154 (PGG)(JLC), 2020 WL 4557387, at *11 (S.D.N.Y. Aug. 6, 2020) (explaining that

"[s]peculation . . . [is] insufficient to discredit an agency's declaration" in FOIA).  All three

requirements to show attorney client privilege are easily met here, and Plaintiffs fail to show

otherwise.

> While the Court need not even reach the issue, the document is also appropriately

withheld as deliberative.  The draft submission is plainly predecisional, as it "predates the final

version of the submission" to OMB.  Weetman Decl. ¶ 35.  If that were not enough, the

document's predecisional nature is underscored by the presence of "highlighted, in-line proposed

changes to the text as well as attorney comments, questions, and advice," and a header marked

"Draft/Deliberative/Attorney Work Product."  *Id.* ¶ 34.  Plaintiffs argue only that the document's

draft nature does not "automatically" exempt it from disclosure, and that it is unclear whether the

decisionmaking concerned "policy-oriented judgment."  Pls.' Mot. at 36-37.  But Defendants do

not claim that any exemption automatically applies; the draft nature of the document, however,

demonstrates that it predated the final decision relating to the "final content and framing of the

submission," Weetman Decl. ¶ 35, and thus is predecisional.  *Accord James Madison Project v.

Dep't of Just.*, 208 F. Supp. 3d 265, 290–91 (D.D.C. 2016) ("[D]raft records have routinely been

protected from FOIA using the deliberative process privilege."); *Wilson v. Dep't of Just.*, No.

87-2415-LFO, 1991 WL 111457, at *5 (D.D.C. June 13, 1991) ("[D]rafts of briefing materials

for the President [are] clearly predecisional because they are part of the process of deciding what

to put in the briefing materials.").

> The draft submission, containing various edits and comments from agency attorneys, is

also deliberative and directly concerns important agency decisionmaking.  The document

"reflects the give-and-take of the consultative process," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980), and sets forth "opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (quoting *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 84-85 (2d Cir. 1991)).  State identified the offices principally involved in the exchange of the draft document, and it is beyond cavil that such a draft document, featuring numerous legal comments and edits, does not simply "describe[] the agency's current practices," or concern "routine computations or measurements," Pls.' Mot. at 37, such that the deliberative process privilege would not apply.

Nor did State somehow "adopt[]" this document, *id*. at 40.  If, as Plaintiffs suggest, a high-level understanding of the "form and substance," *id.* at 38, of an eventual agency decision forced the disclosure of all predecisional materials, the deliberative process privilege would be rendered a near-nullity.  Instead, draft documents are appropriately protected where, as here, disclosure "would divulge information regarding 'decisions to insert or delete material or to change [the] draft's focus or emphasis' and thus 'would stifle the creative thinking and candid exchange of ideas necessary to produce good . . . work.'"  *Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 174 (D.D.C. 2017) (quoting *Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987)).

The foreseeable harm resulting from the disclosure of the draft submission is obvious, and supports application of both the attorney-client and deliberative process privileges.  As State explains, among other things, disclosure would foreseeably harm "the ability of responsible Executive Branch officials to consider the collection of particular information in visa applications, as well as the justification for such collection, and formulate final opinions by

inhibiting candid discussion and the expression of recommendations and judgments regarding draft language and courses of action."  Weetman Decl. ¶ 35; *see also Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370-71 (D.C. Cir. 2020) (finding foreseeable harm because disclosure "would discourage line attorneys from candidly discussing their ideas, strategies, and recommendations, thus impairing the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals") (cleaned up).  The draft submission is thus properly withheld from disclosure pursuant to Exemption 5.

## CONCLUSION

For the foregoing reasons, this Court should grant judgment to Defendants, deny Plaintiffs' Cross-Motion, and close the case.


Dated: March 1, 2023                                    BRIAN M. BOYNTON
                                                        Principal Deputy Assistant Attorney General

                                                        ELIZABETH J. SHAPIRO
                                                        Deputy Director, Federal Programs Branch

                                                        */s/ Michael L. Drezner*
                                                        MICHAEL L. DREZNER
                                                        Trial Attorney, U.S. Department of Justice
                                                        Civil Division, Federal Programs Branch
                                                        1100 L. Street, NW Washington, DC 20005
                                                        Telephone: (202) 514-4505
                                                        Facsimile: (202) 616-8470

                                                        *Counsel for Defendants*