UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------- x
                                           :
COUNCIL ON AMERICAN-ISLAMIC                :
RELATIONS – CONNECTICUT and                :
MAKE THE ROAD NEW YORK,                    :           NO. 3:17 CV 1061(RMS)
Plaintiffs,                                :
                                           :
V.                                         :
                                           :
U.S. CITIZENSHIP AND                       :
IMMIGRATION SERVICES, U.S.                 :
CUSTOMS AND BORDER                         :
PROTECTION, and U.S.                       :
DEPARTMENT OF STATE,                       :
Defendants.                                :
                                           :           DATE: APRIL 17, 2023
                                           :
-------------------------------------------------- x
```

## RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND THE PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

The plaintiffs—Council on American-Islamic Relations – Connecticut and Make the Road New York—bring this action challenging the defendants'—United States Citizenship and Immigration Services ("USCIS"), United States Customs and Border Protection ("CBP"), and United States Department of State ("State")—nondisclosure of information requested pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). The parties cross-move for summary judgment. For the reasons stated below, the defendants' motion is granted in part and denied in part, and the plaintiffs' cross-motion is denied.

## PROCEDURAL BACKGROUND

On April 12, 2017, the plaintiffs submitted FOIA requests to the defendants seeking information regarding, *inter alia*, Executive Orders 13,769[1] and 13,780[2]; screening processes at United States ports of entry; and certain immigration processing policies and procedures. (Doc. No. 4 at 2-6, 20-25, 52-57).

On June 27, 2017, the plaintiffs initiated the instant case, seeking to compel production of the requested documents. (*See* Doc. No. 1).

In August 2019, the parties sought—and the Court (Covello, J.) granted—transfer of the instant case to the undersigned for all purposes. (Doc. Nos. 61-63). Over the course of the next two years, the parties resolved almost all their disputes regarding the scope of the plaintiffs' FOIA requests and the appropriate rate of document production by the defendants. The parties agreed that the defendants would provide the plaintiffs with multiple rolling document productions until all responsive documents were produced. (*See* Doc. Nos. 88, 89). After completing an exhaustive production and review process, the parties ultimately narrowed their dispute to the defendants' withholding of four documents, in part and/or in full: 1) a final copy of the 60-day progress report required by Section 5(b) of Executive Order 13,780 ("EO Report")[3]; 2) a document entitled

---

[1] "Protecting the Nation from Foreign Terrorist Entry into the United States," Exec. Order 13,769, 82 Fed. Reg. 8,977 (Jan. 27, 2017).

[2] "Protecting the Nation from Foreign Terrorist Entry into the United States," Exec. Order 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017).

[3] As described in Executive Order 13,780, the EO Report concerns the implementation of a "program . . . to identify individuals who seek to enter the United States on a fraudulent basis" or otherwise threaten national security, through the development of a "uniform baseline for screening and vetting standards and procedures." *See* Exec. Order 13,780 §§ 5(a)-(b), 82 Fed. Reg. 13,209, 13,215 (Mar. 6, 2017). The Department of Homeland Security ("DHS") withheld the EO Report in full pursuant to the presidential communications privilege under FOIA Exemption 5, and separately withheld portions of the report pursuant to the deliberative process privilege under Exemption 5. (*See* Doc. No. 216-1 at 10). State withheld portions of the EO Report under Exemption 7(E). Finally, the Office of the Director of National Intelligence ("ODNI"), the Central Intelligence Agency ("CIA"), and the National Security Agency ("NSA") each withheld portions of the EO Report under FOIA Exemption 1 and FOIA Exemption 3.

"ALDAC: Heightened Screening of Visa Applications – Further Guidance; MRN: 17 STATE 52856" ("State Cable")[4]; 3) a document entitled "Operational Q&As on 17 STATE 25814 and 17 STATE 52856" ("Operational Q&A")[5]; and 4) a draft document entitled "Supporting Statement for Paperwork Reduction Act Submission," related to 82 Fed. Reg. 20,956 ("PRA Supporting Statement")[6]. (*See* Doc. No. 211 at 1-2).

On December 13, 2022, the plaintiffs informed the Court that they challenged the withholding of only the EO Report and that they intended to file a motion for summary judgment. (*See* Doc. No. 208). On December 16, 2022, the plaintiffs represented to the Court that they also challenged the withholding of three additional documents—the State Cable, the Operational Q&A, and the PRA Supporting Statement. (*See* Doc. No. 210). On December 19, 2022, the parties proposed a briefing schedule that contemplated the plaintiffs' challenge to all four documents, which the Court adopted. (*See* Doc. Nos. 211, 214). In accordance with that schedule, the defendants provided a redacted copy of the EO Report—but not the other three State documents— for *in camera* review by this Court.

On January 25, 2023, the defendants moved for summary judgment, (s*ee* Doc. No. 216), and on February 13, 2023, the plaintiffs cross-moved for summary judgment, (s*ee* Doc. Nos. 217-219).

---

[4] The State Cable addresses "unique, heightened, post-by-post vetting protocols based on localized threats that could elude uniform vetting." (Doc. No. 216-4 at 14). State withheld portions of the State Cable under Exemption 7(E).

[5] The Operational Q&A "concerns vetting issues that consular officers encounter in the field." (Doc. No. 216-4 at 12). State withheld portions of the Operational Q&A under Exemption 7(E).

[6] The PRA Supporting Statement requests approval to collect certain categories of biographic data in screening and vetting procedures. (Doc. No. 216-4 at 16). Although certain categories of data sought in the PRA Supporting Statement are also proposed in the EO Report, the PRA Supporting Statement "requests additional information within each category that was not explicitly proposed in the [EO] Report." (*Id.*). Moreover, the EO Report recommended collecting certain categories of information that were not sought in the PRA Supporting Statement. (*Id.*). State withheld the PRA Supporting Statement in full pursuant to the attorney-client privilege under Exemption 5, and separately withheld portions pursuant to the deliberative process privilege under Exemption 5.

On March 24, 2023, the Court issued an Order stating that it would consider the plaintiffs' challenge to the defendants' withholding of the EO Report and the three additional State documents. (*See* Doc. No. 224). To aid in its determination of whether the defendants have a valid basis for withholding the three State documents, and whether and to what extent privilege may have been waived, the Court directed the defendants to furnish the Court with copies of the State Cable, the Operational Q&A, and the PRA Supporting Statement for *in camera* review. (*See id.*). As directed, the defendants supplied the Court with a copy of each of the additional documents.

On April 5, 2023, the Court heard oral argument from the parties on their cross-motions for summary judgment. (*See* Doc. No. 228).

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). A "genuine issue as to any material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "material fact" is one which, under the governing law, may affect the outcome of a case. *Id.* The moving party must establish the absence of a genuine dispute of material fact by citing to particulars in the record. Fed. R. Civ. P. 56(a), (c); *Celotex*, 477 U.S. at 322-25; *Koch v. Town of Brattleboro*, 287 F.3d 162 (2d Cir. 2002). If the movant satisfies this burden, then the opposing party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). When deciding a motion for summary judgment, a court must view the record in the light most favorable to the non-moving party, *see O'Hara v. Weeks Marine, Inc.*,

294 F.3d 55, 61 (2d Cir. 2002); however, speculation and conclusory assertions are insufficient to defeat summary judgment, *see Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

FOIA, which was enacted to promote honest and open government, "calls for broad disclosure of Government records." *N.Y. Times Co. v. DOJ*, 756 F.3d 100, 111 (2d Cir. 2014) ("*N.Y. Times I*") (quotation marks and citation omitted). Under certain circumstances, however, other interests—such as national security, foreign policy, and law enforcement—outweigh the need for transparency. Where one of the limited exemptions from FOIA's disclosure requirements applies, the government need not disclose agency records upon request. "These exemptions are explicitly made exclusive, and must be narrowly construed." *Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 22 (D.D.C. 2013) (internal quotations and citations omitted).

The government bears the burden of showing that a requested record falls within one or more of the FOIA exemptions. *See* 5 U.S.C. § 552(a)(4)(B). Where an exemption applies to only a portion of a requested record, the government must disclose all reasonable segregable non-exempt portions. *See* 5 U.S.C. § 552(b). "Affidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994). "[A]ffidavits submitted by an agency are accorded a presumption of good faith," and that presumption "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (internal quotations omitted). "[A]n agency may invoke a FOIA exemption if its justification 'appears logical or plausible.'" *ACLU v. DOJ*, 681 F.3d 61, 69 (2d Cir. 2012) ("*ACLU I*") (quoting *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir.

2009)). That said, all doubts as to the applicability of an exemption must be resolved in favor of disclosure. *N.Y. Times I*, 756 F.3d at 112 (quotation marks and citation omitted).

An agency's withholdings are reviewed *de novo*, *see* 5 U.S.C. § 552(a)(4)(B), and as such, a "decision that the information is exempt from disclosure receives no deference," *Bloomberg, L.P. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).

## DISCUSSION

### I.     The EO Report

#### A.     FOIA Exemption 5: Presidential Communications Privilege

DHS withheld the EO Report in full—except for certain public portions of the Appendix— pursuant to the presidential communications privilege under FOIA Exemption 5.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). "Stated simply, agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules . . . are protected from disclosure under Exemption 5." *Tigue v. DOJ*, 312 F.3d 70, 76 (2d Cir. 2002) (footnote and citation omitted).

The presidential communications privilege "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974). The privilege applies not only to the President, but also to his immediate White House advisers acting in their advisory capacities and to "members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given to the President on the particular matter to which the communications relate." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). Communications authored—or solicited and received—by these advisers are protected because they "are close

enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers." *Id.* In particular, the privilege applies "to communications in performance of [a President's] responsibilities, . . . and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (citations omitted). This exemption is "based on the policy of protecting the decision making processes of government agencies," and protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. DOJ*, 697 F.3d 184, 194 (2d Cir. 2012) ("*Brennan Ctr. I*") (quotation marks and citation omitted).

The privilege is "rooted in the need for *confidentiality* to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge." *Ctr. for Effective Gov't*, 7 F. Supp. at 22 (emphasis in original) (quoting *In re Sealed Case*, 121 F.3d at 750). The scope of the presidential communications privilege is to be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decision-making process is adequately protected. *Id.* (internal quotation omitted). Accordingly, the privilege "only applies to communications that . . . advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters" and does not generally "extend to staff outside the White House in executive branch agencies." *In re Sealed Case*, 121 F.3d at 752.

Where the President, or an agency invoking the privilege on the President's behalf, discloses otherwise privileged information to third parties, the privilege is waived. *See Knight First Amend. Inst. at Columbia Univ. v. CDC*, 560 F. Supp. 3d 810, 827-30 (S.D.N.Y. 2021) ("*Knight I*"). Specifically, "the transmittal of a document to persons who are unlikely to be in a position to

give advice to the President waives the privilege." *ACLU v. Dep't of Def.*, 435 F. Supp. 3d 539, 559 (S.D.N.Y. 2020) (citation omitted). Maintaining privilege, therefore, requires that confidential information be kept in a "circle [which] . . . has a narrow diameter." *Id.*

In *Center for Effective Government v. United States Department of State*, the Court identified several factors relevant to determining whether information sought under Exemption 5 may be withheld pursuant to the presidential communications privilege. 7 F. Supp. 3d 16, 25-29 (D.D.C. 2013); *see also Knight I*, 560 F. Supp. 3d at 828-29. The Court (Huvelle, J.) stressed that the privilege did not attach where the withheld document was distributed throughout the Executive Branch for "non-advisory purposes." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26. As Judge Huvelle explained, "[t]he purpose underlying the distribution of a presidential communication beyond the President's closest advisers is paramount. If distribution is limited to advisory purposes, the privilege may apply; but if distribution is far broader, the purposes animating the privilege will not justify its application." *Id.* at 29; *see also Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. Dep't of State*, 17 CV 7520(PCG), 2019 WL 10984173, at *6 (S.D.N.Y. Mar. 29, 2019) ("*Brennan Ctr. II*") (relying on Judge Huvelle's analysis and holding that, "if the information contained within the withheld documents has been widely and publicly disseminated, the rationale for applying the presidential communications privilege is much less compelling"); *Knight I*, 560 F. Supp. 3d at 829 (concluding that documents distributed for non-advisory purposes do not implicate the need for confidentiality in presidential decision-making). "[P]ermitting distribution of a document on a 'need-to-know' basis does not automatically undermine the confidentiality of a document, . . . [b]ut 'need-to-know' must be defined, and adhered to, in a context-specific manner for a given privilege to apply." *Id.* (internal citation omitted).

The EO Report was sent by cabinet-level agency heads to the President at his explicit request in Executive Order 13,780, Section 5(b). (*See* Doc. No. 216-3 at 5-7). According to that Executive Order, the EO Report was intended to address the progress of a program ordered by the President "to identify individuals who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of violence toward any group or class of people within the United States, or who present a risk of causing harm subsequent to their entry." Exec. Order 13,780 §§ 5(a)-(b), 82 Fed. Reg. 13,209 (Mar. 6, 2017). Specifically, the EO Report advised the President on the progress of an interagency working group formed to establish criteria for immigration screening and vetting procedures; to avoid duplicative and overlapping efforts across multiple agencies; and to ensure that all necessary and appropriate information was sought at United States ports of entry. (*See* Doc. No. 216-3 at 6-7). The EO Report discussed the roles that various agencies played in carrying out its objectives; proposed an interagency coordination and governance structure for vetting and screening processes; and recommended changes to existing vetting and screening programs—as well as the development of new programs—designed to achieve the goals established by the Executive Order. (*See id.*).

The plaintiffs do not dispute that the EO Report is the type of record that the presidential communications privilege typically encompasses; rather, they challenge the defendants' characterization of the EO Report as "closely held," and argue that the privilege does not apply because the report "has been widely shared within the executive branch." (Doc. No. 217-1 at 23). Moreover, the plaintiffs assert that, even if the privilege were to apply to the EO Report, the defendants waived it by publicly disclosing information contained in the report. (*See* Doc. No. 217-1 at 28-29).

**1.    There is a genuine issue of material fact as to whether the presidential communications privilege applies to the EO Report in full.**

The defendants assert that DHS properly withheld the EO Report in full pursuant to the presidential communications privilege. (*See* Doc. No. 216-1 at 13-21). In response, the plaintiffs argue that the EO Report is not a privileged presidential communication because it was widely distributed throughout the Executive Branch, including to individuals whom the defendants have not identified as falling within the narrow scope of the privilege. (*See* Doc. No. 217-1 at 22-27).

Although the Second Circuit has not considered whether the dissemination of a document within the Executive Branch for non-advisory purposes defeats the presidential communications privilege, every court to have considered this issue thus far has held that it does. *See, e.g. Ctr. for Effective Gov't*, 7 F. Supp. 3d at 27 (granting summary judgment for plaintiff); *Knight I*, 560 F. Supp. 3d at 827-30 (same); *Brennan Ctr. II*, 2019 WL 10984173, at *5 (concluding that the government failed to meet its burden and ordering *in camera* review of withheld information); *ACLU v. DOJ*, 15 CV 1954(CM), 2016 WL 889739, at *2-6 (S.D.N.Y. Mar. 4, 2016) ("*ACLU II*") (same).

In assessing the applicability of the presidential communications privilege, courts consider various factors, including: (i) the extent to which public dissemination has occurred, *see Brennan Ctr. II*, 2019 WL 10984173, at *6 (holding that the privilege may not apply "if the information contained within the withheld documents has been widely and publicly disseminated"); (ii) whether the document reveals policymaking decisions, *see Knight I*, 560 F. Supp. 3d at 828; (iii) whether the communication was treated as confidential, *id.*; and (iv) whether the document or its contents was widely publicized or distributed for non-advisory purposes, *see ACLU II*, 2016 WL 889739, at *4.

In his declaration, James V.M.L. Holzer, Deputy Chief Privacy Officer at DHS, states that the EO Report "was, and remains, closely held within the Executive Branch." ("DHS declaration," Doc. No. 216-3 at 7). The DHS declaration explains that the majority of those with access to the EO Report were employed by the National Security Council; the Department of Justice ("DOJ"); State; the Office of the Director of National Intelligence ("ODNI"); the Central Intelligence Agency ("CIA"); Customs and Border Protection ("CPB"); the Department of Homeland Security ("DHS") Office of Intelligence and Analysis; and the Office of Strategy, Policy, and Plans (formerly the Office of Policy). (*Id.*). The DHS declaration does not state that this is an exhaustive list of the agencies with access to the EO Report, however.

The plaintiffs argue that the EO Report was not "closely held" since it has been distributed throughout the Executive Branch, which employs millions of Americans, not all of whom are within the narrow circle of the presidential communications privilege. (*See* Doc. No. 217-1 at 24); s*ee also Knight I*, 560 F. Supp. 3d at 829 (holding that the privilege does not extend to all employees in the Executive Office of the President); *Prop. of the People, Inc. v. Office of Mgmt. & Budget*, 330 F. Supp. 3d 373, 387 (D.D.C. 2018) (holding that not all Office of Management and Budget officers qualify as "immediate White House advisers").

To the extent that the DHS declaration lists agencies with access to the EO Report, it does not name the individual recipients of the EO Report within those agencies. Indeed, the defendants fail to identify in the DHS declaration or elsewhere in the record the names of those individuals who received the EO Report, their respective job titles, and the extent to which they advised the President regarding the EO Report, nor do they assert that the recipients of the EO Report were admonished not to share it. These omissions are critical to the Court's assessment of the applicability of the presidential communications privilege, which "should not extend to staff

outside the White House in executive branch agencies." *In re Sealed Case*, 121 F.3d at 752. Rather, the privilege applies only to individuals acting in an advisory capacity, and even then, "[n]ot every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege." *Id.* (*accord Jud. Watch, Inc. v. DOJ*, 365 F.3d 1108, 1116-17 (D.C. Cir. 2004) (holding that the presidential communications privilege does not apply to executive agency staffers' advice regarding a non-delegable presidential duty where the staffers were "twice removed" from the President)).

In her declaration, Susan C. Weetman, Deputy Director of Information Programs and Services at State, explains that she "understand[s] from the [State] Department's subject matter experts who are familiar with the [EO] Report that the [State] Department provided input to [DHS] for purposes of compiling the report to advise the President. The report was maintained on the [State] Department's classified system, and . . . it is [State] Department policy that a person can only access a classified file when that person receives appropriate security clearance and access is necessary in connection with performance of official duties." ("State declaration," Doc. No. 216-4 at 9). The State declaration further explains that, "[t]o the best of the subject matter experts' recollection, distribution of the final report was limited to a small group of [State] Department officials who had contributed to the report, who were in the clearance chain as the draft report was forwarded to [DHS], or who had a need-to-know for similar advisory purposes. To the best of the subject matter experts' recollection, State Department officials did not share the final report outside of the [State] Department." (*Id.*). Notwithstanding that internal distribution of the EO Report within State was limited, the State declaration explains that State "located one final version of [the EO Report] in the files of an official with the Bureau of Consular Affairs on the [State]

Department's classified system"; however, State fails to identify the official's name, title, or advisory role. (*See* Doc. 216-4 at 9).

Moreover, although both the DHS and State declarations explain that the full, unredacted version of the EO Report was distributed on a "need-to-know" basis, they are silent as to whether disclosure was limited to presidential advisers involved in advising the President regarding the report.

The defendants maintain that they need not provide the names and job titles of everyone who received the EO Report, citing *Citizens for Responsibility and Ethics in Washington v. United States Department of Homeland Security*, 514 F. Supp. 2d 36, 49 (D.D.C. 2007) ("Whether the privilege applies depends on the nature of the adviser's responsibilities; not his or her name."). The defendants' reliance on that case is misplaced, however, since its facts are inapposite to those at issue here. Indeed, in that case, the government demonstrated that the "President's immediate advisers and their respective staffs had broad and significant responsibilities for gathering information and formulating advice and recommendations to be transmitted to the President." *Id.* at 49 (internal quotations omitted). Here, on the other hand, the defendants have not identified whether the recipients of the EO Report acted in an advisory capacity to the President. Moreover, the defendants insist that they need not identify the recipients of the EO Report or assert that the recipients were instructed not to share the report. (*See* Doc. No. 222 at 8). This reflects a misunderstanding of the scope of the presidential communications privilege, which extends only to those *individuals*—not agencies—"who have broad and significant responsibility for investigating and formulating advice to be given to the President *on the particular matter* to which the communications relate." *In re Sealed Case*, 121 F.3d at 758 (emphasis added).

Although the plaintiffs have inquired as to the meaning of "need-to-know" in the context of extensive intra-agency distribution of the EO Report, (*see* Doc. No. 217-1 at 25-26), the defendants have neither adequately defined that term[7] nor offered any information regarding the extent to which the EO Report was disclosed within any of the recipient agencies besides State and DHS. This omission is significant in that the scope of "need-to-know" informs the extent to which the presidential communications privilege protects to the EO Report. For the privilege to apply, the *reason* that a given recipient "needs to know" must comport with the purpose of the privilege, which is to promote candor and effective presidential decision-making. *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26 (holding that the presidential communications privilege did not apply to a document disclosed beyond the limited circle of close presidential advisers and their staff, even on a "need to know" basis).

In the absence of more detailed information regarding the DHS, State, and other agency officials that received the EO Report, this Court cannot gauge whether the information contained in the report has been distributed in a manner that undermines application of the presidential communications privilege. *See Brennan Ctr. II*, 2019 WL 10984173, at *6-7 (denying the government's summary judgment motion because it failed to describe the extent to which withheld information had been distributed); *see also ACLU II*, 2016 WL 889739, at *5 (holding, in another case involving partially classified presidential guidance relating to agency actions against terrorist targets, that the Court could not discern "how widely the document has been distributed, or to

---

[7] DHS defines "need-to-know" as "when an agency employee receiving the information has a need for the record in the performance of [her] duties, as similarly applied under the Privacy Act of 1974, 5 U.S.C. 552a(b)(1)." (Doc. No. 216-3 at 8). In addition to being vague, this definition may not be espoused by the other agencies that received the EO Report. To the extent that the other receiving agencies also disseminated the EO Report on a "need-to-know" basis— which the defendants do not specify—the record is silent as to how those agencies define "need-to-know."

whom, or for what purposes it has been used," or whether "there may be portions of the document that must be disclosed because all privileges and FOIA exemptions have been waived").

Based upon its *in camera* review of the EO Report and its consideration of the DHS and State declarations, the Court cannot discern whether and to what extent the defendants have a viable claim of presidential communications privilege over the report in full.

Because there is a genuine issue of material fact regarding whether DHS properly withheld the EO Report in full pursuant to the presidential communications privilege under Exemption 5, the Court denies both the defendants' Motion for Summary Judgment, (Doc. No. 216), and the plaintiffs' Cross-Motion for Summary Judgment, (Doc. No. 217), as to DHS's withholding of the EO Report in full.

> **2.    The presidential communications privilege covering the EO Report was not waived by official disclosure.**

The Court turns next to the plaintiffs' contention that, even if the EO Report is covered by the presidential communications privilege, the defendants waived that privilege "by subsequent disclosure." (Doc. No. 217-1 at 28).

"[A] FOIA plaintiff may compel disclosure of information even over an agency's otherwise valid exemption claim if the government previously officially acknowledged the information." *N.Y. Times Co. v. DOJ*, 390 F. Supp. 3d 499, 518 (S.D.N.Y. 2019) (internal quotation omitted). "[A] plaintiff asserting that information has been previously disclosed bears the initial burden of pointing to specific information in the public domain that duplicates that being withheld. The rationale is that, under these circumstances, any harm the agency fears from disclosure has already been sustained." *Id.* (internal quotation and citation omitted). Only certain official acknowledgments waive privilege, however. "For information to qualify as 'officially acknowledged,' it must satisfy three criteria: (1) the information requested must be as specific as

the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must have been made public through an official and documented disclosure." *Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 890 (D.C. Cir. 2021) (internal quotation omitted). To establish an official acknowledgment, "there cannot be *any* substantive differences between the content of the [publicly] released government documents and the withheld information." *Osen LLC v. U.S. Cent. Command*, 969 F.3d 102, 110 (2d Cir. 2020) (emphasis added) (internal quotation omitted). Indeed, "even a 'substantial overlap' between the requested information and previously disclosed information is not enough to establish waiver." *Id.* at 112 (quoting *N.Y. Times v. CIA*, 965 F.3d 109, 119 (2d Cir. 2020)); *see Protect Democracy Project*, 10 F.4th at 891 (holding that, although the Mueller Report "contains much information similar to information found" in a withheld memo, the presidential communications privilege was not waived in the absence of a "complete match").

Here, the plaintiffs have not demonstrated that information in the public domain is duplicative of the information they seek such that no harm would result from its disclosure. In support of their position that the presidential communications privilege was waived by official acknowledgment, the plaintiffs cite generally to agency actions "related to screening and vetting of visa applicants"; State's distribution of "related guidance"; and Trump Administration officials' "tweets, op-eds, press releases, … rallies, . . . [and] public testimony to Congress describing security and vetting changes associated with President Trump's Muslim Ban." (Doc. No. 217-1 at 29). But the plaintiffs have not shown that any of these official acknowledgments reference the EO Report or that they contain information that is as specific as or matching the report's contents.

Accordingly, the Court concludes that the presidential communications privilege has not been waived as to the EO Report in its entirety.[8]

### 3. The defendants have satisfied the foreseeable harm standard.

Next, the defendants assert that it is reasonably foreseeable that disclosure of the EO Report would harm the interests protected by the presidential communications privilege. (*See* Doc. No. 216-1 at 17). The plaintiffs argue that the defendants have failed to demonstrate that disclosure of the EO Report would result in foreseeable harm. (*See* Doc. No. 217-1 at 22-24).

Congress passed the FOIA Improvement Act of 2016 ("FIA"), 5 U.S.C. § 552(a)(8), to address a growing backlog of FOIA requests and to quell concern that "agencies [we]re overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure." S. Rep. No. 114-4, at 322 (2015). FIA was intended to mitigate the "growing and troubling trend towards relying on these discretionary exemptions to withhold large swaths of Government information, even though no harm would result from disclosure." *Id.* at 323. Accordingly, FIA instituted a "presumption of openness" for FOIA requests and "mandate[d] that an agency may withhold information only if it reasonably foresees a specific identifiable harm to an interest protected by an exemption, or if disclosure is prohibited by law." *Id.* at 327-28. Specifically, FIA contemplated that information should "not be withheld merely . . . because of speculative or abstract fears." *Id.* at 328.

Since FIA was enacted in 2016, the FOIA statute was amended to provide that "[a]n agency shall withhold information . . . only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption" or if "disclosure is prohibited by law." 5 U.S.C. §

---

[8] The plaintiffs assert that "a partial waiver [of the presidential communications privilege] is possible." (Doc. No. 217-1 at 28). Under existing precedent, however, the presidential communications privilege "applies to documents in their entirety." *In re Sealed Case*, 121 F.3d at 745. Therefore, "a record protected by the privilege is not segregable in response to a FOIA request." *Protect Democracy Project*, 10 F.4th at 887.

552(a)(8)(A)(i). "Stated differently, pursuant to [FIA], an agency must release a record—*even if it falls within a FOIA exemption*—if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law." *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 73 (D.D.C. 2018) (emphasis added); *accord Jud. Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 99-100 (D.D.C. 2019) ("[E]ven if an exemption applies, an agency must release the document unless doing so would reasonably harm an exemption-protected interest.").

An agency may not "'perfunctorily state that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information' among or between government officials." *Nat. Res. Def. Council v. EPA*, No. 17 CV 5928(JMF), 2019 WL 3338266 (S.D.N.Y. Jul. 25, 2019) (quoting *Rosenberg*, 342 F. Supp. 3d at 78); *see also Jud. Watch, Inc.*, 375 F. Supp. 3d at 100-01 (finding "boiler plate" and generalized articulations of harm insufficient).

The DHS declaration explains that "disclosure of the EO Report would threaten significant harm upon the interests that the Presidential Communications Privilege is designed to protect." (Doc. No. 216-3 at 9-10). The EO Report advised the President on topics such as processes for screening and vetting of visa applicants; admission of aliens into the United States; and methods for combatting threats to public safety. (*See* Doc. No. 216-3 at 8-9). Furthermore, the EO Report contained recommendations to the President regarding the potential collection of additional information; systems checks; and interagency collaboration in the screening and vetting of non-citizens. (*See* Doc. No. 216-3 at 9). The EO Report also contained advice provided by top advisers to the President at his request; described the nature of decision-making processes and the

considerations that guide them; and flagged specific issues for further evaluation by the President as he made final policy decisions. (*See id.*).

The DHS declaration explains that disclosure of the EO Report "would plainly threaten the President's ability to receive frank and candid advice concerning the sensitive field of immigration policy and related security reforms. Indeed, the quality of the Presidential decision-making process would be damaged if agency heads in the Executive Branch [were unable to] focus solely on providing comprehensive and candid information about border security and immigration policy to the White House." (*See* Doc. No. 216-3 at 10). The Court finds that the defendants have sufficiently articulated the reasonably foreseeable harm that would result from disclosure of the EO Report. *See Wash. Post. Co. v. Special Inspector Gen. for Afg. Reconstruction*, No. 18-2622(ABJ), 2021 WL 4502106, at *23 (D.D.C. Sept. 30, 2021) (holding that the risk that disclosure of the withheld records would "burden[] the ability of the President and his advisors to engage in a confidential and frank decision-making process and chill[] or inhibit[] their ability to have candid discussions, thus impacting the efficiency of government policy-making," was sufficient identification of foreseeable harm).

## B.    FOIA Exemption 5: Deliberative Process Privilege

DHS also withheld portions of the EO Report under Exemption 5, citing the deliberative process privilege, which applies to "decisionmaking of executive officials generally," and protects documents containing deliberations that are part of the process by which the government makes decisions. *See In re Sealed Case*, 121 F.3d at 735, 745.

The deliberative process privilege "'calls for the disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and

determining what its law shall be." *NLRB v. Sears, Roebuck, & Co.*, 421 U.S. 132, 153 (1975).

Under this privilege, "[a]n inter- or intra-agency document may be withheld . . . if it is: (1)

predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision,

and (2) deliberative, *i.e.*, actually . . . related to the process by which policies are formulated."

*Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005) (quotation marks and citation

omitted); *see also Grand Cent. P'ship, Inc.*, 166 F.3d at 482 ("The privilege protects

recommendations, draft documents, proposals, suggestions, and other subjective documents which

reflect the personal opinions of the writer rather than the policy of the agency.") (quotation marks

and citation omitted). "Requiring that a record 'relate to a specific decision facing the agency,'

however, places an unduly restrictive gloss on the deliberative process privilege's predecisional

requirement." *Nat. Res. Def. Council*, 19 F.4th at 192 (quoting *U.S. Fish & Wildlife Serv. v. Sierra

Club, Inc.*, 141 S. Ct. 777, 786 (2021)). Indeed, "'[a]gencies are, and properly should be, engaged

in a continuing process of examining their policies,' and 'courts should be very wary of interfering

with this process.'" *Nat. Res. Def. Council*, 19 F.4th at 192 (quoting *Sears*, 421 U.S. at 151 n.18).

Accordingly, the Second Circuit has held that "a record is predecisional if it relates to a specific

decision *or a specific decisionmaking process* and was generated before the conclusion of that

decision or process." *Nat. Res. Def. Council*, 19 F.4th at 192 (emphasis in original).

Here, the defendants have sufficiently identified the specific decision-making process

addressed by the withheld portions of the EO Report, and the report was generated prior to the

conclusion of that process. Indeed, the defendants assert that the withheld portions of the EO

Report pertain to the President's "decision-making process related to border security and

immigration policy." (Doc. No. 216-3 at 10). These portions of the EO Report "were created to

advise and assist the President in carrying out national security policies. *Specifically*, the

recommendations and pre-decisional discussion were included in the report to assist the President in making decisions on whether to institute certain new information collections, systems checks, and interagency coordination requirements in the immigration screening and vetting processes, . . . [and] as to proposals of certain agencies for appropriate next steps on these issues." (Doc. No. 216-3 at 11) (emphasis added). Moreover, the defendants have demonstrated that the withheld portions of the EO Report do not reflect current agency policy, and that "[t]he recommendations and discussion in this Report d[o] not constitute the government's final position on these issues and accordingly do not contain binding policy or other guidance." (*Id.*). The withheld portions of the EO Report contain advice and recommendations from the Secretary of DHS and other cabinet-level officials to the President regarding the adequacy of certain immigration security procedures, as well as proposals for improving various screening and vetting processes. (*Id.*).

The DHS declaration explains that disclosure of the withheld portions of the EO Report "would likely inhibit Executive Branch decision-making because it would chill frank discussion and collaboration among Executive Branch employees and senior-level decision-makers." (*Id.*). This would likely cause Executive Branch employees and officials "to refrain from full and candid statements of their views to final decision-makers," and "would significantly impede the comprehensive discussion of issues that is necessary to reach a well-reasoned and fully vetted final decision in matters of immigration policy and national security. . . . This lack of candor would seriously impair the Executive Branch's ability to foster forthright, internal discussions necessary for efficient and proper decision-making." (Doc. No. 216-3 at 11-12). Moreover, release of the withheld portions of the EO Report could "undermine agency efforts to enhance the national security by exposing existing and proposed changes to agency operations" relating to national security. (*Id.*).

Because the withheld opinions and recommendations in the EO Report reflect the deliberative process accompanying policy formation, they were properly withheld pursuant to the deliberative process privilege under Exemption 5. *See Hopkins v. HUD*, 929 F.2d 81, 85 (2d Cir. 1991) (holding that HUD reports containing "opinions and recommendations . . . related to the deliberative process by which HUD policies are formulated" are subject to the deliberative process privilege).

In the absence of any genuine issue of material fact regarding the applicability of the deliberative process privilege under Exemption 5 to the portions of the EO Report withheld by DHS, the Court grants summary judgment in favor of the defendants as to those withholdings.

## C.      FOIA Exemption 7(E)

Both DHS and State withheld portions of the EO Report pursuant to Exemption 7(E), which protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

Although the plaintiffs do not explicitly argue that information withheld by DHS and State does not or cannot meet the criteria for withholding pursuant to Exemption 7(E), they challenge the sufficiency of the defendants' descriptions of the withheld information. (*See* Doc. No. 217-1 at 29). In response, the defendants assert that their description of the withheld information is adequately precise, and that requiring more would necessitate disclosure of the very redacted material that it seeks to protect. (*See* Doc. No. 222 at 24-25). Having conducted an *in-camera* review of the EO Report, the Court finds that the DHS and State declarations adequately explain

the nature of the information withheld under Exemption 7(E), as well as the rationale for those withholdings. (*See* Doc. Nos. 216-3 at 14-16, 216-4 at 8-11).

The defendants argue that the EO Report was compiled for law enforcement purposes because it was specifically requested by the President to report on the development of a program that would "identify individuals who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of violence toward any group or class of people within the United States, or who present a risk of causing harm subsequent to their entry." Exec. Order No. 13,780. (*See* Doc. No. 216-3 at 13). The Court agrees with the defendants' position that the EO Report was compiled for law enforcement purposes since it discusses both existing and proposed law enforcement procedures relating to border security. *See Knight First Amend. Inst. at Columbia Univ. v. USCIS*, 30 F.4th 318, 328 (2d Cir. 2022) ("*Knight II*") (holding that, in the FOIA context, "law enforcement" materials may reflect "proactive steps designed to prevent criminal activity and to maintain security") (citation omitted).

The withheld portions of the EO Report constitute both "guidelines" and non-public "techniques." The DHS declaration explains that "[t]he [EO] Report's discussion of certain screening and vetting processes can be considered 'guidelines' because they identify threshold issues that may trigger additional screening, and thus focus law enforcement['s] efforts in specific circumstances." (Doc. No. 216-3 at 14); *see Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678 (2d Cir. 2010) (explaining that "guidelines" generally reference thresholds that implicate "resource allocation"). Moreover, the information in the EO Report withheld under Exemption 7(E) concerns law enforcement "techniques because it describes and highlights processes that would enable the agency to identify persons presenting fraudulent information or having criminal or terroristic intent." (Doc. No. 216-3 at 14); *see Lowenstein*, 626 F.3d at 682

(explaining that "techniques and procedures" refer to "how law enforcement officials go about investigating a crime"). Insofar as the government has withheld information related to law enforcement techniques, it need not show that disclosure would result in circumvention of the law. *See Freedom of Press Found. v. DOJ*, 493 F. Supp. 3d 251, 270 (S.D.N.Y. 2020) ("Discussion of law enforcement techniques and procedures is categorically exempt from FOIA disclosure, without need for demonstration of harm.") (quotation marks and citations omitted). Rather, an agency need only demonstrate that the withheld law enforcement techniques are not known to the public. *See Doherty v. DOJ*, 775 F.2d 49, 52 (2d Cir. 1985) (holding that the government properly withheld "information which would disclose investigative techniques not generally known to the public").

Although the plaintiffs maintain that the "descriptions of withheld categories are so vague and general . . . as to deprive [them] of the ability to meaningfully challenge the withholdings," they simultaneously assert that the defendants waived their right to withhold information under Exemption 7(E) because the information is already in the public domain. (Doc. No. 217-1 at 36-37). But the plaintiffs' position is belied by the DHS and State declarations, both of which explain that none of the publicly available information cited by the plaintiff duplicates those portions of the EO Report that were withheld under Exemption 7(E). (Doc. Nos. 222-1 at 2-3, 222-2 at 2). The information withheld by DHS contains "critical data fields on application forms, [and the] types of national security and public safety questions conducted during interviews for benefit adjudication," none of which is public information. (Doc. No. 216-3 at 14). Similarly, State withheld nonpublic information including "specific high value biographic data elements identified by interagency partners as necessary for the uniform baseline vetting process of immigrant and

24

foreign visitor applications," as well as the "data and vetting capabilities operated by interagency partners in automated system checks." (Doc. No. 216-4 at 10-11).

In support of their position that the defendants waived their right to withhold information under Exemption 7(E), the plaintiffs rely on the Second Circuit's decision in *Knight II*, 30 F.4th 318. As the Court held in that case, "[t]he burden of establishing prior public disclosure is on the requester," and the public domain exception is limited to information that is "freely available." *Id.* at 332 (citation omitted). Furthermore, "[i]n the FOIA context, information is in the public domain if it is generally available to the public at large, not simply if it happens to be known by select members of the public." *Id.* at 332-33. Therefore, to meet its burden, "the requesting party must point to specific information in the public domain that appears to duplicate that being withheld." *Id.* (citation omitted). The plaintiffs have failed to meet their burden in that they do not identify which of the withheld information is in the public domain.

Moreover, as the Court explained in *Knight II*, even if an "enterprising researcher" is able to determine the withheld information based on its public use, "the necessity of the reconstruction exercise itself demonstrates that the information in question is not in the public domain. . . . Put another way, the possibility that a savvy law-evader might be able to infer the substance of some withheld documents by carefully observing an agency's actions does not remove those documents from the ambit of Exemption 7(E)." 30 F.4th at 333. Here, to demonstrate that the withheld information has been made public, the plaintiffs endeavor to locate the withheld information in news articles, agency testimony to Congress, and statements by agency officials. (*See* Doc. No. 217-1 at 30). Such efforts do not demonstrate that the withheld information is in the public domain.

Finally, the plaintiffs argue that, "[t]o the extent that withheld information is in the public domain, . . . it must also be released for the independent reason that there is no foreseeable harm

in disclosure." (Doc. No. 217-1 at 37, citing 5 U.S.C. § 552(a)(8)(A)(i)). The Court disagrees; both the DHS and State declarations explain that release of the withheld information could potentially enable suspects to avoid detection or develop countermeasures to circumvent law enforcement. (*See* Doc. Nos. 216-3 at 15-16, 216-4 at 8). Indeed, disclosure of the withheld information "would enable individuals to better avoid triggering additional scrutiny and thereby increase their chances of not being identified as persons presenting fraudulent information or having criminal or terrorist intent." (*Id.*); *see Freedom of Press Found.*, 493 F. Supp. 3d at 272-73 (holding that Exemption 7(E) applied to FBI "policy guides" because their disclosure could "assist those seeking to violate or circumvent the law"); *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (explaining that Exemption 7(E) sets a "low bar" for justifying the withholding of information).

This Court concludes that the information withheld from the EO Report by DHS and State under Exemption 7(E) concerns screening processes used in the law enforcement context, and as such, fall squarely within the exemption. *See, e.g., Iraqi Refugee Assistance Project v. DHS*, No. 12 CV 3461(PKC), 2017 WL 1155898, at *12 (S.D.N.Y. Mar. 27, 2017) (holding that DHS properly withheld "discussions [that] describe the techniques and procedures for adjudicating [refugee] applications").

Because there are no genuine issues of material fact regarding the applicability of Exemption 7(E) to the portions of the EO Report that were withheld by DHS and State, the Court grants summary judgment in favor of the defendants as to those withholdings.

### D.    FOIA Exemption 1

Portions of the EO Report were withheld by the ODNI, CIA, and NSA pursuant to FOIA Exemption 1, which requires withholding of records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or

foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Stated differently, Exemption 1 applies to material that has been properly classified. *See, e.g., Weinberger v. Cath. Action of Haw.*, 454 U.S. 139, 144-45 (1981). For information to be properly classified for purposes of Exemption 1, it must satisfy the following requirements of section 1.1 of Executive Order 13,526, "Classified National Security Information": "(1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and (4) the original classification authority determines that the unauthorized disclosure of the information could be expected to result in damage to the national security, . . . and the original classification authority is able to identify or describe the damage." 75 Fed. Reg. 707, 707 (Dec. 29, 2009).

When an agency withholds classified information pursuant to Exemption 1, the declaration submitted in support of its decision is entitled to "substantial weight." *ACLU I*, 681 F.3d at 70. Courts adopt a "deferential posture in FOIA cases regarding the uniquely executive purview of national security." *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (internal quotation omitted). Indeed, in the national security context, "[l]ittle proof or explanation is required beyond a plausible assertion that information is properly classified." *Morely v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007).

In his declaration, Gregory M. Koch, Chief of the Information Management Office at the ODNI, explains that the information his agency withheld from the EO Report pursuant to Exemption 1 is currently and properly classified at the "SECRET" level, and is owned by and under the control of the Government. (*See* "ODNI declaration," Doc. No. 216-5 at 8). Furthermore, the information falls within one of the categories listed in section 1.4(c) of Executive Order 13,526,

75 Fed. Reg. at 708, since it concerns "intelligence activities (including covert action), [or] intelligence sources and methods." (Doc. No. 216-5 at 6-7). Release of the withheld information "could reasonably be expected to result in at least serious damage to the national security" because it would reveal "what type of information the [intelligence community] uses, and how, to provide classified vetting support to adjudicative agencies (such as DHS and State) involving foreign applicants for entry into the United States. This information, if released, could be used by nefarious actors to obfuscate their identity and/or intentions and avoid detection by the U.S. Government, potentially gaining unlawful entry into the United States." (*Id.*).

Mr. Koch defends the withholdings not only of the ODNI, but also of the CIA and NSA, relying on his conversations with unidentified "[s]ubject matter experts and original classification authorities" at those agencies. (Doc. No. 216-5 at 5). Mr. Koch conferred with the CIA and NSA and was informed by both agencies that the information they withheld from the EO Report is properly classified at the "SECRET" level. (Doc. No. 216-5 at 7-8). Release of the withheld CIA information threatens "serious damage to the national security by exposing the specific role(s) that the CIA plays in the vetting program. If disclosed, this information could provide the Nation's adversaries with insight into the means by which the CIA supports other departments and agencies under the program, which they in turn could exploit to undermine both the vetting program and the CIA's clandestine intelligence mission." (Doc. No. 216-5 at 7). Similarly, release of the withheld NSA information in the EO Report "reasonably could be expected to cause serious damage to the national security by exposing the specific role(s) that NSA plays in the vetting program," which "could provide the Nation's adversaries with insight into the means by which the NSA supports other departments and agencies under the program, which they in turn could exploit

to undermine both the vetting program and the NSA's foreign signals intelligence mission." (Doc. No. 216-5 at 8).

Mr. Koch's assertions in support of the withholdings by the CIA and NSA are based on hearsay statements of individuals outside of the ODNI. Although the Second Circuit has not ruled on the admissibility of a hearsay statement made in an agency declaration by a party outside that agency, at least one court has deemed such evidence inadmissible. *See, e.g.*, *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1273 n.17 (10th Cir. 2021) (in FOIA cases, "no [hearsay] exception applies where the hearsay declarant is a party outside the agency"). Concerns regarding the reliability of an agency declaration reliant upon hearsay are amplified where, as here, the hearsay declarant states that another agency withheld information that was marked as classified under the incorrect section of Executive Order 13,526.[9]

The Court is satisfied with the justification offered by Mr. Koch for the ODNI's withholdings under Exemption 1. *See N.Y. Times v. DOJ*, 14 CV 3776(ATSN), 2016 WL 5946711, at *11 (S.D.N.Y. Aug. 18, 2016) (holding that, where "the government offers a logical and plausible basis for determining that the redacted information is properly classified, and that harm to national security may result from its release, non-disclosure is justified under Exemption 1"). Insofar as the CIA and NSA withholdings are identical to the ODNI withholdings, the Court need not decide whether the CIA and NSA properly withheld portions of the EO Report under Exemption 1.

---

[9] Mr. Koch states that, "[alt]hough the document is marked as being classified under section 1.4(a) of E.O. 13526, a proper authority at DHS has notified me that this marking was an error and the proper justification is 1.4(c)." (Doc. No. 216-5 at 7 n2).

There are no genuine issues of material fact as to the applicability of Exemption 1 to the portions of the EO Report withheld by the ODNI; accordingly, the Court grants summary judgment in favor of the defendants as to those withholdings.

### E.      FOIA Exemption 3

Portions of the EO Report were also withheld by the ODNI, CIA, and NSA under FOIA Exemption 3, which "requires that [records that are statutorily exempt from disclosure] be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. § 552(b)(3). Courts apply a two-prong test to determine whether documents are covered by Exemption 3: "First, the court must consider whether the statute identified by the agency is a statute of exemption as contemplated by Exemption 3. Second, the court must consider whether the withheld material satisfies the criteria of the exemption statute." *Wilner*, 592 F.3d at 72. Ultimately, the "sole issue for decision is the existence of a relevant statute and the inclusion of the withheld material within the statute's coverage." *Intell. Prop. Watch v. U.S. Trade Rep.*, 134 F. Supp. 3d 726, 743 (S.D.N.Y. 2015) (citation omitted).

In the ODNI declaration, Mr. Koch explains that the ODNI withheld portions of the EO Report pursuant to the National Security Act, which provides that "the Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." (Doc. No. 216-5 at 9, citing 50 U.S.C. § 3024(i)(1)). The National Security Act has been recognized as a withholding statute under Exemption 3. *See, e.g., N.Y. Times Co. v. DOJ*, 550 F. Supp. 3d 26, 36 (S.D.N.Y. 2021). Mr. Koch further explains in the ODNI declaration that the information the ODNI withheld from the EO Report pursuant to Exemption 3 involves "descriptions of data sources, including categories of intelligence holdings and types of checks, that the [intelligence

community] uses to provide classified vetting support to adjudicative agencies (such as DHS and State)." (Doc. No. 216-5 at 9).

Regarding the CIA withholdings, Mr. Koch states that the CIA information withheld under Exemption 1 is properly withheld coextensively under Exemption 3 pursuant to the National Security Act because, "if exposed, that information could reveal specific intelligence sources and methods," and because it "describes the specific role(s) that CIA plays in the vetting program." (Doc. No. 216-5 at 10). Mr. Koch does not identify the source of this information within the CIA, however.

Mr. Koch further states in the ODNI declaration that he consulted with the NSA and is informed that the NSA information withheld from the EO Report pursuant to Exemption 1 is properly withheld coextensively with Exemption 3 pursuant to Section 6 of the NSA Act of 1959, 50 U.S.C. § 3605 ("NSAA"), which provides that "[n]othing in this chapter or any other law . . . shall be construed to require the disclosure of the organization or any function of the [NSA], or any information with response to the activities thereof." (*See* Doc. No. 216-5 at 10). Insofar as the NSAA prohibits disclosure of NSA activities, it, too, is a statute of exemption as contemplated by Exemption 3. (Doc. No. 216-5 at 10); *see Wilner*, 592 F.3d at 71 (affirming Exemption 3 withholding pursuant to section 6 of the NSAA). Mr. Koch explains that the NSA withholdings from the EO Report under Exemption 3 were proper because the withheld information "would disclose information relating to NSA activities." (Doc. No. 216-5 at 10).

The Court is satisfied with the justification offered by Mr. Koch for the ODNI's withholdings under Exemption 3. *See ACLU I*, 681 F.3d at 76 (holding that information was properly withheld under Exemption 3 considering the "substantial weight" afforded to an agency declaration in the national security context). Insofar as the CIA and NSA withholdings are identical

to the ODNI withholdings, the issue of whether those portions of the EO Report were properly withheld by the CIA and NSA under Exemption 3 is moot.

There are no genuine issues of material fact as to the applicability of Exemption 3 to the portions of the EO Report withheld by the ODNI; accordingly, the Court grants summary judgment in favor of the defendants as to those withholdings.

## II.     The State Cable, the Operational Q&A, and the PRA Supporting Statement

### A.     FOIA Exemption 7(E)

State withheld portions of the State Cable and the Operational Q&A pursuant to Exemption 7(E).

In the State declaration, Ms. Weetman explains that both documents satisfy the threshold requirement for this exemption in that they were compiled for law enforcement purposes. (*See* Doc. No. 216-4 at 11-13). Specifically, both the State Cable and the Operational Q&A address "the processes for identifying and flagging certain ineligibilities or potential ineligibilities in a database, including circumstances where certain types of investigations are required and procedures for collecting information required for those investigations." (Doc. No. 216-4 at 12-13). As such, the documents were compiled "for the law enforcement purpose of enforcing the [Immigration and Nationality Act]." (Doc. No. 216-4 at 13).

In both documents, State withheld non-public law enforcement techniques and guidelines, the disclosure of which reasonably could result in circumvention of the law. (*See* Doc. No. 216-4 at 12-13). In the State Cable, State withheld non-public information, including the "specific information to collect, and procedures for such collection, as part of screening for terrorism- and other security-related ineligibilities." (Doc. No. 216-4 at 13). Similarly, in the Operational Q&A, State withheld information relating to law enforcement techniques, including "non-public

information discussing and describing the processes for collecting applicants' information and identifying and flagging certain ineligibilities or potential ineligibilities," as well as "procedures for reviewing and assessing potential fraud in a visa application." (Doc. No. 216-4 at 11-12). State also withheld guidelines in the Operational Q&A regarding "circumstances where certain types of investigations are required," (Doc. No. 216-4 at 12), and in the State Cable relating to "factors that trigger certain kinds of investigations" in the screening and vetting contexts, (Doc. No. 216-4 at 13).

Ms. Weetman explains in the State declaration that disclosure of the information withheld from the State Cable and the Operational Q&A under Exemption 7(E) could enable terrorists and other bad actors to circumvent "the security checks put in place to ensure that [they] cannot gain visas into the United States." (Doc. No. 216-4 at 14); *see Soghoian v. DOJ*, 885 F. Supp. 2d 62, 75 (D.D.C. 2012) ("Knowing what information is collected, how it is collected, and more importantly, when is it is *not* collected, is information that law enforcement might reasonably expect to lead would-be offenders to evade detection.") (citation omitted) (emphasis in original)).

The plaintiffs challenge State's assertion that the State Cable and Operational Q&A were compiled for law enforcement purposes. (*See* Doc. No. 217-1 at 34). They argue that, because State performs both administrative and law-enforcement functions, it is "subject to an exacting standard when it comes to the threshold requirement of Exemption 7." (*Id.*, citing *Knight II*, 30 F.4th at 328 (internal quotation marks omitted)). Next, the plaintiffs assert that the State declaration lacks specificity in its explanation of each of its withholdings from the State Cable and Operation Q&A under Exemption 7(E). (*See* Doc. No. 217-1 at 34). Finally, the plaintiffs argue that the withheld information is in the public domain and has already been disclosed to the plaintiffs in this

litigation, thereby removing it from the scope of Exemption 7(E) since there is no foreseeable harm associated with its disclosure. (*Id.*).

The Court is unpersuaded by the plaintiff's arguments regarding State's withholdings from the State Cable and the Operational Q&A. By explaining the specific function of each of these documents, the State declaration demonstrates that they were created for law enforcement purposes in that they address specific investigative procedures in the immigration context. Moreover, the State declaration is sufficiently specific in explaining the types of information withheld under Exemption 7(E). Indeed, the State declaration is "relatively detailed and nonconclusory." *Wood v. FBI*, 432 F.3d 78, 85 (2d Cir. 2005); *see Eberg v. Dep't of Def.*, 193 F. Supp. 3d 95, 114 (D. Conn. 2016) (articulating the pleading requirements for an agency declaration to prevail on summary judgment). As to their assertion that Exemption 7(E) is waived, the plaintiffs do not demonstrate that the withheld information has entered the public domain such that the exemption does not apply.[10] To the extent that the plaintiffs argue that information withheld under Exemption 7(E) entered the public domain by way of unofficial disclosures such as leaks, such unauthorized disclosures are not official acknowledgments that would otherwise waive applicable exemptions. *See, e.g.*, *Osen, LLC*, 360 F. Supp. 3d at 265 (distinguishing between "unofficially and officially disclosed information," and explaining that unauthorized disclosures of information did not undermine State's withholdings); *ACLU v. Dep't of State*, 878 F. Supp. 2d 215, 224 (D.D.C. 2012) (holding that unauthorized disclosure "is no substitute for an official acknowledgment").

---

[10] The defendants concede that State inadvertently made inconsistent redactions in its disclosures to the plaintiffs. (*See* Doc. No. 222 at 36). Specifically, State erroneously released certain information in a duplicate copy of the State Cable and neglected to withhold certain section headings in the Operational Q&A table of contents. (*Id.*). Additionally, the defendants agree to disclose the term "Donkey SAO" to the extent that it is contained within other non-exempt and reasonably segregable text. (*Id.*). The defendants agree to re-release the State Cable and the Operational Q&A with these amended redactions. (*Id.*).

As a final matter, the Court does not share the plaintiffs' concern that State failed to consider whether any withheld information was non-exempt and reasonably segregable. (*See* Doc. No. 217-1 at 42-43). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). The State declaration adequately explains that the agency "ensured that any reasonably, non-segregable information within [the State Cable and the Operational Q&A] was disclosed and determined that no further information from withheld or partially withheld responsive documents could be released without revealing information warranting protection under the law." (Doc. No. 222-1 at 5). That the defendants are willing to re-review their previous disclosures to the plaintiffs and to release additional material "bolsters the Government's declarations with respect to segregability." *Gonzalez v. USCIS*, 475 F. Supp. 3d 334, 354 (S.D.N.Y. 2020).

For these reasons, information regarding State's vetting processes was properly withheld from the State Cable and the Operational Q&A under Exemption 7(E). *See Bishop v. DHS*, 45 F. Supp. 3d 380, 391 (S.D.N.Y. 2014) (permitting the government to withhold information concerning "which databases CBP considers in its targeting process and how such information can lead to the triggering of additional security screening" pursuant to Exemption 7(E)).

In the absence of a genuine issue of material fact regarding State's withholding of portions of the State Cable and the Operational Q&A pursuant to Exemption 7(E), the Court grants summary judgment in favor of the defendants as to those withholdings.

## B.    FOIA Exemption 5: Attorney-Client and Deliberative Process Privileges

State withheld the PRA Supporting Statement in full pursuant to the attorney-client privilege under FOIA Exemption 5. The PRA Supporting Statement, a draft version of State's

submission to the Office of Management and Budget ("OMB"), was authored by employees of the Bureau of Consular Affairs in consultation with attorneys at State regarding supplemental questions for visa applicants, an emergency request for additional visa screening, and an application for immigrant visa and alien registration. (*See* Doc. No. 216-4 at 14).

The defendants assert that the attorney-client privilege, which "protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance," *ACLU v. NSA*, 925 F.3d 576, 589 (2d Cir. 2019), applies to the PRA Supporting Statement. The draft submission contains "comments and questions from attorneys in [State's] Office of the Legal Adviser in the Offices of Consular Affairs, Management, and Human Rights and Refugees," which were circulated amongst themselves and their "policy clients, namely the Bureau of Consular Affairs and other bureaus within [State] with equities in the document." (Doc. No. 216-4 at 15). As Ms. Weetman explains in the State declaration, the PRA Supporting Statement was "intended to be and [was], in fact, kept confidential" by the drafting attorneys and their clients. (*Id.*). The attorneys' questions and comments regarding the PRA Supporting Statement were intended to provide legal advice, such as ensuring that the submission accurately recited the law and was consistent with State's "position on the interpretation of domestic and international law." (*Id.*).

The plaintiffs argue that the attorney-client privilege does not apply to the PRA Supporting Document because the State declaration neither demonstrates that the document pertains to the agency's confidential information nor identifies its authors or whether they are employed at State. (*See id.* at 46). Moreover, the plaintiffs assert that the State declaration fails to establish that the predominant purpose of the PRA Supporting Statement is to provide legal advice or that any

foreseeable harm would result from disclosure of the withheld information. (*See* Doc. No. 217-1 at 46-47).

The Court disagrees with the plaintiffs' view that the attorney-client privilege does not apply to the PRA Supporting Statement. The defendants are not required to identify the document's authors or to provide as much detail as the plaintiffs suggest. *See ACLU v. NSA*, No. 13 CV 9198(KMW)(JCF), 2017 WL 1155910, at *9 (S.D.N.Y. Mar. 27, 2017), *aff'd*, 925 F.3d 576. Rather, "[d]efendants need only indicate that the documents withheld as attorney-client communications are, indeed, confidential communications seeking or providing legal advice from government attorneys to their clients." *Id.* The State declaration explains that the draft of the PRA Supporting Statement "contains comments and questions from attorneys in the [State] Department's Office of the Legal Adviser in the Offices of Consular Affairs, Management, and Human Rights and Refugees" that were specifically intended for their policy clients. (Doc. No. 216-4 at 14-15). The State declaration further states that the draft "was only circulated between the attorneys and their policy clients, namely the Bureau of Consular Affairs and other bureaus within the [State] Department with equities in the document." (*Id.* at 15).

Moreover, although the plaintiffs speculate that the purpose of the communications contained in the PRA Supporting Statement may have been political, strategic, or policy-oriented, the State declaration explicitly explains that the communications were intended to provide confidential legal advice. *See Perez v. ICE*, No. 19 CV 3154(PGG)(JLC), 2020 WL 4557387, at *11 (S.D.N.Y. Aug. 6, 2020) ("Speculation . . . [is] insufficient to discredit an agency's declaration" in the FOIA context). Finally, disclosure of the PRA Supporting Statement would foreseeably harm "the ability of responsible Executive Branch officials to consider the collection of particular information in visa applications, as well as the justification for such collection, and

formulate final opinions by inhibiting candid discussion and the expression of recommendations and judgments regarding draft language and courses of action." (Doc. No. 216-4 at 15-16); *see Machado Amadis v. Dep't of State*, 971 F.3d 364, 370-71 (D.C. Cir. 2020) (holding that foreseeable harm would result from disclosure of privileged information in that it "would discourage line attorneys from candidly discussing their ideas, strategies, and recommendations, thus impairing the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals").

For these reasons, the PRA Supporting Statement is a privileged attorney-client communication and was properly withheld in full pursuant to Exemption 5. *See Austin Sanctuary Network v. ICE*, No. 20 CV 1686(LJL), 2022 WL 4356732, at *25 (S.D.N.Y. Sept. 19, 2022) (holding that a "working draft of a memorandum" written by agency attorneys was properly withheld as a privileged attorney-client communication) (citation omitted).

State also withheld the PRA Supporting Statement in full pursuant to the deliberative process privilege under Exemption 5. The defendants argue that the PRA Supporting Statement is deliberative because it is predecisional (*i.e.*, it is a redline draft that predates the final version of the submission); it "reflects proposed language for the submission, including edits and comments on [its] substance"; and disclosure would "reveal the details of intra-agency discussions regarding the development of the submission to OMB." (Doc. No. 216-4 at 15). Moreover, as explained in the State declaration, disclosure of the PRA Supporting Statement "would foreseeably harm the ability of responsible Executive Branch officials to consider the collection of particular information in visa applications, as well as the justification for such collection, and formulate final opinions by inhibiting candid discussion and the expression of recommendations and judgments regarding draft language and courses of action." (Doc. No. 216-4 at 15-16).

Considering the harm that reasonably could result from the release of draft agency documents, courts have routinely held that such documents are protected by the deliberative process privilege, particularly where, as here, they contain redlines and comments, the hallmarks of a draft in progress. *See, e.g., Nat'l Day Laborer Org. Network v. ICE*, No. 16 CV 387(PAE), 2020 WL 7321396, at *5 (S.D.N.Y. Dec. 11, 2020) (holding that the deliberative process privilege applied to records that "include redline edits in the form of track changes and/or comment bubbles") (citation omitted); *Competitive Enter. Inst. V. Off. Of Sci. & Tech. Pol'y*, 161 F. Supp. 3d 120, 129 (D.D.C. 2016) (collecting cases in which courts have held that "drafts are protected by the deliberative process privilege").

With respect to the predecisional prong of the deliberative process privilege, the plaintiffs argue that the State declaration defines the relevant agency decision too broadly and overemphasizes the significance of the fact that the PRA Supporting Statement it seeks to withhold is a draft. (*See* Doc. No. 217-1 at 43). Moreover, the plaintiffs assert that they are unable to determine whether the withheld PRA Supporting Statement preceded the relevant agency decision. (*See id.* at 44). As to the deliberative prong of the privilege, the plaintiffs maintain that the State declaration is insufficient in that it fails to identify the author of the PRA Supporting Statement and does not indicate whether the document reflects the author's opinion or the agency's policy. (*See id.*). Finally, the plaintiffs argue that, even if the deliberative process privilege applies, they cannot discern from the State declaration whether the draft of the PRA Supporting Statement has been adopted such that it is not privilege-protected or that foreseeable harm would result from disclosure. (*See* Doc. No. 217-1 at 45).

The Court is unpersuaded by the plaintiffs' arguments regarding State's withholding of the PRA Supporting Statement pursuant to the deliberative process privilege since the State

declaration clearly states that the draft "predates the final version." (Doc. No. 216-4 at 15). That the draft of the PRA Supporting Statement is predecisional is apparent from the "highlighted, in-line proposed changes to the text as well as attorney comments, questions, and advice," as well as the "Draft/Deliberative/Attorney Work Product" header. (*Id.* at 14); *see James Madison Project v. DOJ*, 208 F. Supp. 3d 265, 290-91 (D.D.C. 2016) ("[D]raft records have routinely been protected from FOIA using the deliberative process privilege."). The PRA Supporting Statement is also deliberative in that it contains edits and comments from agency attorneys. The document clearly "reflects the give-and-take of the consultative process," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980), and contains "opinions, recommendations and deliberations comprising part of a process by which the governmental decisions and policies are formulated." *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (quotation omitted). Draft documents such as the PRA Supporting Statement are appropriately protected from disclosure where, as here, such disclosure "would divulge information regarding 'decisions to insert or delete material or to change [the] draft's focus or emphasis' and thus 'would stifle the creative thinking and candid exchange of ideas necessary to produce good . . . work." *Hardy v. ATF*, 243 F. Supp. 3d 155, 174 (D.D.C. 2017) (quoting *Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987)).

For these reasons, the PRA Supporting Statement is also covered by the deliberative process privilege and was properly withheld in full pursuant to Exemption 5.

Where, as here, there is no genuine issue of material fact as to State's withholding of the PRA Supporting Statement in full pursuant to both the attorney-client and the deliberative process privileges under Exemption 5, the Court grants summary judgment in favor of the defendants as to those withholdings.

**CONCLUSION**

For the reasons stated above, the defendants' motion for summary judgment, (Doc. No. 216), is **GRANTED IN PART** and **DENIED IN PART**, and the plaintiffs' cross-motion for summary judgment, (Doc. No. 217), is **DENIED**.

The Court grants summary judgment in the defendants' favor as to the following withholdings:

1) DHS withholding of portions of the EO Report pursuant to the deliberative process privilege under Exemption 5;

2) DHS and State withholdings of portions of the EO Report under Exemptions 1 and 7(E);

3) ODNI withholding of portions of the EO Report under Exemptions 1 and 3[11];

4) State withholding of portions of the State Cable and the Operational Q&A under Exemption 7(E); and

5) State withholding of the PRA Supporting Statement in full pursuant to the attorney-client and deliberative process privileges under Exemption 5.

Insofar as there exists a genuine issue of material fact as to whether DHS properly withheld the EO Report in full pursuant to the presidential communications privilege under Exemption 5, the case shall proceed to a factual hearing only on this discrete issue.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge in August 2019, (Doc. Nos. 61-63), with any appeal to be made directly to the Court of Appeals. *See* Fed. R. Civ. P. 73(b)-(c).

---

[11] The Court finds as moot the parties' motions for summary judgment as to the portions of the EO Report withheld by the CIA and NSA since they are identical to those that were properly withheld by the ODNI under Exemptions 1 and 3.

**IT IS SO ORDERED.**

Dated at New Haven, Connecticut, this 17th day of April 2023.

_____/s/_____

Robert M. Spector
United States Magistrate Judge
